No. 24-7700

# United States Court of Appeals
## for the
## Ninth Circuit

---

J. DOE 1, et al.,

*Plaintiffs-Appellants,*

*v.*

GITHUB, INC., et al.,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Northern District of California
No. 4:22-cv-06823, Hon. Jon S. Tigar

---

## APPELLANTS' OPENING BRIEF

---

JOSEPH SAVERI
LAW FIRM, LLP
Joseph R. Saveri
Christopher K.L. Young
601 California St., 1505
San Francisco, CA 94108
(415) 500-6800
jsaveri@saverilawfirm.com
cyoung@saverilawfirm.com

Matthew Butterick
1920 Hillhurst Ave.
Ste. 406
Los Angeles, CA 90027
(323) 968-2632
mb@butericklaw.com

BOIES SCHILLER FLEXNER LLP
Jesse Panuccio
Evan Ezray
401 East Las Olas Blvd.
Fort Lauderdale, FL 33301
(954) 356-0011
jpanuccio@bsfllp.com
eezray@bsfllp.com

Maxwell V. Pritt
44 Montgomery St., 41st Fl.
San Francisco, CA 94104
(415) 293-6800
mpritt@bsfllp.com

*Counsel for Plaintiff-Appellants and Proposed Class*

TABLE OF CONTENTS

Page(s)

INTRODUCTION......................................................................1

JURISDICTIONAL STATEMENT ........................................2

STATEMENT OF THE ISSUE ...............................................3

STATUTORY PROVISIONS....................................................3

STATEMENT OF THE CASE .................................................3

    I.     Factual Background .....................................................3

              A.    GitHub, Microsoft, and OpenAI Partner Together
                            ......................................................................3

              B.    Defendants Jointly Develop Two Generative AI
                          Models: Copilot and Codex....................................7

              C.    Defendants Intentionally Remove Plaintiffs' CMI
                          from Their Licensed Code .....................................9

              D.    Defendants Knowingly Distribute Copies of
                          Plaintiffs' Code with CMI Removed. ..................11

    II.    Procedural Background .................................................14

SUMMARY OF THE ARGUMENT .......................................16

STANDARD OF REVIEW......................................................19

    I.     Subsection 1202(b) Does Not Require an Identical Copy......21

              A.    Statutory Text....................................................22

              B.    Statutory Context ...............................................29

              C.    Statutory Purpose ..............................................35

i

D.     Precedent................................................................39

II.   Defendants' Concession that the District Court's
Interpretation Is Erroneous Should Result in Reversal........46

III.  The District Court Was Wrong to Dismiss Even Under Its
Identicality Standard...................................................50

CONCLUSION ..................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ADR Int'l Ltd. v. Inst. for Supply Mgmt. Inc.*,
    667 F. Supp. 3d 411 (S.D. Tex. 2023) ......................................................*passim*

*Advanta-STAR Automotive Research Corp. of America v. Search Optics, LLC*,
    672 F. Supp. 3d 1035 (S.D. Cal. 2023) ............................................................44

*APL Microscopic, LLC v. Steenblock*,
    2022 WL 4830687 (9th Cir. Oct. 3, 2022) .......................................................37

*Arellano v. Clark Cnty. Collection Serv., LLC*,
    875 F.3d 1213 (9th Cir. 2017) ........................................................................34

*Bain v. Film Indep., Inc.*,
    2018 WL 6930766 (C.D. Cal. Aug. 9, 2018) ...................................................41

*Baker v. Master Printers Union*,
    34 F. Supp. 808 (D. N.J. 1940) .......................................................................34

*Beijing Meishe Network Tech. Co., v. TikTok Inc.*,
    2024 WL 3522196 (N.D. Cal. July 23, 2024) .................................................41

*Bounce Exch., Inc. v. Zeus Enter. Ltd.*,
    2015 WL 8579023 (S.D.N.Y. Dec. 9, 2015) ....................................................37

*Brown Bag Software v. Symantec Corp.*,
    960 F.2d 1465 (9th Cir. 1992) ........................................................................26

*Charboneau v. Davis*,
    87 F.4th 443 (9th Cir. 2023) ...........................................................................27

*Cnty. of Maui v. Haw. Wildlife Fund*,
    590 U.S. 165 (2020) ........................................................................................34

*Comptone Co. v. Rayex Corp.*,
    251 F.2d 487 (2d Cir. 1958) ...........................................................................26

*Craft v. Nat'l Park Serv.*,
34 F.3d 918 (9th Cir. 1994) .................................................................23

*Davidson v. Blankenship Dry Goods LLC*,
2025 WL 486623 (S.D.N.Y. Feb. 12, 2025) .......................................37

*DeFries v. Union Pac. R.R. Co.*,
104 F.4th 1091 (9th Cir. 2024) ..........................................................48

*Design Basics, LLC v. WK Olson Architects, Inc.*,
2019 WL 527535 (N.D. Ill. Feb. 11, 2019) .........................................45

*Dolls Kill, Inc. v. Zoetop Business Co.*,
2022 WL 16961477 (C.D. Cal. Aug. 25, 2022) ...................................45

*The Emily*, 22 U.S. 381 (1824) .................................................................34

*Enter. Tech. Holdings, Inc. v. Noveon Sys., Inc.*,
2008 WL 11338356 (S.D. Cal. July 29, 2008) ..............................36, 42

*Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*,
893 F.3d 1176 (9th Cir. 2018) ............................................................26

*Falkner v. Gen. Motors LLC*,
393 F. Supp. 3d 927 (C.D. Cal. 2018) ................................................45

*Faulkner Press, LLC v. Class Notes, LLC*,
756 F. Supp. 2d 1352 (N.D. Fla. 2010) ..............................................45

*Fischer v. Forrest*,
286 F. Supp. 3d 590 (S.D.N.Y. 2018) .................................................44

*Fischer v. Forrest*,
968 F.3d 216 (2d Cir. 2020) ...............................................................35

*Friedman v. Live Nation Merch., Inc.*,
833 F.3d 1180 (9th Cir. 2016) ......................................................26, 41

*Frost-Tsuji Architects v. Highway Inn, Inc.*,
2015 WL 263556 (D. Haw. Jan. 21, 2015)..........................................43

*GC2 Inc. v. Int'l Game Tech.*,
391 F. Supp. 3d 828 (N.D. Ill. 2019)..............................................39, 40

iv

*Google LLC v. Oracle America, Inc.*,
  593 U.S. 1 (2021) ........................................................................ 27, 38

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985) ............................................................................ 27

*ICONICS, Inc. v. Massaro*,
  192 F. Supp. 3d 254 (D. Mass. 2016) ................................................ 40

*Jones v. Google LLC*,
  73 F.4th 636 (9th Cir. 2023) ............................................................. 25

*Kadrey v. Meta Platforms, Inc.*,
  2025 WL 744032 (N.D. Cal. Mar. 7, 2025) ........................................ 51

*Kelly v. Arriba Soft Corp.*,
  77 F. Supp. 2d 1116 (C.D. Cal. 1999) ............................................ 44, 45

*Kepner-Tregoe, Inc. v. Leadership Software, Inc.*,
  12 F.3d 527 (5th Cir. 1994) ............................................................... 26

*Kirk Kara Corp. v. Western Stone & Metal Corp.*,
  2020 WL 5991503 (C.D. Cal. Aug. 14, 2020) .................................. 43, 44

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) ........................................................... 19

*Kodadek v. MTV Networks, Inc.*,
  152 F.3d 1209 (9th Cir. 1998) ........................................................... 30

*MAI Sys. Corp. v. Peak Comput., Inc.*,
  991 F.2d 511 (9th Cir. 1993) .......................................................... 31, 32

*Mango v. BuzzFeed, Inc.*,
  970 F.3d 167 (2d Cir. 2020) ........................................................... 33, 36

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
  629 F.3d 928 (9th Cir. 2010) ............................................................. 35

*Mendez-Garcia v. Lynch*,
  840 F.3d 655 (9th Cir. 2016) ............................................................. 24

*Monotype Imaging, Inc. v. Bitstream, Inc.*,
   2005 WL 936882 (N.D. Ill. Apr. 21, 2005) ........................................................49

*Murphy v. Millennium Radio Grp. LLC*,
   650 F.3d 295 (3d Cir. 2011) .................................................................29, 36, 42

*Nat'l Lab. Rels. Bd. v. Aakash, Inc.*,
   58 F.4th 1099 (9th Cir. 2023) ...........................................................................27

*New Parent World, LLC v. True To Life Prods., Inc.*,
   2024 WL 4277865 (D. Ariz. Sept. 24, 2024) ..........................................*passim*

*Nichols v. Universal Pictures Corp.*,
   45 F.2d 119 (2d Cir. 1930) ........................................................................17, 27

*Oracle Int'l Corp. v. Rimini St., Inc.*,
   2023 WL 4706127 (D. Nev. July 24, 2023) .....................................................39

*In re Pangang Grp. Co., LTD.*,
   901 F.3d 1046 (9th Cir. 2018) ...........................................................................25

*Real World Media LLC v. Daily Caller, Inc.*,
   744 F. Supp. 3d 24 (D.D.C. 2024) ...........................................................*passim*

*REC Software USA, Inc. v. Bamboo Sols. Corp.*,
   2012 WL 3780352 (W.D. Wash. Aug. 31, 2012) ..............................................32

*Ringgold v. Black Entm't Television, Inc.*,
   126 F.3d 70 (2d Cir. 1997) ................................................................................25

*Rodriguez v. United States*,
   480 U.S. 522 (1987) ..........................................................................................30

*Ross v. Blake*,
   578 U.S. 632 (2016) ..........................................................................................42

*Roth v. Foris Ventures, LLC*,
   86 F.4th 832 (9th Cir. 2023) .............................................................................47

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
   81 F.2d 49 (2d Cir. 1936) .................................................................................29

*Shihab v. Complex Media, Inc.*,
    2022 WL 3544149 (S.D.N.Y. Aug. 17, 2022)....................................52

*Splunk Inc. v. Cribl, Inc.*,
    662 F. Supp. 3d 1029 (N.D. Cal. 2023)............................................41

*Stevens v. Corelogic, Inc.*,
    899 F.3d 666 (9th Cir. 2018) ..............................................33

*Sw. Airlines Co. v. Saxon*,
    596 U.S. 450 (2022)...................................................30

*Taggart v. Lorenzen*,
    587 U.S. 554 (2019)...................................................26

*Tellez v. Lynch*,
    839 F.3d 1175 (9th Cir. 2016) ............................................23

*The Intercept Media, Inc. v. OpenAI, Inc.*,
    2025 WL 556019 (S.D.N.Y. Feb. 20, 2025) .............................40, 51

*Tremblay v. OpenAI, Inc.*,
    716 F. Supp. 3d 772 (N.D. Cal. 2024)..........................................44

*United States v. Cabaccang*,
    332 F.3d 622 (9th Cir. 2003) ..............................................34

*United States v. Harrell*,
    530 F.3d 1051 (9th Cir. 2008) ............................................23

*United States v. Prasad*,
    18 F.4th 313 (9th Cir. 2021) ..............................................35

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ..............................................35

*Varjabedian v. Emulex Corp.*,
    888 F.3d 399 (9th Cir. 2018) ............................................19

*Vernor v. Autodesk, Inc.*,
    621 F.3d 1102 (9th Cir. 2010) ............................................31

**Federal Statutes**

16 U.S.C. § 460n-1 ...................................................................31

16 U.S.C. § 460s-1 ....................................................................31

17 U.S.C. § 101 ........................................................................25

17 U.S.C. § 117 ..............................................................31, 32, 33

17 U.S.C. § 407(a)(1) ...............................................................30

17 U.S.C. § 408(b) ....................................................................30

17 U.S.C. § 1201 ......................................................................30

17 U.S.C. § 1202 ...............................................................*passim*

28 U.S.C. § 1292 ..................................................................3, 16

28 U.S.C. § 1331 .........................................................................2

**Rules**

9th Cir. R. 28-2.7 ...................................................................3, 9

Fed. R. Civ. Pro. 12(b)(6) ........................................................19

## INTRODUCTION

This is a heartland DMCA case. Defendants copied Plaintiffs' and other GitHub users' computer code in their entirety and stripped those digital files of their copyright management information ("CMI"). Defendants did so to train Copilot, their commercial, generative AI software, which Defendants know distributes computer code to its paying users and regularly regurgitates verbatim portions of Plaintiffs' code stripped of its CMI. And they knew, or should have known, that this practice would conceal their own infringement and facilitate Copilot users' infringement. That conduct is exactly what the Digital Millenium Copyright Act ("DMCA") forbids: Defendants "intentionally remove[d] or alter[ed]" Plaintiffs' CMI, 17 U.S.C. § 1202(b)(1), and "distribut[ed]" "copies of" those works "knowing that copyright management information" had been removed, *id.* § 1202(b)(3).

Yet the district court dismissed Plaintiffs' DMCA claims with prejudice because the Complaint alleges that Defendants generated "near-identical cop[ies]" with "only semantically insignificant variations" from the "original" works, not "identical" copies, which the district court deemed required by subsection 1202(b). 3-ER-259; *see* 1-ER-6-8. As

several other district courts have recognized, however, the plain "language of the DMCA does not require identical copies." *New Parent World, LLC v. True To Life Prods., Inc.*, No. 23-cv-08089, 2024 WL 4277865, at *2 (D. Ariz. Sept. 24, 2024); *see also Real World Media LLC v. Daily Caller, Inc.*, 744 F. Supp. 3d 24, 40 (D.D.C. 2024) ("[N]othing in § 1202(b) requires precise equivalence between the work from which CMI is removed and the allegedly infringing work."); *ADR Int'l Ltd. v. Inst. for Supply Mgmt. Inc.*, 667 F. Supp. 3d 411, 427 (S.D. Tex. 2023) (same). Moreover, adopting a judicially created "identicality requirement" would eviscerate the statute's protections and undermine Congress's stated objectives in enacting it. If the district court's interpretation becomes governing law, wrongdoers will be permitted to remove CMI with impunity so long as they make just one cosmetic change to the original work. The Court should reverse and reject the district court's "identicality" gloss on statutory text that does not contain it.

## JURISDICTIONAL STATEMENT

This is an appeal from the district court's order, issued June 24, 2024, dismissing Plaintiffs' DMCA claims. 1-ER-3-17. The district court had jurisdiction over Plaintiffs' DMCA claims under 28 U.S.C. § 1331.

2

On September 27, 2024, the district court certified its order for interlocutory appeal under 28 U.S.C. § 1292(b). 2-ER-46-50.

On October 7, 2024, Plaintiffs timely petitioned this Court for permission to appeal the district court's order under 28 U.S.C. § 1292(b), 2-ER-20-45, and the Court granted permission on December 19, 2024, Doc. 29, No. 24-6136. This Court has jurisdiction under 28 U.S.C. § 1292(b).

## STATEMENT OF THE ISSUE

Whether §§ 1202(b)(1) and (b)(3) of the DMCA impose an "identicality" requirement.

## STATUTORY PROVISIONS

The pertinent statutory provisions appear in the Addendum to this brief. *See* Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### I. FACTUAL BACKGROUND

#### A. GitHub, Microsoft, and OpenAI Partner Together

In 2008, a team of open-source programmers founded GitHub to provide source-code hosting services, with the goal of fostering

3

transparency and collaboration in the programming community.[1]  3-ER-185-86 ¶ 3.  Drawn by this core mission, programmers flocked to GitHub, which quickly became the largest and most successful open-source hosting service in the world.  3-ER-185-86, 230 ¶¶ 3, 186.  On GitHub, programmers can store their open-source code in publicly accessible "repositories," where it can be viewed and accessed by others anywhere in the world.  3-ER-185-87, 229-30 ¶¶ 1, 3, 10, 181.[2]  GitHub users typically make their source-code freely available to anyone, subject to defined licensing terms conditioning its use.  3-ER-185-86, 226-27 ¶¶ 1, 3, 160-62.[3]  These open-source licenses generally require that any copy, derivative, or redistribution of the code retain the original code's CMI, including the open-source license text, attribution (such as the author's

---

[1] Open-source software "refers to software whose source code is freely available to anyone" and "can be modified, used, and distributed by anyone under defined licensing terms."  *What Is Open Source Software?*, PennState Open Source Program Office, https://opensource.psu.edu/project/what-is-open-source-software/.

[2] GitHub users may also create "private" repositories that are not available to the public.  3-ER-229-30 ¶ 181.

[3] While most of its repositories are subject to licenses, GitHub has never required licenses, and those repositories without licenses are subject to the ordinary U.S. copyright rules.  3-ER-230 ¶ 185.

name), and copyright notices.[4]  3-ER-230, 234-35 ¶¶ 182-83, 211; *e.g.*, 3-ER-226-27 ¶ 162.  To ensure that users can find it easily, this information is typically stored at the top of every source file in the codebase.  3-ER-221-22, 230 ¶¶ 142, 182.

In 2018, Microsoft acquired GitHub for $7.5 billion.  3-ER-186 ¶ 5.  The purchase alarmed many GitHub users and the broader open-source community, who distrusted Microsoft due to its well-known hostility to open-source software.  3-ER-227-29 ¶¶ 166-75.  For decades, Microsoft treated open-source competitors as an existential threat to its business model, which relied on the substantial revenue generated from sales of its licensed products, such as its Windows operating system.  3-ER-227 ¶¶ 166-68.  Microsoft's then-CEO Steve Ballmer described one open-source competitor as a "cancer" to intellectual property, and corporate documents revealed Microsoft executives plotting to destroy open-source by "target[ing] a process rather than a company."  3-ER-228 ¶¶ 171-72.  To placate these concerns, Microsoft pledged to maintain GitHub's open-source mission.  3-ER-186 ¶ 5.

---

[4] Copyright management information includes the open-source licenses and attributions at issue in this matter.  *See* 17 U.S.C. §1202(c).

That promise would prove short-lived. Within a year of acquiring GitHub, Microsoft partnered with OpenAI. OpenAI was founded in December 2015 as a "non-profit artificial intelligence research company" that sought to shape AI "in the way that is most likely to benefit humanity as a whole."[5] 3-ER-231 ¶¶ 188, 190. Despite that rhetoric, OpenAI created a for-profit subsidiary, OpenAI, LP, in February 2019 to attract outside investment. 3-ER-231 ¶ 193. Several months later, Microsoft invested $1 billion in OpenAI, LP, at a $20 billion valuation. 3-ER-186, 231-32 ¶¶ 6, 194. Microsoft and OpenAI's strategic partnership continued to grow over the next three years. In addition to its ownership stake, Microsoft became the exclusive licensor of certain OpenAI, LP products. 3-ER-186, 231-32 ¶¶ 6, 194, 197. Microsoft remains OpenAI's largest investor and main service provider. 3-ER-186 ¶ 7. Observers describe Microsoft as "the unofficial owner of OpenAI." 3-ER-232 ¶ 196.

---

[5] Artificial intelligence, or AI, uses computer programming to algorithmically simulate human reasoning using statistical methods. 3-ER-185 ¶ 2. AI relies, in part, on Machine Learning, which derives a program's behavior by analyzing a corpus of material called training data. 3-ER-184 ¶ 2.

**B.** **Defendants Jointly Develop Two Generative AI Models: Copilot and Codex.**

In June 2021, Defendants launched Copilot, a generative AI software product that offers to make coding easier by providing users instant, ready-to-use code for their programming needs. 3-ER-197 ¶¶ 58-59.[6] Since shortly after launch, Copilot has been powered by Codex, an AI model developed by OpenAI. 3-ER-187, 197 ¶¶ 9, 59.

Copilot users can submit questions, or "prompts," and Copilot will respond in real time by emitting lines (or entire blocks) of code, sometimes described as "outputs." 3-ER-197 ¶¶ 58-59. This can enable users to outsource the nitty-gritty details of writing code to the AI models. For example, if a user prompts Copilot with the beginning of a "function"—a unit of code designed to perform a specific task—Copilot will interpret the prompt and output code meant to complete the rest of that function. 3-ER-197-99, 201-02 ¶¶ 59-66, 78-85. Copilot held itself out as reducing the time and effort needed to write code from scratch. 3-ER-197 ¶ 59.

---

[6] Copilot is jointly owned and developed by GitHub and OpenAI and is sold to consumers by Microsoft and GitHub. 3-ER-186, 197 ¶¶ 8, 59. It runs exclusively on Microsoft's Azure platform. 3-ER-187 ¶ 12.

Like other AI models, Copilot and Codex are "trained" by copying and ingesting massive amounts of source code. 3-ER-187, 204¶¶ 10 & n.2, 91. After doing so, these models can propose completions of code in response to user prompts. 3-ER-197, 204-05, 207 ¶¶ 58, 91, 93, 104. Every time a user enters a prompt into Copilot, the model responds with a sequence of code based on the training data stored within the model. 3-ER-197 ¶ 58.

To train Copilot and Codex, Defendants thus needed an abundant repository of source code to "feed" their models. At the time it was acquired by Microsoft, GitHub hosted the most open-source code in the world. 3-ER-186-87 ¶¶ 7, 10. One obstacle, however, was the open-source licenses attached to this code. 3-ER-186-87 ¶¶ 8, 11, 13. Much of the code on GitHub is subject to an open-source license, 3-ER-230 ¶ 182, which generally requires that "a copy of the license be included with any copy, derivative, or redistribution of the software," 3-ER-230 ¶ 184. Defendants trained Codex and Copilot by "feeding" them billions of lines of code taken directly from GitHub's public open-source repositories. 3-ER-205-06 ¶¶ 94-97.

### C. Defendants Intentionally Remove Plaintiffs' CMI from Their Licensed Code

As AI models, Codex and Copilot do not understand the meaning of software code the way humans do. Rather, they operate by ingesting and analyzing training data and then following statistical associations found in that data. 3-ER-198-99 ¶ 64. Because of this, Codex and Copilot cannot "write" code as a human would. 3-ER-199 ¶¶ 65-66. Instead, they merely derive their outputs from the training data they have absorbed. *Id.* For example, outputs from Codex and Copilot sometimes include extra lines of code that even an amateur programmer would know are irrelevant to the user prompt, simply because the model often encountered the relevant code and the extra lines together in its training sets. 3-ER-199 ¶¶ 66-67; *e.g.*, 3-ER-197-99 ¶¶ 60-65. Similarly, in many instances, Codex and Copilot's output is a nearly-identical reproduction of code from the training data—a common shortcoming of AI models known as "memorization." 3-ER-197, 207 ¶¶ 58, 104.

According to researchers, AI models frequently "memorize parts of their training data, and when prompted appropriately, they will emit the memorized training data verbatim." 3-ER-207 ¶ 104. Studies have shown that memorization becomes more prevalent as an AI model's

capacity grows.  3-ER-207-08 ¶ 104-105.  It also becomes more prevalent as training data is duplicated and the overall volume of user prompts increases.  3-ER-207 ¶ 104 (predicting this problem "will likely get worse as models continue[] to scale").  Because Codex and Copilot's training data originally included CMI, early iterations of Copilot would often regurgitate memorized software code along with the license text and CMI.  3-ER-222 ¶¶ 143-44.

In response, Defendants programmed their AI models to strip Plaintiffs' CMI from their code, in violation of their licenses and the DMCA.  3-ER-187, 222 ¶¶ 11, 143-44.  Exactly how Defendants did that is not yet fully clear.  One plausible inference is that Defendants made complete, identical copies of Plaintiffs' works and removed the CMI before feeding the data into Codex and Copilot.  3-ER-187, 195-96, 233 ¶¶ 11, 49, 205.  This ensures Codex and Copilot "ingest and distribute" Plaintiffs' licensed materials to Copilot users without including the CMI, creating the false impression that the code had been created by Copilot itself.  3-ER-187, 195-96 ¶¶ 11, 49.  It is also plausible that the AI models themselves are designed to remove the CMI as they output responses to users.  3-ER-222 ¶¶ 143-44.  But regardless of whether the CMI is

stripped before or after the code is fed to Codex and Copilot, the effect is the same. Codex and Copilot routinely and deliberately remove CMI from the code they have copied and ingested during training. 3-ER-222 ¶¶ 143-44.

### D. Defendants Knowingly Distribute Copies of Plaintiffs' Code with CMI Removed.

Defendants know Copilot regularly emits verbatim copies of Plaintiffs' code without the CMI. 3-ER-199, 206-07, 222-25 ¶¶ 68, 99-102, 145-154. The Complaint includes several examples of Codex and Copilot producing essentially identical copies of Plaintiffs' code but with the CMI omitted. 3-ER-208-10, 217-21 ¶¶ 112-16, 133-40. Copilot has also reproduced the exact code used from the video game Quake III, which is subject to an open-source license. 3-ER-206 ¶ 99. And Texas A&M computer-science professor Tim Davis has flagged multiple instances where Copilot has emitted "large chunks" of his copyrighted code verbatim, without any attribution. 3-ER-206 ¶ 101.

Indeed, Defendants concede that Copilot regularly emits identical passages of code. 3-ER-206-07 ¶ 102 (admitting GitHub's "internal research shows that about 1 percent of the time, a suggestion may contain some code snippets longer than ~150 characters that matches"

code from its training data). Even at that one-percent level, such regurgitation would represent at least tens of thousands of DMCA violations when those regurgitations omit CMI, 3-ER-207 ¶ 103, and the latest research shows that the rate at which these AI models reproduce exact replicas is increasing as their corpus of training data grows, 3-ER-207 ¶ 104.

Worse, Defendants intentionally allow Copilot to distribute identical copies of Plaintiffs' code without CMI. In response to public criticism, Copilot introduced a user-settable filter in 2022 called "Suggestions matching public code" that detects when Copilot's code suggestions are exact matches to GitHub training data of "about 150 characters" or more. 3-ER-222-23 ¶ 145-46. This duplicate detection feature allows users to prevent Copilot from suggesting "verbatim excerpts" of code from GitHub's public repositories, though it does not block modifications of licensed work. *Id.* Instead of automatically blocking Copilot from distributing identical copies, however, Defendants give Copilot users the choice to receive code that is identical to the code on GitHub's public repositories. 3-ER-223 ¶ 147. GitHub informs users, "[y]ou can opt to allow GitHub Copilot to suggest code completions that

match publicly available code on GitHub.com." *Id.* GitHub even tells users that "[i]f you have allowed suggestions that match public code, GitHub Copilot can provide you with details about the matching code when you accept such suggestions"—a "feature" it calls "code referencing." *Id.*

The addition of this feature shows that Defendants know Copilot sometimes produces identical, or nearly identical, copies of code without CMI. *Id.* This feature is also strong evidence that Codex and Copilot use identical copies of the original code in their systems and are programmed to either (i) make small changes just before sending code to users to ensure they are not identical, or (ii) flag identical code for some percentage of users (those who opt in), but not others. 3-ER-222-23 ¶¶ 145-47.

Thus, Defendants knowingly and intentionally facilitate and encourage the distribution of these exact copies of licensed code knowing that CMI has been removed. If users choose to receive "matching" code, Copilot gives them the option to receive a link to the open-source license for the original code published on GitHub; but, users are not required to receive the link. 3-ER-223 ¶ 148. Defendants thus facilitate, or at least

13

enable, infringement by telling Copilot users they may choose to use identical code from GitHub, without its original CMI attached. 3-ER-223-24 ¶ 150 ("The linked web page includes details of any license identified for the repository where the matching code was found. Having reviewed the references, you can decide how to proceed."). And if users opt not to receive this link, Copilot will still produce exact copies of licensed code without the CMI. *Id.*

## II. PROCEDURAL BACKGROUND

On November 21, 2022, Plaintiffs filed their initial complaint, bringing class claims against Defendants based on breach of their open-source licenses, breach of GitHub's terms and conditions of service in which GitHub promised not to sell its users' code, and violations of subsections 1202(b)(1) and (b)(3) of the DMCA.[7] Doc. 1, No. 4:22-cv-6823. Plaintiffs alleged Defendants violated subsections 1202(b)(1) and (b)(3) by removing or altering CMI from Plaintiffs' licensed software code and distributing copies of their code without that CMI. *Id.* ¶¶ 46-47, 138-64.

---

[7] Plaintiffs' breach of contract claims have not been dismissed, are not at issue here, and are stayed pending this appeal. *See* 1-ER-17; 2-ER-46-50.

Defendants moved to dismiss the DMCA claims. Docs. 50, 53. At first, the district court permitted Plaintiffs' DMCA claims to proceed. Doc. 95, at 18-21. Plaintiffs then filed an amended complaint, which maintained the DMCA claims with additional supporting allegations, including examples of Copilot emitting nearly-identical copies of Plaintiffs' licensed codes. Doc. 98 ¶¶ 100-28. Defendants again moved to dismiss, 3-ER-262-98, 299-327, and asked the district court to reconsider its prior ruling on the DMCA claims, arguing for the first time that the DMCA requires the stripped works to be "identical" to the original works. 3-ER-317. This time, the district court dismissed Plaintiffs' DMCA claims, holding Plaintiffs' allegations of "nearly verbatim copying" did not satisfy § 1202(b)'s "identicality" requirement. 3-ER-259. The district court granted Plaintiffs leave to amend, 3-ER-260-61, and denied Plaintiffs' motion for reconsideration, Doc. 218, 246.

Plaintiffs filed a Second Amended Complaint with additional allegations demonstrating the overwhelming likelihood that Copilot and Codex will continue to produce exact copies of Plaintiffs' licensed code. 3-ER-207-08 ¶¶ 104-07. But the district court again dismissed Plaintiffs' DMCA claims, holding these additional allegations still "failed to meet

the DMCA's identicality requirement," 1-ER-7.  In response, Plaintiffs moved to certify the dismissal order for interlocutory appeal under 28 U.S.C. § 1292(b).  Doc. 268.  Citing the conflicting rulings across district courts on this issue and the lack of controlling precedent from this Court, the district court granted certification on September 27, 2024, and stayed trial proceedings pending this Court's ruling.  2-ER-47-48.

Plaintiffs timely petitioned this Court for permission to appeal.  2-ER-20-45.  The Court granted Plaintiffs' petition.  Doc. 29, No. 24-6136.  This appeal followed.

## SUMMARY OF THE ARGUMENT

**I.**  The district court held that the DMCA requires a plaintiff's original work to be identical (save for the removal of CMI) to the defendant's altered version.  Every traditional indicator of statutory interpretation cuts the other way.  To start, the text says nothing about an identical copy.  Rather, it proscribes the intentional removal or alteration of CMI and the knowing distribution of works that have had such information removed.  Nothing in those prohibitions demands identicality.  Nor can identicality be smuggled into the statutory regime through the word "copy."  Copyright law, of course, speaks of copies.  But

the term has never been thought to entail identicality. As Judge Learned Hand explained almost a century ago, copyright law is not "limited literally to the text, else a plagiarist would escape by immaterial variations." *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930).

Three contextual features reinforce the plain text. *First*, other provisions of the DMCA use the term "identical copy," but section 1202 does not. Congress thus knew how to demand an identical copy yet declined to do so here. *Second*, the DMCA's software provisions embrace the concept of non-identical copies, which demonstrates that Congress understood that copies do not require identicality. In the DMCA, Congress took care to shield computer maintenance organizations from liability for incidentally copying software to a local device's RAM. That only makes sense, however, if a copy can be nonidentical because computers often store only pieces of software code in RAM. *Third*, the DMCA's scienter requirement is difficult to square with an identicality rule. The scienter requirement limits the DMCA to truly bad actors: those who knowingly remove CMI and do so to induce, enable, conceal, or facilitate down-the-line copyright violations. It would be passing strange

17

to give those same bad actors a liability-defeating loophole if they only marginally tweaked the works they were pirating.

Purpose too cuts against an identicality requirement. Congress, after all, sought to expand copyright protection by proscribing the removal of CMI. Once again, it would be odd, given that purpose, if Congress also exempted from liability any defendant who made a superficial change when copying a protected work.

Precedent reinforces that conclusion. The better-reasoned district court cases all find that identicality is not required. *E.g.*, *New Parent World*, 2024 WL 4277865, at *2; *Real World Media*, 744 F. Supp. 3d at 40; *ADR*, 667 F. Supp. 3d at 427. By contrast, the district courts on which the court below relied fail to meaningfully engage with the statutory text.

**II.** Perhaps recognizing that text, context, purpose, and precedent all disfavor identicality, Defendants refused to defend an identicality rule in this Court. Instead, they raised a new argument that the district court did not consider or adopt. As Defendants tell it, they never removed CMI from Plaintiffs' works. Instead, they created new works, which merely resembled Plaintiffs' works. The Court should not consider Defendants' new-found position; it is a Court of review, not first-view. Anyway,

18

Defendants raise only a fact-bound pleading fight, which ignores the key allegations showing that Defendants deleted CMI. The time to adjudicate fact disputes is not on an interlocutory appeal of a motion to dismiss order.

**III.** In all events, this Court should reverse. Even if the DMCA requires identicality, Plaintiffs pleaded it. The Complaint, fairly construed, alleges Defendants took identical copies of Plaintiffs' works, removed the CMI, and then used those identical works as training data for their AI models. Those allegations satisfy even the district court's test.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's decision to grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Varjabedian v. Emulex Corp.*, 888 F.3d 399, 403 (9th Cir. 2018). The Court "also review[s] *de novo* questions of statutory interpretation." *Id.* When reviewing a district court's grant of a motion to dismiss, the Court "accept[s] all factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

## ARGUMENT

Subsection 1202(b) provides, in relevant part, the following:

> **(b) Removal or alteration of copyright management information.**—No person shall, without the authority of the copyright owner or the law—
>
> > (1) intentionally remove or alter any copyright management information,
> >
> > . . . or
> >
> > (3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,
>
> knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. §§ 1202(b)(1), (b)(3).

Additionally, subsection 1202(c) provides the following definition for CMI:

> **(c) Definition.**—As used in this section, the term 'copyright management information' means any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work:

20

> (1) The title and other information identifying the work, including the information set forth on a notice of copyright.
>
> (2) The name of, and other identifying information about, the author of the work.
>
> (3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.
>
> . . .
>
> (6) Terms and conditions for use of the work.
>
> (7) . . . [L]inks to such information.
>
> (8) Such other information as the Register of Copyrights may prescribe by regulation. . . .

*Id.* §§ 1202(c)(1)-(3), (6)-(8).

## I. SUBSECTION 1202(B) DOES NOT REQUIRE AN IDENTICAL COPY

Subsection 1202(b) creates three substantive prohibitions. *See* 4 Nimmer on Copyright § 12A.10 (2025). Two are relevant here. Subsection (b)(1) prohibits, with the requisite scienter,[8] the intentional removal or alteration of any CMI without permission from the copyright

---

[8] Both violations must be done with the requisite scienter, i.e. "knowing, or . . . having reasonable grounds to know," that doing so "will induce, enable, facilitate, or conceal" copyright infringement. 17 U.S.C. § 1202(b).

owner. 17 U.S.C. § 1202(b)(1). Subsection (b)(3) prohibits, with the requisite scienter, distribution of copies of works knowing the CMI has been removed or altered without permission from the copyright owner. *Id.* § 1202(b)(3). The district court concluded that both subsections require identicality between the original work and the copy of that work. 1-ER-6-7. In other words, unless the copy of the original is completely identical, except for the removal or alteration of CMI, there is no violation of subsection 1202(b). That interpretation cannot be squared with the text, ignores the statutory context, significantly undermines the DMCA's purpose, and is inconsistent with the better-reasoned precedent.

## A.    Statutory Text

Subsection (b)(1) says that "[n]o person shall, without the authority of the copyright owner or the law . . . intentionally remove or alter any copyright management information." 17 U.S.C. § 1202(b)(1). "Copyright management information" means certain "information conveyed in connection with copies . . . of a work," including "[t]he title and other information identifying the work, including the information set forth on a notice of copyright," "[t]he name of, and other identifying information about, the author" or "the copyright owner of the work," and the "[t]erms

22

and conditions for use of the work." *Id.* § 1202(c). The word "remove" is "ordinarily defined as '[t]o move from a position occupied.'" *Tellez v. Lynch*, 839 F.3d 1175, 1178 (9th Cir. 2016) (quoting *The American Heritage Dictionary of the English Language* 1101 (1976)). And the word "'alter' extends broadly to activities that 'modify.'" *Craft v. Nat'l Park Serv.*, 34 F.3d 918, 922 (9th Cir. 1994) (quoting *Webster's II New Riverside University Dictionary*); *see also United States v. Harrell*, 530 F.3d 1051, 1058 (9th Cir. 2008) (defining "'alter' as to 'make or become different; change'" (quoting *Oxford American Dictionary of Current English* (1st ed. 1999)). Putting those definitions together, a defendant violates subsection 1202(b)(1) if he removes or modifies the name of the author or the copyright owner, the title, or the licensing terms of a work. *See* 17 U.S.C. §§ 1202(b)(1), (c). Subsection 1202(b)(1) does not include the word "identical." And none of the statutory terms require an identical copy. *See* 4 Nimmer on Copyright § 12A.10 ("But there is no warrant to conclude, as did *dictum* in one case, that 'no DMCA violation exists where the works are not identical.'" (citation omitted)). Put differently, a subsection 1202(b)(1) violation is complete the moment a defendant removes or alters CMI with the requisite scienter; it is irrelevant if the

23

defendant also removes or alters other material. "The language of the DMCA," said otherwise, "does not require identical copies." *New Parent World,* 2024 WL 4277865, at *2.

Subsection 1202(b)(3) says "[n]o person shall … distribute, … copies of works, … knowing that copyright management information has been removed or altered without authority of the copyright owner or the law." 17 U.S.C. § 1202(b)(3). Title 17 defines "copies" as "material objects … in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated." *Id.* § 101. And "distribute" means "[t]o deal or divide out in proportion or in shares." *Distribute*, Black's Law Dictionary (6th ed. 1990). Subsection 1202(b)(3) thus requires only the distribution of a copy of a work with knowledge that the CMI has been removed or altered. Nothing in that text requires a complete or exact copy.

Nor does the statute's definition of "copies" require identicality. "When a statute includes an explicit definition," that "statutory definition controls." *Mendez-Garcia v. Lynch*, 840 F.3d 655, 665 (9th Cir. 2016) (quotation marks and alteration omitted). Section 1202 defines "copyright management information" as certain "information conveyed *in*

connection with copies . . . of a work."  17 U.S.C. § 1202(c) (emphasis

added).  And section 101's definition of "copies" does not suggest copies

must be identical.  17 U.S.C. § 101.  Quite the opposite: if identicality

were required, the phrase "from which the work can be perceived," *id.*

would be superfluous because, of course, a work can always be perceived

from an exact copy—perception, after all, only adds something new when

a copy is analogous to, but distinct from, the original.  *See Jones v. Google*

*LLC*, 73 F.4th 636, 642 (9th Cir. 2023) (rejecting "construction [that]

would effectively read [a] word … out of [statutory] provision"); *In re*

*Pangang Grp. Co., LTD.*, 901 F.3d 1046, 1056 (9th Cir. 2018) ("The

superfluity canon guides a court to infer that Congress did not intend to

make any portion of a statute superfluous, and therefore 'we must give

effect to every word of a statute wherever possible.'" (quoting *Leocal v.*

*Ashcroft*, 543 U.S. 1, 12 (2004))).

That interpretation tracks statutory history.  Before the DMCA's

enactment in 1998, courts interpreted the Copyright Act's use of the word

"copies" to include more than just identical copies.  *E.g.*, *Ringgold v. Black*

*Entm't Television, Inc.*, 126 F.3d 70, 74-75 (2d Cir. 1997) ("[S]ubstantial

similarity . . . [has] always [been] a required element of actionable

copying."); *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1468-69, 1472-73 (9th Cir. 1992) (considering whether "source code" in parties' "computer programs" were "substantially similar"); *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 536 (5th Cir. 1994) (noting that "parts of [defendant's] modified [software] program are but a transparent, syntactic rearrangement of portions of [plaintiff's] copyrighted" program, and holding that while "the modified [software] program" is "no longer identical" to the original work, it "is still a copy"); *Comptone Co. v. Rayex Corp.*, 251 F.2d 487, 488 (2d Cir. 1958) ("The copying need not be of every detail so long as the copy is substantially similar to the copyrighted work.");[9] *see also Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016) ("A 'striking similarity' between the works may give rise to a permissible inference of copying." (quoting *Baxter v. MCA, Inc.*, 812 F.32d 421, 423 (9th Cir. 1987))).[10]

---

[9] The capacious definition of "copies" thus predates the Copyright Act of 1976, Pub. L. 94–553, 90 Stat. 2541. *See Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) ("When a statutory term is 'obviously transplanted from another legal source' it 'brings the old soil with it.'" (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947))).

[10] Even infringement claims "dealing with factual compilations" require, at most, that the works be "virtually identical," not completely identical. *Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*, 893

Courts, in other words, had long held, both "at common-law or under . . . statute," that copyright law could not be "limited literally to the text, else a plagiarist would escape by immaterial variations." *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (L. Hand, J.) (observing [t]hat has never been the law"). That is why the "verbatim copying of some 300 words of direct quotation from" a larger "manuscript would constitute an infringement." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 569 (1985). And that is why, when it comes to computer code, "even a small amount of copying may" constitute infringement "where the excerpt copied consists of the heart of the original work's creative expression." *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 33 (2021) (quotation marks omitted).

Nothing in section 1202 purports to change the broad definition of "copies." To the contrary, Congress's "choice" to use the word "copies" (twice) in section 1202 "confirms its intention" to apply the word's broad scope to the removal of, and distribution of copies without, CMI. *Charboneau v. Davis*, 87 F.4th 443, 455 (9th Cir. 2023); *see Nat'l Lab.*

---

F.3d 1176, 1186 (9th Cir. 2018) (quoting *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir. 1994)).

*Rels. Bd. v. Aakash, Inc.*, 58 F.4th 1099, 1105 (9th Cir. 2023) ("Congress is presumed to 'legislate against the backdrop of existing law.'" (alteration omitted) (quoting *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019))).

The Copyright Act, in short, has never required an identical copy when it uses the term "copies," *e.g.*, 4 Nimmer on Copyright § 12A.10 (explaining why the DMCA does not require identicality), and nothing in subsection 1202(b) requires otherwise.

To be sure, in a DMCA case, CMI must be removed from the plaintiff's work. *See* 3-ER-222 ¶ 144 (alleging removal). Sometimes that analysis is straightforward—such as when a defendant "remov[es] a copyright owner's watermark from a digital file." Restatement of the Law, Copyright § 10.03 TD No. 5 cmt. g (2024). Other times, it may be "more complicated"—such as "when the defendant is accused of creating a new work that incorporates part of an existing work without including the existing work's CMI." *Id.* But in no circumstance does the statute require that the defendant create or distribute an identical copy of the plaintiff's work (with just the CMI removed). As explained, the requirement of a copy does not demand an exact copy. *See* 4 Nimmer on

Copyright § 12A.10.  And it has long been a feature of copyright law that a "plagiarist" cannot "excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936) (L. Hand, J.).

So, too, with the DMCA.  If the defendant removes or alters CMI— or distributes a copy knowing the CMI has been removed or altered—the DMCA violation is complete, even if the defendant also removes other text.  *See Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 302 (3d Cir. 2011) ("§ 1202 simply establishes a cause of action for the removal of (among other things) the name of the author of a work when it has been "conveyed in connection with copies of" the work."); Restatement of the Law, Copyright § 10.03 TD No. 5 cmt. g (if "the defendant produces something that is nearly identical to the original work except for the exclusion of CMI and other minor changes . . . [t]hat is properly understood as removal of the CMI, even if the changes are significant enough to create a derivative work").

**B.    Statutory Context**

Statutory context confirms that identicality is not required.

29

*First*, the immediately preceding section of the DMCA uses the term "identical copy," 17 U.S.C. § 1201(d)(2), but section 1202 does not. Similarly, another provision of the Copyright Act refers to "exact copies," *id.* § 117(b), but section 1202 does not. And still other provisions of the Copyright Act refer to "complete copies." *Id.* § 407(a)(1); *id.* § 408(b); *see Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1211-12 (9th Cir. 1998) (interpreting § 408(b) to require a "bona fide copy" that is "virtually identical to the original" and is "produced by directly referring to the original," as opposed to a "reproduction" of the "previous work from memory"). But again, section 1202 does not. Those ommissions are meaningful. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Rodriguez v. United States*, 480 U.S. 522, 525 (1987) (quotation marks and alteration omitted). So, too, when a statute "has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457-58 (2022) (quotation marks omitted). Applied here, when Congress wanted to

require an "identical" or "exact" copy, it said so explicitly by using an appropriate adjective. *Accord* 16 U.S.C. §§ 460n–1, 460s–1 (using the phrase "exact copy"). That section 1202, unlike its neighbors, does not require an "identical copy" or an "exact copy" means just that—the section does not require an identical or exact copy. It just requires a copy, which the Copyright Act specifically defines as *not* needing to be identical.

*Second*, the DMCA contemplates that even a portion of protected software code may constitute a "copy" under copyright law. Section 117(c) shields computer users from liability for "the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains the authorized copy of the computer program." 17 U.S.C. § 117(c). Before the DMCA, courts generally held that the "loading of copyrighted software" from a storage source (such as a "hard disk" or "read only memory") to the computer's "random access memory" ("RAM"), i.e., short-term memory, "creates a 'copy' of that software in violation of the Copyright Act"—even when this occurs automatically "when the computer is turned on." *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 517-18 (9th Cir. 1993); *see also Vernor v.*

31

*Autodesk, Inc.*, 621 F.3d 1102, 1109-11 (9th Cir. 2010) (discussing *MAI* and its progeny). In response, Congress added section 117 to create a safe harbor "to ensure that independent service organizations do not inadvertently become liable for copyright infringement merely because they have turned on a machine in order to service its hardware components." S. Rep. No. 105-190, at 21 (1998).

In doing so, Congress confirmed that even a portion of protected software code can be a "copy" when loaded onto a computer's RAM. Because an entire software program "is sometimes larger than the capacity of the RAM," software code is often only partially loaded into the computer's RAM. *Id.* (noting "different parts" of a program's code "may reside in the RAM at different times"); *see also* H.R. Conf. Rep. No. 105-796, at 652 (1998) ("When a computer is activated, certain software or *parts thereof* [are] automatically copied into the machine's . . . 'RAM.'" (emphasis added)).[11] Congress's safe harbor thus recognized that partial copying of software code is a copy; it just sought to shield such copying

---

[11] *See, e.g.*, *REC Software USA, Inc. v. Bamboo Sols. Corp.*, No. 11-cv-0554, 2012 WL 3780352, at *2 (W.D. Wash. Aug. 31, 2012) (describing how computer operating systems "conserve RAM by only loading portions of a file that are actually needed rather than the entire file").

from liability. If that was unclear, section 117 itself distinguishes between an ordinary "copy" for purposes of subsection (c) and an "exact" copy under subsection (b). *See* 17 U.S.C. § 117(b) (permitting the lease, sale, or transfer of "exact copies . . . only as part of the lease, sale, or other transfer of all rights in the program"). In short, Congress did not understand a "copy" to require an identical or entire reproduction of the protected software code when it enacted the DMCA, including subsection 1202(b).

*Third*, the DMCA imposes a stringent scienter requirement. Under subsection 1202(b)(1), for example, a plaintiff must show the defendant "intentionally" removed CMI and did so "knowing, or . . . having reasonable grounds to know, that" the removal "will induce, enable, facilitate, or conceal an infringement." *Id.* § 1202(b)(1). That "'double-scienter' requirement," *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 171-72 (2d Cir. 2020), limits DMCA liability to truly purposeful actors, *see Stevens v. Corelogic, Inc.*, 899 F.3d 666, 674-75 (9th Cir. 2018) (observing "Section 1202's provisions do not apply to those who act innocently" (quotation marks omitted)). But a rigid identicality requirement would suggest to knowing violators of the DMCA that they can get off scot-free if they alter

33

just one letter in the work. In that regime, "few would be stupid enough to make exact copies of another's" work, *Baker v. Master Printers Union*, 34 F. Supp. 808, 811 (D. N.J. 1940) (discussing degree of similarity required under trademark law), and subsection 1202(b) would be rendered largely meaningless.

An identicality requirement would thus undermine the statutory design by offering an easy path for avoiding liability to the very wrongdoers that the scienter requirement is supposed to capture. That cannot be the right answer. Courts should not adopt interpretations that "render[] the law in a great measure nugatory, and enable offenders to elude its provisions in the most easy manner." *The Emily*, 22 U.S. (9 Wheat.) 381, 389 (1824); *see also Cnty. of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 178-79 (2020) ("We do not see how Congress could have intended to create such a large and obvious loophole[.]"); *Arellano v. Clark Cnty. Collection Serv., LLC*, 875 F.3d 1213, 1218 (9th Cir. 2017) (rejecting construction that would allow violators to "strategically . . . evade the restrictions of the Act" and thus "thwart enforcement of the [statute]"). The better reading is that the DMCA, taken "as a whole," *United States v. Cabaccang*, 332 F.3d 622, 627 (9th Cir. 2003) (en banc),

does not require an identical copy for a defendant to be liable for intentionally removing CMI from a copied work or disseminating such a copy.

## C.    Statutory Purpose

Purpose resolves any remaining doubts.  *See United States v. Prasad*, 18 F.4th 313, 322 (9th Cir. 2021) (reading text "in light of its statutory purpose").   Congress passed the DMCA "to mitigate the problems presented by copyright enforcement in the digital age."  *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 942 (9th Cir. 2010). "Fearful that the ease with which pirates could copy and distribute a copyrightable work in digital form was overwhelming the capacity of conventional copyright enforcement to find and enjoin unlawfully copied material," Congress designed the DMCA "to combat copyright piracy in its earlier stages, before the work was even copied."  *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435 (2d Cir. 2001).   So Congress included preventative measures "to ensure the integrity of the electronic marketplace by preventing fraud and misinformation" *before* copyright infringement occurs. *Fischer v. Forrest*, 968 F.3d 216, 222 (2d Cir. 2020) (quoting H.R. Rep. 105-551(l), at 10 (1998)).   One such measure is section

1202, which "realizes this aim by 'prohibiting . . . the deliberate deleting or altering of copyright management information . . . to protect consumers from misinformation as well as authors and copyright owners from interference with the private licensing process.'" *Id.* (alterations omitted) (quoting H.R. Rep. 105-551(l), at 10-11).

In passing the DMCA, Congress thus recognized that CMI "is an important element in establishing an efficient Internet marketplace in copyrighted works." S. Rep. 105-190, at 16. So Congress set out to "protect[]" that information. *Id.*; *see Enter. Tech. Holdings, Inc. v. Noveon Sys., Inc.*, No. 05-cv-2236, 2008 WL 11338356, at *16 (S.D. Cal. July 29, 2008) ("The purpose of [section 1202] is 'to give an added layer of protection to certain works that were vulnerable to infringement due to advances in modern technology.'" (quoting *Textile Secrets Int'l, Inc. v. Ya-Ya Brand, Inc.*, 524 F. Supp. 2d 1184, 1202 (C.D. Cal. 2007))). To do that, Congress sought to "expand—in some cases … significantly—the rights of copyright owners." *Murphy*, 650 F.3d at 303 (rejecting "restrictive reading of § 1202's scope"); *see also, e.g.*, *Mango*, 970 F.3d at 172 n.2 (rejecting narrower construction of subsection 1202(b) that would "limit liability" as "inconsistent with the purpose of the DMCA, which is to

36

provide broad protections to copyright owners"); *Bounce Exch., Inc. v. Zeus Enter. Ltd.*, No. 15-cv-3268, 2015 WL 8579023, at *3 (S.D.N.Y. Dec. 9, 2015) (rejecting "narrowing interpretation" of section 1202).

Given that purpose, "it would be odd if a defendant could evade DMCA liability by removing or altering CMI in a copied work but only disseminating 99% rather than 100% of that work." *Real World Media*, 744 F. Supp. 3d at 40. Consider just a few examples. Under the district court's reasoning:

- A defendant would have no DMCA exposure if she stripped the novel *1984* of CMI and changed the first line to "[i]t was a bright cold day in April, and the clocks were striking thirteen[!]" George Orwell, 1984 (1949). The insertion of the exclamation point (when Orwell chose the more staid period) would make the work non-identical.

- A movie studio would not violate the DMCA if it removed all CMI and changed the famous yellow, sans-serif text in the Star Wars opening crawl to a yellow, serif text and then distributed the film. Again, that small change would make the copy non-identical.

- A defendant would not violate the DMCA by publishing "cropped versions" of photographs that removed watermarks with CMI along with other parts of the photographs. *But see APL Microscopic, LLC v. Steenblock*, No. 21-55745, 2022 WL 4830687, at *2 (9th Cir. Oct. 3, 2022) (reversing dismissal of section 1202(b) claim based on such allegations); *Davidson v. Blankenship Dry Goods LLC*, No. 24-cv-7544, 2025 WL 486623, at *3 (S.D.N.Y. Feb. 12, 2025) (declining to dismiss section 1202(b) claim when defendant "cropped" plaintiff's

copyrighted "image, removing the CMI" along with the bottom of the photograph (alteration omitted)).

- A tech company could copy "several million lines" of a competitor's computer code and remove all CMI without violating the DMCA, so long as the company hired an amatuer coder to substitute one or two lines of code with his own. *Cf. Oracle*, 593 U.S. at 33 (suggesting "only 0.4 percent" of "2.86 million lines of code" may be a copy if that 0.4 percent "consists of the heart" of competitor's code (quotation marks omitted)).

The district court never explained why Congress would welcome such absurd results. "[C]onstruing the statute to apply only to identical copies," in short, "would narrow it considerably and lead to unreasonable results." *New Parent World*, 2024 WL 4277865, at *3. Why, after all, would Congress "laboriously prescribe[]" CMI "as an aid to sound information policy" only to turn around and allow that same information to "be defaced or deformed with impunity" so long as the defendant also defaced *some* other information as well? 4 Nimmer on Copyright § 12A.10. This Court should adopt the much more reasonable interpretation recognized in nearly all copyright contexts—that a "copy" under the DMCA does not require identicality.

### D.    Precedent

Finally, precedent confirms identicality is not required.  The better reasoned cases have rejected identicality.

**1.** Those decisions to consider the statutory text have found that the "language of the DMCA does not require identical copies."  *New Parent World*, 2024 WL 4277865, at *2.[12]  They have done so for two primary reasons.

*First*, courts have recognized that the Copyright Act's definition of "'copies' . . . lacks any requirement of an identical copy."  *New Parent World*, 2024 WL 4277865, at *2 (citing 17 U.S.C. § 101); *see Real World Media*, 744 F. Supp. 3d at 40 ("Nor does the Copyright Act's definition of 'copy' confine the sweep of that term to a copy in full as opposed to in part."); *ADR*, 667 F. Supp. 3d at 427 ("[T]he definition of 'copies' lacks any

---

[12] *See, e.g.*, *Real World Media*, 744 F. Supp. 3d at 40; *ADR*, 667 F. Supp. 3d at 427; *GC2 Inc. v. Int'l Game Tech.*, 391 F. Supp. 3d 828, 843-443 (N.D. Ill. 2019) (rejecting "the broad proposition that derivative or collaborative works are categorically excluded from protection under the DMCA's provision for removal of copyright information"); *see also Oracle Int'l Corp. v. Rimini St., Inc.*, No. 2:14-cv-1699, 2023 WL 4706127, at *82 (D. Nev. July 24, 2023) (rejecting argument "that a work that removes [CMI] must  be an exact copy of the original work" because "[t]his construction  of  the  DMCA  would  weaken  the  statute's  intended protections for copyright holders"), *aff'd in part, vacated in part, and rev'd in part on other grounds*, 123 F.4th 986 (9th Cir. 2024).

requirement for an identical copy."); *see also ICONICS, Inc. v. Massaro*, 192 F. Supp. 3d 254, 272 (D. Mass. 2016) ("[T]he definition of CMI neither states nor implies that CMI can only exist with regard to the full version of a work.").

*Second*, courts have declined to narrow the scope of section 1202 by inserting additional terms not found in the statutory text. *See Real World Media*, 744 F. Supp. 3d at 40 ("[N]othing in § 1202(b) requires precise equivalence between the work from which CMI is removed and the allegedly infringing work."); *ADR*, 667 F. Supp. 3d at 427 ("[T]he plain wording of the statute" does not "include[] an 'identical copy' requirement."); *GC2 Inc. v. Int'l Game Tech.*, 391 F. Supp. 3d 828, 844 (N.D. Ill. 2019) (noting the "language on which the defendants precariously rest their entire argument does not even appear in [subsection 1202(b)]" but rather "is entirely a product of district court opinions").

Courts have thus held that "regurgitat[ing] verbatim *or nearly verbatim* copyrighted works . . . without CMI" may support section 1202(b) claims. *The Intercept Media, Inc. v. OpenAI, Inc.*, No. 24-cv-1515, 2025 WL 556019, at *3, 7-8 (S.D.N.Y. Feb. 20, 2025) (emphasis added)

(finding basis for section 1202(b) liability "even when the AI models do not regurgitate verbatim" because "they still mimic significant amounts of material from copyright-protected works" (quotation marks omitted)); *see also Beijing Meishe Network Tech. Co., v. TikTok Inc.*, No. 23-cv-6012, 2024 WL 3522196, at *9 (N.D. Cal. July 23, 2024) (declining to dismiss section 1202(b) claims for lack of identicality based on allegations defendant reproduced "verbatim portions of [plaintiff's] source code"); *ADR*, 667 F. Supp. 3d at 428 (same when defendant removed CMI from "copies of [plaintiff's] work with only superficial alterations"); *Bain v. Film Indep., Inc.*, No. 18-cv-4126, 2018 WL 6930766, at *1, 5 (C.D. Cal. Aug. 9, 2018) (same where defendant allegedly posted scenes excerpted from plaintiff's film with watermark removed); *cf. Splunk Inc. v. Cribl, Inc.*, 662 F. Supp. 3d 1029, 1054 (N.D. Cal. 2023) (finding sufficient to infer scienter on motion to dismiss section 1202(b) claims that defendant allegedly "derived" his source code "from [plaintiff's] copyrighted source code" while omitting the CMI).

Consistent with this reading, this Court has explained that a "striking similarity between the works may give rise to a permissible inference of copying" supporting a DMCA claim. *Friedman*, 833 F.3d at

1188 (quotation marks omitted). Courts in this circuit have similarly found DMCA liability may attach when the defendant's "modified source code [is] 'substantially similar' to Plaintiff's copyrighted source code." *Enter. Tech. Holdings*, 2008 WL 11338356, at *14, 16. Relatedly, the Third Circuit has held that "a cause of action under § 1202 of the DMCA potentially lies whenever the types of information listed in § 1202(c)(1)-(8) and 'conveyed in connection with copies of a work including in digital form' is falsified or removed, *regardless of the form in which that information is conveyed*." *Murphy*, 650 F.3d at 305 (emphasis added). None of these decisions can be squared with the district court's conclusion that subsection 1202(b) requires identical copies.

**2.** In contrast with those well-reasoned decisions, the district court here imposed an identicality requirement without examining the statute's text. *But see Ross v. Blake*, 578 U.S. 632, 638 (2016) ("Statutory interpretation … begins with the text."). Instead, the court relied on four other district court cases that held that "no DMCA violation exists where the works are not identical." 3-ER-259; *see also* 1-ER-6-7. But each of those cases "fails to withstand scrutiny." 4 Nimmer on Copyright § 12A.10.

In *Frost-Tsuji Architects v. Highway Inn, Inc.*, No. 13-cv-0496, 2015 WL 263556 (D. Haw. Jan. 21, 2015), the court used the phrase "not identical" in passing. *Id.* at *3. But *Frost-Tsuiji* "neither mentioned nor employed an identical copies requirement." *ADR*, 667 F. Supp. 3d at 427. Instead, the court observed that the copies there were not identical as part of a broader explanation that the plaintiff "submitted no evidence" that the defendant had removed CMI at all. *Frost-Tsuji*, 2015 WL 263556, at *3. The need for actual evidence of CMI removal, not an identicality requirement, is *Frost-Tsuji*'s holding.

Next, in *Kirk Kara Corp. v. Western Stone & Metal Corp.*, No. 20-cv-1931, 2020 WL 5991503 (C.D. Cal. Aug. 14, 2020), the court adopted an identicality standard, but it did so without reference to the statutory language. *Id.* at *6. Instead, *Kirk Kara*'s full analysis was the (mis)citation of cases that themselves did not adopt an identicality requirement. *See* 4 Nimmer on Copyright § 12A.10 at n.150.7; *see also New Parent World*, 2024 WL 4277865, at *2 (explaining that *Kirk Kara*'s cases "do not support" identicality); *ADR*, 667 F. Supp. 3d at 427 ( "[T]he caselaw [*Kirk Kara*] cited does not support its holding."). Indeed, one of the cases *Kirk Kara* relied on did not adopt an identicality standard,

43

explaining instead that "[i]n those cases where claims of removal of CMI have been held viable, the underlying work has been *substantially* or entirely reproduced." *Fischer v. Forrest*, 286 F. Supp. 3d 590, 609 (S.D.N.Y. 2018) (emphasis added).

Neither *Advanta-STAR Automotive Research Corp. of America v. Search Optics, LLC*, 672 F. Supp. 3d 1035 (S.D. Cal. 2023), nor *Tremblay v. OpenAI, Inc.*, 716 F. Supp. 3d 772 (N.D. Cal. 2024), are any better. Both, again, failed to consider the statutory language, and both summarily adopted *Kirk Kara*'s analysis . *See New Parent World*, 2024 WL 4277865, at *2 (explaining the issue); *see also Advanta-STAR*, 672 F. Supp. 3d at 1057; *Tremblay*, 716 F. Supp. 3d at 780. *Advanta-STAR* and *Tremblay* thus lack "warrant" for the same reason that *Kirk Kara* does. 4 Nimmer on Copyright § 12A.10.

In addition, Defendants previously relied on *Kelly v. Arriba Soft Corp.*, 77 F. Supp. 2d 1116, 1122 (C.D. Cal. 1999), *aff'd and rev'd in part on other grounds*, 336 F.3d 811 (9th Cir. 2003). *See* 3-ER-138 n.3, 173, 284. But *Kelly* never adopted an "identical copies" requirement. Rather, the court entered summary judgment on section 1202(b) claims because the plaintiff failed to "offfer[] any evidence" that the defendant had the

requisite scienter. 77 F. Supp. 2d at 1122. Defendants also relied on *Dolls Kill, Inc. v. Zoetop Business Co.*, No. 2:22-cv-1463, 2022 WL 16961477 (C.D. Cal. Aug. 25, 2022), *see* 3-ER-286, which merely quotes *Kirk Kara*'s conclusion that "no DMCA violation exists where the works are not identical," with no additional analysis. 2022 WL 16961477, at *4. Finally, Defendants cited *Faulkner Press, LLC v. Class Notes, LLC*, 756 F. Supp. 2d 1352 (N.D. Fla. 2010), for the proposition that subsection 1202(b) requires "complete works" and not "mere excerpts," 3-ER-173. But, as Defendants acknowledge, *Faulkner* nowhere suggests that the DMCA requires identical copies. *See* 3-ER-137-38 & n.3.[13] Instead, the court reasoned that, when "student note takers simply took notes from [a] course" based on the professor's copyrighted textbook, failing to add the textbook's CMI to the notes is not "remov[ing]" that information under the statute. 756 F. Supp. 2d at 1359. That in no way requires identical copies of the complete original work. And it is lightyears from

---

[13] Defendants have acknowledged that the remaining cases they relied on before the district court do not hold that the DMCA requires identicality. 3-ER-137-38 & n.3. *See Falkner v. Gen. Motors LLC*, 393 F. Supp. 3d 927, 938-39 (C.D. Cal. 2018); *Design Basics, LLC v. WK Olson Architects, Inc.*, No. 17-cv-7432, 2019 WL 527535, at *5 (N.D. Ill. Feb. 11, 2019).

the allegations here, where Defendants directly copied Plaintiff's licensed work with only "small cosmetic variations."  3-ER-225 ¶ 155.

*    *    *

In sum, the district court's identicality standard has nothing to recommend it.  It cannot be squared with the DMCA's text; it betrays the statutory context; it obliterates statutory purpose; and it defies the better-reasoned precedent.  Accordingly, this Court should reverse and remand for Plaintiffs to prove their claims under the correct legal standard.

## II.  DEFENDANTS' CONCESSION THAT THE DISTRICT COURT'S INTERPRETATION IS ERRONEOUS SHOULD RESULT IN REVERSAL

In the district court, Defendants advanced a categorical argument that section 1202 imposes an identicality requirement.  *E.g.*, 3-ER-174-77; Doc. 219, at 2-6, No. 4:22-cv-6823.  Perhaps now recognizing that this argument is doomed by the DMCA's text, structure, and purpose, Defendants' Response to Appellants' Petition for Permission to Appeal in this Court conceded that there is only a "requirement of 'remov[al]' of CMI" such that the DMCA applies to the removal of CMI even when the defendant also makes "superficial modifications."  3-ER-142.  That

concession alone should resolve this appeal, as the district court's certification was solely on the "purely legal question of statutory interpretation [of] whether sections 1202(b)(1) and (b)(3) of the DMCA impose an identicality requirement." 2-ER-47.

Defendants, however, attempt re-cast this appeal as a fact-bound pleading fight: Did Plaintiffs allege the removal of CMI, or did they allege only "new content" that "bears some resemblance to an original"? 3-ER-138. But that is not the argument Defendants made before the district court, *see* 3-ER-174-77, 284-86, 317-19; Doc. 219, is not the issue the district court certified, *see* 2-ER-47; and is not the question for which this Court accepted jurisdiction, *see*, Doc. 29, No. 24-6136. Defendants can concede error, but they should not be permitted to transform this appeal into something it is not. This Court, after all, is one "of review, not first view." *Roth v. Foris Ventures, LLC*, 86 F.4th 832, 838 (9th Cir. 2023) (quoting *Shirk v. United States ex rel. Dep't of Interior*, 773 F.3d 999, 1007 (9th Cir. 2014)). "[S]tandard practice" is thus to "leave it to the district court to address … potentially dispositive issue[s] in the first instance." *Id.* The Court should follow that practice here: the district court erred by adopting the wrong view of the law, so it should consider

47

the Complaint in the first instance under the correct one. *See DeFries v. Union Pac. R.R. Co.*, 104 F.4th 1091, 1109 (9th Cir. 2024) (declining to consider "deeply fact-bound" issues in the first instance).

But even if this Court were to consider Defendant's newly raised argument, Plaintiffs would still prevail under any new standard. *See* 3-ER-143 (suggesting a "substantial identicality requirement"). Plaintiffs allege that Defendants accessed Plaintiffs' licensed works, including the CMI, and trained Codex and Copilot on those works. 3-ER-208 ¶ 109. Plaintiffs then allege that Codex and Copilot output their works (with slight modifications) and with the CMI removed. *E.g.*, 3-ER-213, 216, 221-22, 233-34 ¶¶ 120, 131, 139, 205-06; *see also* 3-ER-206-07 ¶¶ 99-102. And Plaintiffs allege that Defendants distribute those works. *E.g.*, 3-ER-221 ¶ 139. Plaintiffs thus allege that Defendants collect their works with CMI, remove that CMI, and then have Copilot make additional "semantically insignificant variations" to the work. 3-ER-208 ¶ 108; *see also* 3-ER- 187, 204, 222, 233 ¶¶ 11, 91-92, 143-44, 205 142. Even Defendants now admit that pleads a DMCA violation. 3-ER-142.

To be sure, Defendants disagree with that factual characterization. On their view, Codex and Copilot generate "new content" that "bears

some resemblance to an original." 3-ER-142. But it is far from clear that Defendants' theory matters legally. *See Monotype Imaging, Inc. v. Bitstream, Inc.*, No. 03-cv-4349, 2005 WL 936882, at *8 (N.D. Ill. Apr. 21, 2005) (St. Eve, J.) ("[T]he mere fact that TrueDoc does not 'remove' the copyright notices, but instead makes copies of the font software without including the copyright notice, does not preclude liability under the DMCA."). And even if it does, Defendants raise a classic fact dispute. Plaintiffs intend to show that Codex and Copilot reproduce their works—with the CMI removed and only superficial changes. Defendants, apparently, intend to show that Codex and Copilot create entirely new works with incidental resemblance to the originals. But there cannot be only an incidental resemblance when the outputted code is flagged by Copilot's duplicate detection feature. *See* 3-ER-222-23 ¶¶ 144-48. And in any event, that dispute can only be resolved by taking a "fact-specific" dive into how the models truly work. Restatement of the Law, Copyright § 10.03 cmt. g TD No 5. A motion to dismiss is the wrong vehicle to decide that factual question.

## III. THE DISTRICT COURT WAS WRONG TO DISMISS EVEN UNDER ITS IDENTICALITY STANDARD

Even if the district court was correct that the DMCA requires identicality, it was wrong to dismiss the DMCA claims. Drawing all inferences for the Plaintiffs, the Complaint alleges that Defendants removed CMI from Plaintiffs' licensed code before using the works to train Codex and Copilot. *See, e.g.*, 3-ER-187, 195-97, 205, 207-08, 221-22, 143-44 ¶¶ 11, 49, 58, 94-95, 104-06, 141, 143-44, 205. That is, Defendants took exact copies of the code, removed the CMI, and used those exact copies (sans CMI) to train their AI models. *See* 3-ER-187, 195-96, 233 ¶¶ 11, 49, 205. Those allegations satisfy even the district court's interpretation of the DMCA.

The Complaint alleges that Codex and Copilot were trained on a "large corpus of publicly accessible software code and other materials, including all the Licensed Materials." 3-ER-197 ¶ 58; *see also* 3-ER-205 ¶¶ 94-95. As a general matter, a large language model will sometimes return exact replicas of the data it was trained on. *See* 3-ER-207-08 ¶¶ 104-106. But models "have no way to determine whether license text or other Copyright Management Information … is part of the code it appears immediately before or after." 3-ER-221 ¶ 141. Thus, if the

50

models are trained on code that includes CMI, the models will often regurgitate the CMI along with the reproduced work. 3-ER-222 ¶¶ 143-44. "Early iterations of Copilot" did just that. 3-ER-222 ¶¶ 143-44. The Complaint alleges that Defendants avoided that outcome by stripping CMI from the code before training the models. 3-ER-187, 195-96,233 ¶¶ 11, 49, 205. The models, in other words, "ingest[ed]" Plaintiffs' works without CMI. 3-ER-195-96 ¶ 49.

Those allegations describe an obvious subsection 1202(b)(1) violation, even under the district court's test. Defendants took Plaintiffs' works, removed the CMI, and then trained the models on the remainder of the work. The removal of CMI from an exact replica of Plaintiffs' work is a routine DMCA violation. *E.g.*, *OpenAI*, 2025 WL 556019, at *2, 7 (finding plaintiff adequately pleaded section 1202(b)(1) claim based on allegations that "OpenAI used [proprietary] algorithms to extract" from plaintiff's internet articles only the "main article content" without the CMI "when creating training sets" for ChatGPT (quotation marks omitted)); *Kadrey v. Meta Platforms, Inc.*, No. 23-cv-3417, 2025 WL 744032, at *1-2 (N.D. Cal. Mar. 7, 2025) (denying motion to dismiss when plaintiffs alleged AI model stripped CMI from training data to facilitate

future infringement); *cf. Shihab v. Complex Media, Inc.,* No. 21-cv-6425, 2022 WL 3544149, at \*5 (S.D.N.Y. Aug. 17, 2022) (stripping a copyright watermark). The Complaint should not have been dismissed.

## CONCLUSION

For these reasons, the Court should reverse the district court's dismissal of Plaintiffs' claims under §§ 1202(b)(1) and (b)(3) of the DMCA.

Dated: April 9, 2025

Respectfully submitted,

Jesse Panuccio
Evan Ezray
Daniel Morales
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Ste 1200
Fort Lauderdale, FL 33301
(954) 356-0011
jpanuccio@bsfllp.com
eezray@bsfllp.com
dmorales@bsfllp.com

Matthew Butterick
(State Bar No. 250953)
1920 Hillhurst Avenue, #406
Los Angeles, CA 90027
(323) 968-2632
mb@but007ericklaw.com

*s/Joseph R. Saveri*
Joseph R. Saveri
Christopher K.L. Young
Evan Cruetz
William W. Castillo Guardado
JOSEPH SAVERI LAW FIRM, LLP
601 California Street, Suite 1505
San Francisco, CA 94108
(415) 500-6800
jsaveri@saverilawfirm.com
cyoung@saverilawfirm.com
ecreutz@saverilawfirm.com
wcastillo@saverilawfirm.com

Maxwell V. Pritt
Margaux Poueymirou
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
(415) 293-6800
mpritt@bsfllp.com
jstein@bsfllp.com
mpoueymirou@bsfllp.com

*Counsel for Plaintiff-Appellants and Proposed Class*

## STATEMENT OF RELATED CASES

Under Ninth Circuit Rule 28-2.6, Appellants state that they are not

aware of any related cases pending before this Court.


Dated: April 9, 2025                                  *s/    Joseph R. Saveri*
                                                      Joseph R. Saveri

# CERTIFICATE OF COMPLIANCE

I certify that under Federal Rule of Appellate Procedure 32(a)(7)(B) and Ninth Circuit Rule 32-2(b), Appellants' Opening Brief is proportionally spaced, has a typeface of 14 points, and contains 10,334 words, excluding the portions excerpted by Federal Rule of Appellate Procedure 32(f), according to the word-count feature of Microsoft Word used to generate this brief.

Dated: April 9, 2025

*s/    Joseph R. Saveri*
Joseph R. Saveri

# CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of April 2025, I electronically filed the foregoing brief and attached addendum with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: April 9, 2025                                  s/    *Joseph R. Saveri*
                                                      Joseph R. Saveri

# ADDENDUM

# TABLE OF CONTENTS

**Statute**       Page

17 U.S.C. § 1202 ................................................................ Add. 1

17 U.S.C. § 101 .................................................................. Add. 6

17 U.S.C. § 1201 ................................................................ Add. 7

17 U.S.C. § 117 ................................................................ Add. 25

17 U.S.C. § 407 ................................................................ Add. 27

17 U.S.C. § 408 ................................................................ Add. 30

16 U.S.C. § 460n-1 .......................................................... Add. 35

16 U.S.C. § 460s-1 ........................................................... Add. 37

# 17 U.S.C. § 1202.  Integrity of copyright management information

**(a) False copyright management information**.—No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement—

(1) provide copyright management information that is false, or

(2) distribute or import for distribution copyright management information that is false.

**(b) Removal or alteration of copyright management information**.—No person shall, without the authority of the copyright owner or the law—

(1) intentionally remove or alter any copyright management information,

(2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

(3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

**(c) Definition**.—As used in this section, the term "copyright management information" means any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form, except that

such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work:

(1) The title and other information identifying the work, including the information set forth on a notice of copyright.

(2) The name of, and other identifying information about, the author of a work.

(3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

(4) With the exception of public performances of works by radio and television broadcast stations, the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work.

(5) With the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual work.

(6) Terms and conditions for use of the work.

(7) Identifying numbers or symbols referring to such information or links to such information.

(8) Such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work.

**(d) Law enforcement, intelligence, and other government activities.**—This section does not prohibit any lawfully authorized

investigative, protective, information security, or intelligence activity of an officer, agent, or employee of the United States, a State, or a political subdivision of a State, or a person acting pursuant to a contract with the United States, a State, or a political subdivision of a State. For purposes of this subsection, the term "information security" means activities carried out in order to identify and address the vulnerabilities of a government computer, computer system, or computer network.

**(e) Limitations on liability.—**

**(1) Analog transmissions.—**In the case of an analog transmission, a person who is making transmissions in its capacity as a broadcast station, or as a cable system, or someone who provides programming to such station or system, shall not be liable for a violation of subsection (b) if—

(A) avoiding the activity that constitutes such violation is not technically feasible or would create an undue financial hardship on such person; and

(B) such person did not intend, by engaging in such activity, to induce, enable, facilitate, or conceal infringement of a right under this title.

**(2) Digital transmissions.—**

(A) If a digital transmission standard for the placement of copyright management information for a category of works is set in a voluntary, consensus standard-setting process involving a representative cross-section of broadcast stations or cable systems and copyright owners of a category of works that are intended for public performance by such stations or systems, a person identified in paragraph (1) shall not be liable for a violation of subsection (b) with respect to the

particular copyright management information addressed by such standard if—

(i) the placement of such information by someone other than such person is not in accordance with such standard; and

(ii) the activity that constitutes such violation is not intended to induce, enable, facilitate, or conceal infringement of a right under this title.

(B) Until a digital transmission standard has been set pursuant to subparagraph (A) with respect to the placement of copyright management information for a category of works, a person identified in paragraph (1) shall not be liable for a violation of subsection (b) with respect to such copyright management information, if the activity that constitutes such violation is not intended to induce, enable, facilitate, or conceal infringement of a right under this title, and if—

(i) the transmission of such information by such person would result in a perceptible visual or aural degradation of the digital signal; or

(ii) the transmission of such information by such person would conflict with—

(I) an applicable government regulation relating to transmission of information in a digital signal;

(II) an applicable industry-wide standard relating to the transmission of information in a digital signal that was adopted by a voluntary consensus standards body prior to the effective date of this chapter; or

(III) an applicable industry-wide standard relating to the transmission of information in a digital signal that was adopted in a voluntary, consensus standards-setting process open to participation by a representative cross-section of broadcast stations or cable systems and copyright owners of a category of works that are intended for public performance by such stations or systems.

**(3) Definitions.**—As used in this subsection—

(A) the term "broadcast station" has the meaning given that term in section 3 of the Communications Act of 1934 (47 U.S.C. 153); and

(B) the term "cable system" has the meaning given that term in section 602 of the Communications Act of 1934 (47 U.S.C. 522).

**7 U.S.C. § 101. Definitions**

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

. . . "Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

**17 U.S.C. § 1201.  Circumvention of copyright protection systems**

**(a) Violations regarding circumvention of technological measures.—**

(1)

(A) No person shall circumvent a technological measure that effectively controls access to a work protected under this title. The prohibition contained in the preceding sentence shall take effect at the end of the 2-year period beginning on the date of the enactment of this chapter.

(B) The prohibition contained in subparagraph (A) shall not apply to persons who are users of a copyrighted work which is in a particular class of works, if such persons are, or are likely to be in the succeeding 3-year period, adversely affected by virtue of such prohibition in their ability to make noninfringing uses of that particular class of works under this title, as determined under subparagraph (C).

(C) During the 2-year period described in subparagraph (A), and during each succeeding 3-year period, the Librarian of Congress, upon the recommendation of the Register of Copyrights, who shall consult with the Assistant Secretary for Communications and Information of the Department of Commerce and report and comment on his or her views in making such recommendation, shall make the determination in a rulemaking proceeding for purposes of subparagraph (B) of whether persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition under subparagraph (A) in their ability to make noninfringing uses under this title of a

particular class of copyrighted works. In conducting such rulemaking, the Librarian shall examine—

(i) the availability for use of copyrighted works;

(ii) the availability for use of works for nonprofit archival, preservation, and educational purposes;

(iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research;

(iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and

(v) such other factors as the Librarian considers appropriate.

(D) The Librarian shall publish any class of copyrighted works for which the Librarian has determined, pursuant to the rulemaking conducted under subparagraph (C), that noninfringing uses by persons who are users of a copyrighted work are, or are likely to be, adversely affected, and the prohibition contained in subparagraph (A) shall not apply to such users with respect to such class of works for the ensuing 3-year period.

(E) Neither the exception under subparagraph (B) from the applicability of the prohibition contained in subparagraph (A), nor any determination made in a rulemaking conducted under subparagraph (C), may be used as a defense in any action to enforce any provision of this title other than this paragraph.

(2) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;

(B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

(3) As used in this subsection—

(A) to "circumvent a technological measure" means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner; and

(B) a technological measure "effectively controls access to a work" if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.

**(b) Additional violations.—**

(1) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

(A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof;

(B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof.

(2) As used in this subsection—

(A) to "circumvent protection afforded by a technological measure" means avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure; and

(B) a technological measure "effectively protects a right of a copyright owner under this title" if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title.

**(c) Other rights, etc., not affected.—**

(1) Nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title.

(2) Nothing in this section shall enlarge or diminish vicarious or contributory liability for copyright infringement in connection with any technology, product, service, device, component, or part thereof.

(3) Nothing in this section shall require that the design of, or design and selection of parts and components for, a consumer electronics, telecommunications, or computing product provide for a response to any particular technological measure, so long as such part or component, or the product in which such part or component is integrated, does not otherwise fall within the prohibitions of subsection (a)(2) or (b)(1).

(4) Nothing in this section shall enlarge or diminish any rights of free speech or the press for activities using consumer electronics, telecommunications, or computing products.

**(d) Exemption for nonprofit libraries, archives, and educational institutions.—**

(1) A nonprofit library, archives, or educational institution which gains access to a commercially exploited copyrighted work solely in order to make a good faith determination of whether to acquire a copy of that work for the sole purpose of engaging in conduct permitted under this title shall not be in violation of subsection (a)(1)(A). A copy of a work to which access has been gained under this paragraph—

(A) may not be retained longer than necessary to make such good faith determination; and

(B) may not be used for any other purpose.

(2) The exemption made available under paragraph (1) shall only apply with respect to a work when an identical copy of that work is not reasonably available in another form.

(3) A nonprofit library, archives, or educational institution that willfully for the purpose of commercial advantage or financial gain violates paragraph (1)—

(A) shall, for the first offense, be subject to the civil remedies under section 1203; and

(B) shall, for repeated or subsequent offenses, in addition to the civil remedies under section 1203, forfeit the exemption provided under paragraph (1).

(4) This subsection may not be used as a defense to a claim under subsection (a)(2) or (b), nor may this subsection permit a nonprofit library, archives, or educational institution to manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, component, or part thereof, which circumvents a technological measure.

(5) In order for a library or archives to qualify for the exemption under this subsection, the collections of that library or archives shall be—

(A) open to the public; or

(B) available not only to researchers affiliated with the library or archives or with the institution of which it is a part, but also to other persons doing research in a specialized field.

**(e) Law enforcement, intelligence, and other government activities.**—This section does not prohibit any lawfully authorized

investigative, protective, information security, or intelligence activity of an officer, agent, or employee of the United States, a State, or a political subdivision of a State, or a person acting pursuant to a contract with the United States, a State, or a political subdivision of a State. For purposes of this subsection, the term "information security" means activities carried out in order to identify and address the vulnerabilities of a government computer, computer system, or computer network.

**(f) Reverse engineering.—**

(1) Notwithstanding the provisions of subsection (a)(1)(A), a person who has lawfully obtained the right to use a copy of a computer program may circumvent a technological measure that effectively controls access to a particular portion of that program for the sole purpose of identifying and analyzing those elements of the program that are necessary to achieve interoperability of an independently created computer program with other programs, and that have not previously been readily available to the person engaging in the circumvention, to the extent any such acts of identification and analysis do not constitute infringement under this title.

(2) Notwithstanding the provisions of subsections (a)(2) and (b), a person may develop and employ technological means to circumvent a technological measure, or to circumvent protection afforded by a technological measure, in order to enable the identification and analysis under paragraph (1), or for the purpose of enabling interoperability of an independently created computer program with other programs, if such means are necessary to achieve such interoperability, to the extent that doing so does not constitute infringement under this title.

(3) The information acquired through the acts permitted under paragraph (1), and the means permitted under paragraph (2), may be made available to others if the person referred to in paragraph

(1) or (2), as the case may be, provides such information or means solely for the purpose of enabling interoperability of an independently created computer program with other programs, and to the extent that doing so does not constitute infringement under this title or violate applicable law other than this section.

(4) For purposes of this subsection, the term "interoperability" means the ability of computer programs to exchange information, and of such programs mutually to use the information which has been exchanged.

**(g) Encryption research.**—

    **(1) Definitions.**—For purposes of this subsection—

        (A) the term "encryption research" means activities necessary to identify and analyze flaws and vulnerabilities of encryption technologies applied to copyrighted works, if these activities are conducted to advance the state of knowledge in the field of encryption technology or to assist in the development of encryption products; and

        (B) the term "encryption technology" means the scrambling and descrambling of information using mathematical formulas or algorithms.

    **(2) Permissible acts of encryption research.**—Notwithstanding the provisions of subsection (a)(1)(A), it is not a violation of that subsection for a person to circumvent a technological measure as applied to a copy, phonorecord, performance, or display of a published work in the course of an act of good faith encryption research if—

        (A) the person lawfully obtained the encrypted copy, phonorecord, performance, or display of the published work;

(B) such act is necessary to conduct such encryption research;

(C) the person made a good faith effort to obtain authorization before the circumvention; and

(D) such act does not constitute infringement under this title or a violation of applicable law other than this section, including section 1030 of title 18 and those provisions of title 18 amended by the Computer Fraud and Abuse Act of 1986.

**(3) Factors in determining exemption.**—In determining whether a person qualifies for the exemption under paragraph (2), the factors to be considered shall include—

(A) whether the information derived from the encryption research was disseminated, and if so, whether it was disseminated in a manner reasonably calculated to advance the state of knowledge or development of encryption technology, versus whether it was disseminated in a manner that facilitates infringement under this title or a violation of applicable law other than this section, including a violation of privacy or breach of security;

(B) whether the person is engaged in a legitimate course of study, is employed, or is appropriately trained or experienced, in the field of encryption technology; and

(C) whether the person provides the copyright owner of the work to which the technological measure is applied with notice of the findings and documentation of the research, and the time when such notice is provided.

**(4) Use of technological means for research activities.**— Notwithstanding the provisions of subsection (a)(2), it is not a violation of that subsection for a person to—

(A) develop and employ technological means to circumvent a technological measure for the sole purpose of that person performing the acts of good faith encryption research described in paragraph (2); and

(B) provide the technological means to another person with whom he or she is working collaboratively for the purpose of conducting the acts of good faith encryption research described in paragraph (2) or for the purpose of having that other person verify his or her acts of good faith encryption research described in paragraph (2).

**(5) Report to Congress.**—Not later than 1 year after the date of the enactment of this chapter, the Register of Copyrights and the Assistant Secretary for Communications and Information of the Department of Commerce shall jointly report to the Congress on the effect this subsection has had on—

(A) encryption research and the development of encryption technology;

(B) the adequacy and effectiveness of technological measures designed to protect copyrighted works; and

(C) protection of copyright owners against the unauthorized access to their encrypted copyrighted works.

The report shall include legislative recommendations, if any.

**(h) Exceptions regarding minors.**—In applying subsection (a) to a component or part, the court may consider the necessity for its intended and actual incorporation in a technology, product, service, or device, which—

(1) does not itself violate the provisions of this title; and

(2) has the sole purpose to prevent the access of minors to material on the Internet.

**(i) Protection of personally identifying information.—**

> **(1) Circumvention permitted.—**Notwithstanding the provisions of subsection (a)(1)(A), it is not a violation of that subsection for a person to circumvent a technological measure that effectively controls access to a work protected under this title, if—

> > (A) the technological measure, or the work it protects, contains the capability of collecting or disseminating personally identifying information reflecting the online activities of a natural person who seeks to gain access to the work protected;

> > (B) in the normal course of its operation, the technological measure, or the work it protects, collects or disseminates personally identifying information about the person who seeks to gain access to the work protected, without providing conspicuous notice of such collection or dissemination to such person, and without providing such person with the capability to prevent or restrict such collection or dissemination;

> > (C) the act of circumvention has the sole effect of identifying and disabling the capability described in subparagraph (A), and has no other effect on the ability of any person to gain access to any work; and

> > (D) the act of circumvention is carried out solely for the purpose of preventing the collection or dissemination of personally identifying information about a natural person who seeks to gain access to the work protected, and is not in violation of any other law.

**(2) Inapplicability to certain technological measures.**—This subsection does not apply to a technological measure, or a work it protects, that does not collect or disseminate personally identifying information and that is disclosed to a user as not having or using such capability.

**(j) Security testing.—**

**(1) Definition.**—For purposes of this subsection, the term "security testing" means accessing a computer, computer system, or computer network, solely for the purpose of good faith testing, investigating, or correcting, a security flaw or vulnerability, with the authorization of the owner or operator of such computer, computer system, or computer network.

**(2) Permissible acts of security testing.**—Notwithstanding the provisions of subsection (a)(1)(A), it is not a violation of that subsection for a person to engage in an act of security testing, if such act does not constitute infringement under this title or a violation of applicable law other than this section, including section 1030 of title 18 and those provisions of title 18 amended by the Computer Fraud and Abuse Act of 1986.

**(3) Factors in determining exemption.**—In determining whether a person qualifies for the exemption under paragraph (2), the factors to be considered shall include—

(A) whether the information derived from the security testing was used solely to promote the security of the owner or operator of such computer, computer system or computer network, or shared directly with the developer of such computer, computer system, or computer network; and

(B) whether the information derived from the security testing was used or maintained in a manner that does not facilitate

infringement under this title or a violation of applicable law other than this section, including a violation of privacy or breach of security.

**(4) Use of technological means for security testing.—** Notwithstanding the provisions of subsection (a)(2), it is not a violation of that subsection for a person to develop, produce, distribute or employ technological means for the sole purpose of performing the acts of security testing described in subsection [(a)](2), provided such technological means does not otherwise violate [sub]section (a)(2).

**(k) Certain analog devices and certain technological measures.—**

**(1) Certain analog devices.—**

(A) Effective 18 months after the date of the enactment of this chapter, no person shall manufacture, import, offer to the public, provide or otherwise traffic in any—

(i) VHS format analog video cassette recorder unless such recorder conforms to the automatic gain control copy control technology;

(ii) 8mm format analog video cassette camcorder unless such camcorder conforms to the automatic gain control technology;

(iii) Beta format analog video cassette recorder, unless such recorder conforms to the automatic gain control copy control technology, except that this requirement shall not apply until there are 1,000 Beta format analog video cassette recorders sold in the United States in any one calendar year after the date of the enactment of this chapter;

(iv) 8mm format analog video cassette recorder that is not an analog video cassette camcorder, unless such recorder conforms to the automatic gain control copy control technology, except that this requirement shall not apply until there are 20,000 such recorders sold in the United States in any one calendar year after the date of the enactment of this chapter; or

(v) analog video cassette recorder that records using an NTSC format video input and that is not otherwise covered under clauses (i) through (iv), unless such device conforms to the automatic gain control copy control technology.

(B) Effective on the date of the enactment of this chapter, no person shall manufacture, import, offer to the public, provide or otherwise traffic in—

(i) any VHS format analog video cassette recorder or any 8mm format analog video cassette recorder if the design of the model of such recorder has been modified after such date of enactment so that a model of recorder that previously conformed to the automatic gain control copy control technology no longer conforms to such technology; or

(ii) any VHS format analog video cassette recorder, or any 8mm format analog video cassette recorder that is not an 8mm analog video cassette camcorder, if the design of the model of such recorder has been modified after such date of enactment so that a model of recorder that previously conformed to the four-line colorstripe copy control technology no longer conforms to such technology.

Manufacturers that have not previously manufactured or sold a VHS format analog video cassette recorder, or an 8mm format analog cassette recorder, shall be required to conform to the four-line colorstripe copy control technology in the initial model of any such recorder manufactured after the date of the enactment of this chapter, and thereafter to continue conforming to the four-line colorstripe copy control technology. For purposes of this subparagraph, an analog video cassette recorder "conforms to" the four-line colorstripe copy control technology if it records a signal that, when played back by the playback function of that recorder in the normal viewing mode, exhibits, on a reference display device, a display containing distracting visible lines through portions of the viewable picture.

**(2) Certain encoding restrictions.**—No person shall apply the automatic gain control copy control technology or colorstripe copy control technology to prevent or limit consumer copying except such copying—

(A) of a single transmission, or specified group of transmissions, of live events or of audiovisual works for which a member of the public has exercised choice in selecting the transmissions, including the content of the transmissions or the time of receipt of such transmissions, or both, and as to which such member is charged a separate fee for each such transmission or specified group of transmissions;

(B) from a copy of a transmission of a live event or an audiovisual work if such transmission is provided by a channel or service where payment is made by a member of the public for such channel or service in the form of a subscription

fee that entitles the member of the public to receive all of the programming contained in such channel or service;

(C) from a physical medium containing one or more prerecorded audiovisual works; or

(D) from a copy of a transmission described in subparagraph (A) or from a copy made from a physical medium described in subparagraph (C).

> In the event that a transmission meets both the conditions set forth in subparagraph (A) and those set forth in subparagraph (B), the transmission shall be treated as a transmission described in subparagraph (A).

**(3) Inapplicability.**—This subsection shall not—

(A) require any analog video cassette camcorder to conform to the automatic gain control copy control technology with respect to any video signal received through a camera lens;

(B) apply to the manufacture, importation, offer for sale, provision of, or other trafficking in, any professional analog video cassette recorder; or

(C) apply to the offer for sale or provision of, or other trafficking in, any previously owned analog video cassette recorder, if such recorder was legally manufactured and sold when new and not subsequently modified in violation of paragraph (1)(B).

**(4) Definitions.**—For purposes of this subsection:

(A) An "analog video cassette recorder" means a device that records, or a device that includes a function that records, on electromagnetic tape in an analog format the electronic

impulses produced by the video and audio portions of a television program, motion picture, or other form of audiovisual work.

(B) An "analog video cassette camcorder" means an analog video cassette recorder that contains a recording function that operates through a camera lens and through a video input that may be connected with a television or other video playback device.

(C) An analog video cassette recorder "conforms" to the automatic gain control copy control technology if it—

(i) detects one or more of the elements of such technology and does not record the motion picture or transmission protected by such technology; or

(ii) records a signal that, when played back, exhibits a meaningfully distorted or degraded display.

(D) The term "professional analog video cassette recorder" means an analog video cassette recorder that is designed, manufactured, marketed, and intended for use by a person who regularly employs such a device for a lawful business or industrial use, including making, performing, displaying, distributing, or transmitting copies of motion pictures on a commercial scale.

(E) The terms "VHS format", "8mm format", "Beta format", "automatic gain control copy control technology", "colorstripe copy control technology", "four-line version of the colorstripe copy control technology", and "NTSC" have the meanings that are commonly understood in the consumer electronics and motion picture industries as of the date of the enactment of this chapter.

**(5) Violations.**—Any violation of paragraph (1) of this subsection shall be treated as a violation of subsection (b)(1) of this section. Any violation of paragraph (2) of this subsection shall be deemed an "act of circumvention" for the purposes of section 1203(c)(3)(A) of this chapter.

**17 U.S.C. § 117.  Limitations on exclusive rights: Computer programs**

**(a) Making of additional copy or adaptation by owner of copy.**—Notwithstanding the provisions of section 106, it is not infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:

> (1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or

> (2) that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful.

**(b) Lease, sale, or other transfer of additional copy or adaptation**.—Any exact copies prepared in accordance with the provisions of this section may be leased, sold, or otherwise transferred, along with the copy from which such copies were prepared, only as part of the lease, sale, or other transfer of all rights in the program. Adaptations so prepared may be transferred only with the authorization of the copyright owner.

**(c) Machine maintenance or repair.**—Notwithstanding the provisions of section 106, it is not an infringement for the owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine, if—

> (1) such new copy is used in no other manner and is destroyed immediately after the maintenance or repair is completed; and

(2) with respect to any computer program or part thereof that is not necessary for that machine to be activated, such program or part thereof is not accessed or used other than to make such new copy by virtue of the activation of the machine.

**(d) Definitions.**—For purposes of this section—

(1) the "maintenance" of a machine is the servicing of the machine in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that machine; and

(2) the "repair" of a machine is the restoring of the machine to the state of working in accordance with its original specifications and any changes to those specifications authorized for that machine.

## 17 U.S.C. § 407.  Deposit of copies or phonorecords for Library of Congress

(a) Except as provided by subsection (c), and subject to the provisions of subsection (e), the owner of copyright or of the exclusive right of publication in a work published in the United States shall deposit, within three months after the date of such publication—

(1) two complete copies of the best edition; or

(2) if the work is a sound recording, two complete phonorecords of the best edition, together with any printed or other visually perceptible material published with such phonorecords.

Neither the deposit requirements of this subsection nor the acquisition provisions of subsection (e) are conditions of copyright protection.

(b) The required copies or phonorecords shall be deposited in the Copyright Office for the use or disposition of the Library of Congress. The Register of Copyrights shall, when requested by the depositor and upon payment of the fee prescribed by section 708, issue a receipt for the deposit.

(c) The Register of Copyrights may by regulation exempt any categories of material from the deposit requirements of this section, or require deposit of only one copy or phonorecord with respect to any categories. Such regulations shall provide either for complete exemption from the deposit requirements of this section, or for alternative forms of deposit aimed at providing a satisfactory archival record of a work without imposing practical or financial hardships on the depositor, where the individual author is the owner of copyright in a pictorial, graphic, or sculptural work and (i) less than five copies of the work have been published, or (ii) the work has been published in a limited edition consisting of numbered copies, the monetary value of which would make

the mandatory deposit of two copies of the best edition of the work burdensome, unfair, or unreasonable.

(d) At any time after publication of a work as provided by subsection (a), the Register of Copyrights may make written demand for the required deposit on any of the persons obligated to make the deposit under subsection (a). Unless deposit is made within three months after the demand is received, the person or persons on whom the demand was made are liable—

    (1) to a fine of not more than $250 for each work; and

    (2) to pay into a specially designated fund in the Library of Congress the total retail price of the copies or phonorecords demanded, or, if no retail price has been fixed, the reasonable cost to the Library of Congress of acquiring them; and

    (3) to pay a fine of $2,500, in addition to any fine or liability imposed under clauses (1) and (2), if such person willfully or repeatedly fails or refuses to comply with such a demand.

(e) With respect to transmission programs that have been fixed and transmitted to the public in the United States but have not been published, the Register of Copyrights shall, after consulting with the Librarian of Congress and other interested organizations and officials, establish regulations governing the acquisition, through deposit or otherwise, of copies or phonorecords of such programs for the collections of the Library of Congress.

    (1) The Librarian of Congress shall be permitted, under the standards and conditions set forth in such regulations, to make a fixation of a transmission program directly from a transmission to the public, and to reproduce one copy or phonorecord from such fixation for archival purposes.

(2) Such regulations shall also provide standards and procedures by which the Register of Copyrights may make written demand, upon the owner of the right of transmission in the United States, for the deposit of a copy or phonorecord of a specific transmission program. Such deposit may, at the option of the owner of the right of transmission in the United States, be accomplished by gift, by loan for purposes of reproduction, or by sale at a price not to exceed the cost of reproducing and supplying the copy or phonorecord. The regulations established under this clause shall provide reasonable periods of not less than three months for compliance with a demand, and shall allow for extensions of such periods and adjustments in the scope of the demand or the methods for fulfilling it, as reasonably warranted by the circumstances. Willful failure or refusal to comply with the conditions prescribed by such regulations shall subject the owner of the right of transmission in the United States to liability for an amount, not to exceed the cost of reproducing and supplying the copy or phonorecord in question, to be paid into a specially designated fund in the Library of Congress.

(3) Nothing in this subsection shall be construed to require the making or retention, for purposes of deposit, of any copy or phonorecord of an unpublished transmission program, the transmission of which occurs before the receipt of a specific written demand as provided by clause (2).

(4) No activity undertaken in compliance with regulations prescribed under clauses (1) or (2) of this subsection shall result in liability if intended solely to assist in the acquisition of copies or phonorecords under this subsection.

## 17 U.S.C. § 408.  Copyright registration in general

**(a) Registration Permissive.**—At any time during the subsistence of the first term of copyright in any published or unpublished work in which the copyright was secured before January 1, 1978, and during the subsistence of any copyright secured on or after that date, the owner of the copyright or of any exclusive right in the work may obtain registration of the copyright claim by delivering to the Copyright Office the deposit specified by this section, together with the application and fee specified by sections 409 and 708. Such registration is not a condition of copyright protection.

**(b) Deposit for Copyright Registration.**—Except as provided by subsection (c), the material deposited for registration shall include—

> (1) in the case of an unpublished work, one complete copy or phonorecord;

> (2) in the case of a published work, two complete copies or phonorecords of the best edition;

> (3) in the case of a work first published outside the United States, one complete copy or phonorecord as so published;

> (4) in the case of a contribution to a collective work, one complete copy or phonorecord of the best edition of the collective work.

> Copies or phonorecords deposited for the Library of Congress under section 407 may be used to satisfy the deposit provisions of this section, if they are accompanied by the prescribed application and fee, and by any additional identifying material that the Register may, by regulation, require. The Register shall also prescribe regulations establishing requirements under which copies or phonorecords acquired for the Library of Congress under subsection (e) of section 407, otherwise than by

deposit, may be used to satisfy the deposit provisions of this section.

**(c) Administrative Classification and Optional Deposit.—**

(1) The Register of Copyrights is authorized to specify by regulation the administrative classes into which works are to be placed for purposes of deposit and registration, and the nature of the copies or phonorecords to be deposited in the various classes specified. The regulations may require or permit, for particular classes, the deposit of identifying material instead of copies or phonorecords, the deposit of only one copy or phonorecord where two would normally be required, or a single registration for a group of related works. This administrative classification of works has no significance with respect to the subject matter of copyright or the exclusive rights provided by this title.

(2) Without prejudice to the general authority provided under clause (1), the Register of Copyrights shall establish regulations specifically permitting a single registration for a group of works by the same individual author, all first published as contributions to periodicals, including newspapers, within a twelve-month period, on the basis of a single deposit, application, and registration fee, under the following conditions:

(A) if the deposit consists of one copy of the entire issue of the periodical, or of the entire section in the case of a newspaper, in which each contribution was first published; and

(B) if the application identifies each work separately, including the periodical containing it and its date of first publication.

(3) As an alternative to separate renewal registrations under subsection (a) of section 304, a single renewal registration may be

made for a group of works by the same individual author, all first published as contributions to periodicals, including newspapers, upon the filing of a single application and fee, under all of the following conditions:

> (A) the renewal claimant or claimants, and the basis of claim or claims under section 304(a), is the same for each of the works; and

> (B) the works were all copyrighted upon their first publication, either through separate copyright notice and registration or by virtue of a general copyright notice in the periodical issue as a whole; and

> (C) the renewal application and fee are received not more than twenty-eight or less than twenty-seven years after the thirty-first day of December of the calendar year in which all of the works were first published; and

> (D) the renewal application identifies each work separately, including the periodical containing it and its date of first publication.

**(d) Corrections and Amplifications.**—The Register may also establish, by regulation, formal procedures for the filing of an application for supplementary registration, to correct an error in a copyright registration or to amplify the information given in a registration. Such application shall be accompanied by the fee provided by section 708, and shall clearly identify the registration to be corrected or amplified. The information contained in a supplementary registration augments but does not supersede that contained in the earlier registration.

**(e) Published Edition of Previously Registered Work.**— Registration for the first published edition of a work previously

registered in unpublished form may be made even though the work as published is substantially the same as the unpublished version.

**(f) Preregistration of works being prepared for commercial distribution.—**

**(1) Rulemaking.—**Not later than 180 days after the date of enactment of this subsection, the Register of Copyrights shall issue regulations to establish procedures for preregistration of a work that is being prepared for commercial distribution and has not been published.

**(2) Class of works.—**The regulations established under paragraph (1) shall permit preregistration for any work that is in a class of works that the Register determines has had a history of infringement prior to authorized commercial distribution.

**(3) Application for registration.—**Not later than 3 months after the first publication of a work preregistered under this subsection, the applicant shall submit to the Copyright Office—

(A) an application for registration of the work;

(B) a deposit; and

(C) the applicable fee.

**(4) Effect of untimely application.—**An action under this chapter for infringement of a work preregistered under this subsection, in a case in which the infringement commenced no later than 2 months after the first publication of the work, shall be dismissed if the items described in paragraph (3) are not submitted to the Copyright Office in proper form within the earlier of—

(A) 3 months after the first publication of the work; or

(B) 1 month after the copyright owner has learned of the infringement.

**16 U.S.C. § 460–n1.  Boundaries of area; filing of map with Federal Register; revision; donations of land; property acquisition and exclusion**

Lake Mead National Recreation Area shall comprise that particular land and water area which is shown on a certain map, identified as "boundary map, RA-LM-7060-B, revised July 17, 1963", which is on file and which shall be available for public inspection in the office of the National Park Service of the Department of the Interior. An exact copy of such map shall be filed with the Federal Register within thirty days following October 8, 1964, and an exact copy thereof shall be available also for public inspection in the headquarters office of the superintendent of the said Lake Mead National Recreation Area.

The Secretary of the Interior is authorized to revise the boundaries of such national recreation area, subject to the requirement that the total acreage of that area, as revised, shall be no greater than the present acreage thereof. In the event of such boundary revision, maps of the recreation area, as revised, shall be prepared by the Department of the Interior, and shall be filed in the same manner, and shall be available for public inspection also in accordance with the aforesaid procedures and requirements relating to the filing and availability of maps. The Secretary may accept donations of land and interests in land within the exterior boundaries of such area, or such property may be procured by the Secretary in such manner as he shall consider to be in the public interest.

In exercising his authority to acquire property by exchange, the Secretary may accept title to any non-Federal property located within the boundaries of the recreation area and convey to the grantor of such property any federally owned property under the jurisdiction of the Secretary, notwithstanding any other provision of law. The properties so exchanged shall be approximately equal in fair market value: Provided, That the Secretary may accept cash from or pay cash to the grantor in

such an exchange in order to equalize the values of the properties exchanged.

Establishment or revision of the boundaries of the said national recreation area, as herein prescribed, shall not affect adversely any valid rights in the area, nor shall it affect the validity of withdrawals heretofore made for reclamation or power purposes. All lands in the recreation area which have been withdrawn or acquired by the United States for reclamation purposes shall remain subject to the primary use thereof for reclamation and power purposes so long as they are withdrawn or needed for such purposes. There shall be excluded from the said national recreation area by the Secretary of the Interior any property for management or protection by the Bureau of Reclamation, which would be subject otherwise to inclusion in the said recreation area, and which the Secretary of the Interior considers in the national interest should be excluded therefrom.

**16 U.S.C. § 460–s1.  Description of Area**

The area comprising that particular land and water depicted on the map identified as "Proposed Pictured Rocks National Lakeshore, United States Department of the Interior, National Park Service, Boundary Map, NL-PR-7100A, July 1966", which is on file and available for public inspection in the office of the National Park Service of the Department of the Interior, is hereby designated for establishment as the Pictured Rocks National Lakeshore. An exact copy of such map shall be filed for publication in the Federal Register within thirty days following October 15, 1966.