No. 24-7700

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

J. DOE, 1 AND J. DOE, 2-5, INDIVIDUALLY AND
ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,
*Plaintiffs-Petitioners,*

v.

GITHUB, INC., A DELAWARE CORPORATION; ET. AL.,
*Defendants- Respondents.*

*On Appeal From The United States District Court For The Northern District of California*
*No.* 22-cv-06823-JST

*Judge Jon. S. Tigar*

**BRIEF OF AMICI CURIAE ACT | THE APP ASSOCIATION IN SUPPORT OF NEITHER PARTY**

BRIAN SCARPELLI
PRIYA NAIR
ACT | THE APP ASSOCIATION
1401 K St NW
Suite 501
Washington, D.C. 20005
(202) 331-2130

*Counsel for Amici Curiae*

April 16, 2025

# CERTIFICATE OF INTEREST

Counsel for *amicus curiae* ACT | The App Association certifies the following:

1. **A*micus curiae* on whose behalf the brief is filed:** ACT | The App Association.

2. **The names of any real parties in interest:** Not applicable.

3. **Any parent corporation or any publicly held corporation that owns 10% or more of stock in ACT | The App Association:** None.

4. **Every law office and attorney that has appeared, or will appear, on behalf of ACT | The App Association:** None.

5. **The title and number of any case that is pending that will "directly affect or be directly affected by" this Court's decision in the appeal being briefed:** ACT | The App Association defers to the first-hand knowledge of the parties to the appeal on this question.

6. **Any information required under Federal Rule of Appellate Procedure 26.1(b) (organizational victims in criminal cases) or 26.1(c) (debtors or trustees in bankruptcy cases):** None.


Dated: April 16, 2025　　　　　　　/s/ Brian Scarpelli
　　　　　　　　　　　　　　　　BRIAN SCARPELLI
　　　　　　　　　　　　　　　　PRIYA NAIR
　　　　　　　　　　　　　　　　ACT | THE APP ASSOCIATION
　　　　　　　　　　　　　　　　1401 K St NW
　　　　　　　　　　　　　　　　Suite 501
　　　　　　　　　　　　　　　　Washington, D.C. 20005
　　　　　　　　　　　　　　　　(202) 331-2130

i

## TABLE OF CONTENTS

          Page

CERTIFICATE OF INTEREST ..................................................................................i

TABLE OF AUTHORITIES................................................................................... iii

INTEREST OF AMICUS CURIAE ........................................................................1

SUMMARY OF THE ARGUMENT......................................................................2

ARGUMENT ..........................................................................................................3

I.    COPYRIGHT PROTECTION OF OPEN SOURCE SOFTWARE SUPPORTS SMALL BUSINESS DEVELOPERS AND GOVERNMENT FUNCTIONALITY ........................................................................................3

    A.    OPEN SOURCE LICENSES PROTECT OPEN AND MODIFIABLE SOFTWARE EXPRESSION THAT PROVIDES SMALL BUSINESSES AND GOVERNMENT ENTITIES WITH AFFORDABLE AND OPTIMAL FUNCTIONAL SOLUTIONS......................................................3

    B.    THE UNITED STATES ECONOMY RELIES ON THE USABILITY OF THE OPEN SOURCE MODEL ..................................................................4

II.    AN "IDENTICALITY REQUIREMENT" FOR PURPOSES OF §1202(B) DOES NOT ANTICIPATE CURRENT REALITIES IN INNOVATIVE AND CREATIVE WORKS........................................................6

    A.    AN OVERLY RIGID IDENTICALITY REQUIREMENT HARMS AN APPROPRIATE BALANCE BETWEEN COPYRIGHT PROTECTION AND INNOVATION ............................................................7

CONCLUSION.....................................................................................................12

# TABLE OF AUTHORITIES

**Cases**

*Doe v. Github, Inc.*, 2024 U.S. Dist. LEXIS 175951 (N.D. Cal. Sept. 27, 2024) ..... 7

*Google LLC v. Oracle Am., Inc.*, 593 U.S. 1(2021) .................................................. 3

*Jacobsen v. Katzer*, 535 F.3d 1373 (Fed. Cir. 2008) ................................................. 4

*Oracle Int'l Corp. v. Rimini St., Inc.*, 2023 U.S. Dist. LEXIS 126766 (D. Nev. July 24, 2023) ........................................................................................................ 8

**Statutes**

17 U.S.C. § 102(a)(1) (1976) ..................................................................................... 3

17 U.S.C. §1202(b)(2022) .......................................................................................... 7

17 U.S.C. §1202(c)(2)(3)(6) (2022) ........................................................................... 7

**Other Authorities**

*GNU General Public License*, GNU OPERATING SYS. (June 29, 2007), https://www.gnu.org/licenses/gpl-3.0.en.html ..................................................... 5

Hoffmann, Manuel, Frank Nagle & Yanuo Zhou, *The Value of Open Source Software* (Harv. Bus. Sch. Working Paper, Paper No. 24-038, 2024), https://www.hbs.edu/faculty/Pages/item.aspx?num=65230 ............................. 5, 6

S. Rep. No. 105-190, at 16 (1998) ............................................................................. 8

*Source Code Policy*, U.S. DEP'T OF COMMERCE, https://www.commerce.gov/about/policies/source-code (last visited Apr. 15, 2025) ..................................................................................................6

*The MIT License*, OPEN SOURCE INITIATIVE, https://opensource.org/license/mit (last visited Apr. 15, 2025) ..........................................................................................4

iv

## INTEREST OF AMICI CURIAE[1]

ACT | The App Association ("App Association") is a global policy trade association for the small business technology developer community. Our members are entrepreneurs, innovators, and independent developers within the app ecosystem that engage with verticals across every industry. The value of the ecosystem the App Association represents—which we call the app economy—is approximately $1.8 trillion and is responsible for 6.1 million American jobs, while serving as a key driver of the $8 trillion internet of things (IoT) revolution.[2] Our members lead in developing innovative applications and products across consumer and enterprise use cases, using both closed and open source models. The App Association has a strong interest in protecting the open source software ecosystem that supports new and meaningful software-based products.

---

[1] No party or party's counsel authored this brief in whole or in part. No one, other than amici, their members, and their counsel, contributed money that was intended to fund preparing or submitting the brief. This brief is submitted with a motion for leave to file. All parties have consented to its filing.

[2] ACT | The App Association, State of the App Economy (2022), https://actonline.org/wp-content/uploads/APP-Economy-Report-FINAL.pdf.

1

## SUMMARY OF ARGUMENT

We argue that: (1) Copyright protection of open source software licenses supports an alternative, cost-efficient, and collaborative approach to creating important innovative solution for U.S. businesses, U.S. government, and downstream consumers; (2) Small businesses would not be able to grow at their current rate, and U.S. government entities would not be able benefit from currently implemented strong software solutions, without the open source model; and (3) An identicality requirement does not align with the intent of the DMCA to support an evolving digital landscape. Therefore, the court should not consider an identicality requirement for purposes of a §1202(b) claim under the DMCA to protect the open source model and its impact on U.S. economic and national security.

# ARGUMENT

I. **COPYRIGHT PROTECTION OF OPEN SOURCE SOFTWARE SUPPORTS SMALL BUSINESS DEVELOPERS AND GOVERNMENT FUNCTIONALITY**

   A. **OPEN SOURCE LICENSES PROTECT OPEN AND MODIFIABLE SOFTWARE EXPRESSION THAT PROVIDES SMALL BUSINESSES AND GOVERNMENT ENTITIES WITH AFFORDABLE AND OPTIMAL FUNCTIONAL SOLUTIONS**

Open source software licensing provides a cost-efficient and collaborative approach to creating strong and leading solutions for U.S. businesses, the U.S. government, and downstream consumers. U.S. copyright law protects software as a copyrightable literary work. 17 U.S.C. § 102(a)(1) (1976). This categorization encourages small developers to create and secure intellectual property assets, which they might otherwise be disincentivized to protect due to the higher burden of seeking patent protection. Copyright law views software as a unique hybrid between expressive and inventive, where functional elements of software must be fair use to protect innovation, while expressive elements benefit from copyright protection. *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 22 (2021).

The open source software model differs from traditional copyright protection because the author dedicates their exclusive rights for their copyrighted work to the public, allowing anyone to use, learn, or modify the underlying source code under certain licensing conditions that, if not complied with, impose copyright liability.

3

*See Jacobsen v. Katzer*, 535 F.3d 1373, 1378 (Fed. Cir. 2008). The conditions outlined in open source licenses range from permissive to restrictive. Permissive licenses often differ from more restrictive licenses in that modifications to the underlying code may remain proprietary.

An example of a permissive or less restrictive license includes the MIT license, which requires that all copies and substantial portions of the software include the license's copyright notice and an explanation that that the software is provided "as is" without any warranties. *The MIT License*, OPEN SOURCE INITIATIVE, https://opensource.org/license/mit (last visited Apr. 15, 2025). More restrictive open source licenses are designated as "copyleft" due to stronger conditions that ensure the openness of the underlying source code and its modifications. The most prominent example of a copyleft license is the GNU General Public License (GPL), which is known for licenses such as the GPLv3 license that requires licensees to make their modifications to code public and attributable to the GPL license upon redistribution. *GNU General Public License*, GNU OPERATING SYS. (June 29, 2007), https://www.gnu.org/licenses/gpl-3.0.en.html.

### B. THE UNITED STATES ECONOMY RELIES ON THE USABILITY OF THE OPEN SOURCE MODEL

Nearly every innovative technology-based business and government agency security solution utilizes open source software. The open source model's

4

collaborative and resourceful framework allows American businesses and government entities to build upon and incorporate the strongest evolving solutions. A study estimates that it would cost a company about $8.8 trillion to develop the open source software that currently underlies their business model. Hoffmann, Manuel, Frank Nagle & Yanuo Zhou, *The Value of Open Source Software* 17 (Harv. Bus. Sch. Working Paper, Paper No. 24-038, 2024), https://www.hbs.edu/faculty/Pages/item.aspx?num=65230. This value is indispensable to companies of all sizes, and particularly small developers, like App Association members, that operate on thin margins. A small or startup software company would not have the scaling opportunity it does at the rate that it does without open source software. This model is not only responsible for supporting baseline software solutions, but also the growth of emerging and complex technologies, including artificial intelligence (AI) and quantum computing. *Id*. at 2.

The transparency and auditable requirement of open source licensing has played an important role in the U.S. government's efforts to protect against cybersecurity threats. U.S. federal agencies are not only benefactors of the open source software licensing model, but they also create opportunities for developers to improve upon federal source code. For example, the Department of Commerce Source Code Policy requires at least 20 percent of custom-developed federal source code, through contracted services or employee work, to be released as open source

5

software. *Source Code Policy*, U.S. DEP'T OF COMMERCE, https://www.commerce.gov/about/policies/source-code (last visited Apr. 15, 2025). The integration of open source software in both private and public sector operations establishes its importance to U.S. economic growth and security as well as national security.

## II. AN "IDENTICALITY REQUIREMENT" FOR PURPOSES OF §1202(B) DOES NOT ANTICIPATE CURRENT REALITIES IN INNOVATIVE AND CREATIVE WORKS

This court has the opportunity to provide much needed clarity around judicial disagreements on the application of an identicality requirement under §1202(b) of the Digital Millenium Copyright Act (DMCA). 17 U.S.C. §1202(b) (2022). §1202(b) prohibits the removal or alteration of copyright management information (CMI), which includes identifying information about the author and copyright holder along with terms and conditions for the use of the work. *Id*.;17 U.S.C. §1202(c)(2)(3)(6) (2022). The question of law raised by Plaintiffs is whether certain provisions of §1202(b) of the DMCA impose an identicality requirement, which is a purely legal question of statutory interpretation. *Doe v. Github, Inc.*, 2024 U.S. Dist. LEXIS 175951, *5 (N.D. Cal. Sept. 27, 2024). Since our analysis would not differ based on the specific provisions, we address the identicality requirement based on §1202(b) as a whole.

6

### A. AN OVERLY RIGID IDENTICALITY REQUIREMENT HARMS AN APPROPRIATE BALANCE BETWEEN COPYRIGHT PROTECTION AND INNOVATION

An overly rigid identicality requirement for a §1202(b) claim does not align with the intent of the DMCA to modernize U.S. copyright law to the evolving landscape of digital works. Congress intended this provision to support tracking uses of copyrighted works, the licensing of rights and indicating attribution, creation and ownership. S. Rep. No. 105-190, at 16 (1998). A plain reading of §1202(b) does not require the removal or alteration of CMI to be associated with original or identical copies to obtain relief. *Oracle Int'l Corp. v. Rimini St., Inc.*, 2023 U.S. Dist. LEXIS 126766, *280 (D. Nev. July 24, 2023). Similarly, court within the Ninth Circuit have held that if source code is modified to be substantially similar to a copyrighted source code, DMCA liability attaches. *Id.* (*citing Enter. Tech. Holdings, Inc. v. Noveon Sys.*, 2008 U.S. Dist. LEXIS 130740, *14-*16 (S.D. Cal. July 29, 2008). This rationale has led other courts to conclude that an identicality requirement would weaken the statute's intended protections. *Rimini St., Inc.*, 2023 U.S. Dist. LEXIS 126766.

Generative AI tools are unique from traditional AI tools in that they have an independent process that extracts data to train on, understands patterns, and creates rules that help produce outputs. Generative AI systems might output, in part or in whole, an image, software code, audio, or other works from its training dataset.

7

This process is contrasted by AI that receives human instructions to support the streamlining of repeatable tasks and the detection of common mistakes, issues, and risks in the software development process that would otherwise require manual interventions. Software developers have been using AI tools that heavily rely on human cognition to deliver a desired output for years, but generative AI tools reduce the need for human instruction. Generative AI platforms can pull data from the public domain and licensed datasets to train on without human instruction. Unless a publicly displayed copyrighted work is protected through anti-web crawler mechanisms (e.g., robots.txt), the likelihood that copyrighted data may be trained on to support new outputs is high.

CMI protects copyright holders and their consumers. In the case of an open source model, the rights reserved by the author to its licensees and the broader ecosystem that it supports is protected by CMI. The exposure of open source code without proper CMI depletes its auditable nature that ensures constant improvement to its strength and security, impacting every licensee that benefits from this model. While challenges persist regarding whether an AI product's use of copyrighted data to develop their underlying model or to produce new outputs should be liable for the removal or alteration of CMI, an identicality requirement would not alleviate this issue. Rather, such a requirement would bar copyright protection against AI products.

8

## CONCLUSION

We urge this court to consider the case of the open source model and its impact on U.S. economic and national security in rejecting a rigid identicality requirement for a §1202(b) claim under the DMCA.

Respectfully submitted,

/s/ Brian Scarpelli
BRIAN SCARPELLI
PRIYA NAIR
ACT | THE APP ASSOCIATION
1401 K St NW
Suite 501
Washington, D.C. 20005
(202) 331-2130

*Counsel for Amici Curiae*

April 16, 2025

9

## CERTIFICATE OF SERVICE

I hereby certify that, on this 16th day of April 2025, I filed the foregoing with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Brian Scarpelli
BRIAN SCARPELLI
PRIYA NAIR
ACT | THE APP ASSOCIATION
1401 K St NW
Suite 501
Washington, D.C. 20005
(202) 331-2130

April 16, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29(a)(4)(G) and Circuit Rule 29(b), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Circuit Rule 32(b).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains [1451] words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Office 365 Pro Plus in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

       /s/ Brian Scarpelli
BRIAN SCARPELLI
PRIYA NAIR
ACT | THE APP ASSOCIATION
1401 K St NW
Suite 501
Washington, D.C. 20005
(202) 331-2130

April 16, 2024