## Case No. 24-7700

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

J. DOE, 1; J. DOE, 2-5,
individually and on behalf of all others similarly situated,
*Plaintiffs-Appellants,*

v.

GITHUB, INC., a Delaware corporation; MICROSOFT CORPORATION,
a Washington corporation; OPENAI, INC., a Delaware nonprofit corporation; OPENAI, LP,
a Delaware limited partnership; OPENAI GP, LLC, a Delaware limited liability company;
OPENAI STARTUP FUND GP I, LLC, a Delaware limited liability company;
OPENAI STARTUP FUND I, LP, a Delaware limited partnership;
OPENAI STARTUP FUND MANAGEMENT, LLC, a Delaware limited
liability company; OPENAI OPCO, LLC; OPENAI, LLC; OPENAI GLOBAL, LLC;
OAI CORPORATION; OPENAI HOLDINGS, LLC; OPENAI HOLDCO, LLC;
OPENAI INVESTMENT; OPENAI STARTUP FUND SPV I, LP;
OPENAI STARTUP FUND SPV GP I, LLC,
*Defendants-Appellees.*

*On Appeal from the United States District Court for the Northern District of California (Oakland),*
*Case No. 4:22-cv-06823-JST • The Honorable Jon S. Tigar, District Judge*

### MEMORANDUM OF LAW OF *AMICI CURIAE* THE AUTHORS GUILD, INC.; THE ASSOCIATION OF AMERICAN PUBLISHERS; THE NEWS/MEDIA ALLIANCE; AND THE INTERNATIONAL ASSOCIATION OF SCIENTIFIC, TECHNICAL AND MEDICAL PUBLISHERS IN SUPPORT OF PLAINTIFFS-APPELLANTS

ROBERT CLARIDA
**REITLER KAILAS & ROSENBLATT LLP**
885 Third Avenue, 20th Floor
New York New York 10022
Telephone: (212) 209-3050
Facsimile: (212) 371-5500
rclarida@reitlerlaw.com

*Attorneys for Amici Curiae*

 COUNSEL PRESS · (213) 680-2300     PRINTED ON RECYCLED PAPER 

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 34. Disclosure Statement under FRAP 26.1 and Circuit Rule 26.1-1

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form34instructions.pdf

**9th Cir. Case Number(s)**  | 24-7700 |

Name(s) of party/parties, prospective intervenor(s), or amicus/amici filing this form:

> The Authors Guild, Inc., the Association of American Publishers, the
> News/Media Alliance, and the International Association of Scientific, Technical
> and Medical Publishers

Under FRAP 26.1 and Circuit Rule 26.1-1, I make the following disclosures:

1. I disclose the following information required by FRAP 26.1(a) and/or Circuit Rule 26.1-1(b) for any nongovernmental corporation, association, joint venture, partnership, limited liability company, or similar entity[1] which is a party, prospective intervenor, or amicus curiae in any proceeding, or which the government identifies as an organizational victim below in section 2 of this form,[2] or which is a debtor as disclosed below in section 3 of this form.

   a. Does the party, prospective intervenor, amicus, victim, or debtor have any parent companies? Parent companies include all companies that control the entity directly or indirectly through intermediaries.
      ◯ Yes      ⦿ No

      If yes, identify all parent corporations of each entity, including all generations of parent corporations *(attach additional pages as necessary)*:

   b. Is 10% or more of the stock of the party, prospective intervenor, amicus, victim, or debtor owned by a publicly held corporation or other publicly held entity?
      ◯ Yes      ⦿ No

---

[1] A corporate entity must be identified by its full corporate name as registered with a secretary of state's office and, if its stock is publicly listed, its stock symbol or "ticker."

[2] To the extent it can be obtained through due diligence.

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 34**                                                                 *New 12/01/24*

If yes, identify all such owners for each entity *(attach additional pages as necessary)*:

2. In a criminal case, absent good cause shown, the government must identify here any organizational victim of the alleged criminal activity:

3. In a bankruptcy case, the debtor, the trustee, or, if neither is a party, the appellant must identify here each debtor not named in the court of appeals caption:

4. Are you aware of any judge serving on this Court who participated at any stage of the case, either in district court, administrative proceedings, or in related state court proceedings?
   ○ Yes    ⊙ No

   If yes, list the name of the judge and the case name, case number, and name of court of the related proceedings:

I certify that *(select only one)*:

⊙ this is the first disclosure statement filed in the above-referenced case by the above-identified party/parties, prospective intervenor(s), or amicus/amici, and this disclosure statement complies with FRAP 26.1 and Circuit Rule 26.1-1.

○ the party/parties, prospective intervenor(s), or amicus/amici submitting this supplemental disclosure statement has previously filed a compliant disclosure statement in this case, and this updated disclosure statement discloses changed or additional information.

○ I have reviewed this form, FRAP 26.1, and Circuit Rule 26.1-1 and, to the best of my knowledge, have no information to disclose at this time.

**Signature** | /s/ Robert Clarida | **Date** | April 16, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 34**      *New 12/01/24*

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................1

STATEMENT OF INTEREST OF *AMICI CURIAE* ...............................1

SUMMARY OF ARGUMENT .................................................................2

ARGUMENT ...........................................................................................3

    I.   17 U.S.C. §§ 1202(b)(1) and 1202(b)(3) DO NOT IMPOSE AN
IDENTICALITY REQUIREMENT. ............................................4

        A.   An identicality requirement contradicts the plain
meaning of the statute. ......................................................4

        B.   An identicality requirement frustrates the objectives
of the DMCA and the WCT/WPPT treaties......................10

    II.   THE WEIGHT OF AUTHORITY REJECTS AN IDENTICALITY
REQUIREMENT ......................................................................13

    III.  CONCLUSION ........................................................................17

CERTIFICATE OF COMPLIANCE......................................................18

APPENDIX ........................................................................................Add.1

# TABLE OF AUTHORITIES

## Cases

*ADR Int'l Ltd. v. Inst. for Supply Mgmt. Inc*,
667 F.Supp.3d 411 (S.D. Tex. 2023)...................................................... 13, 14, 15

*Advanta-STAR Automotive Research Corp. of Am. v. Search Optics, LLC*,
672 F.Supp.3d 1035 (S.D. Cal. 2023) ...................................................15

*Anderson v. Stability AI Ltd.*,
744 F. Supp. 3d 956 (C.D. Cal. 2024)....................................................14

*Beijing Meishe Network Tech. Co. v. Tiktok Inc.*,
2024 WL 3522196 (N.D. Cal. 2024) ......................................................13

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992) .................................................................................9

*Fischer v. Forrest*,
286 F. Supp. 3d 590 (S.D.N.Y. 2018) ............................................ 14, 16

*Frost-Tsuji Architects v. Highway Inn, Inc.*,
No. 13-00496, 2015 WL 263556 (D. Haw. Jan. 21, 2015).......................... 14, 16

*Funky Films, Inc. v. Time Warner Entm't Co., Ltd. P'ship*,
462 F.3d 1072 (9th Cir. 2006)..................................................................7

*Huffman v. Activision Publishing Inc.*,
2020 WL 8678493 (E.D. Tex. at 2020)..................................................13

*Hunley v. Instagram, LLC*,
73 F.4th 1060 (9th Cir. 2023)...................................................................7

*Iselin v. United States*,
270 U.S. 245 (1926) .................................................................................8

*Kelly v. Arriba Soft Corp.*,
77 F. Supp. 2d 1116 (C.D. Cal. 1999)............................................ 14, 16

*Kirk Kara Corp. v. Western Stone & Metal Corp.*,
2020 WL 5991503 (C.D. Cal. 2020) ...................................... 14, 15, 16

*Lamie v. U.S. Tr.*,
   540 U.S. 526 (2004) ...........................................................................8

*Life Receivables Trust v. Syndicate 102 at Lloyd's of London*,
   549 F.3d 210 (2d Cir. 2008) ...............................................................9

*Nichols v. United States*,
   578 U.S. 104 (2016) ...........................................................................8

*O'Neal v. Sideshow, Inc.*,
   583 F. Supp. 3d 1282 (C.D. Cal. 2022)..............................................15

*Obsidian Finance Group, LLC v. Cox*,
   2012 WL 1065484 (D. Or. Mar. 27, 2012) .........................................9

*Oracle Int'l Corp. v. Rimini Street Inc.*,
   2023 WL 4706127 (D. Nev. 2023).....................................................13

*Pavelic & LeFlore v. Marvel Entertainment Group, Div. of Cadence Industries Corp.*,
   493 U.S. 120 (1989) ...........................................................................6

*Ramos-Portillo v. Barr*,
   919 F.3d 955 (5th Cir. 2019) ............................................................13

*Real World Media LLC v. Daily Caller, Inc.*,
   744 F. Supp. 3d 24 (D.D.C. 2024) .............................................. 13, 16

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
   81 F.2d 49 (2d Cir. 1936) ...................................................................7

*U.S. v. Locke*,
   471 U.S. 84 (1985) .............................................................................9

*Universal Pictures Co., Inc., v. Harold Lloyd Corp.*,
   162 F.2d 354 (9th Cir. 1947)...............................................................7

*West Virginia Univ. Hospitals, Inc. v. Casey*,
   499 U.S. 83 (1991) .............................................................................5

*Whitman v. Am. Trucking Ass'ns, Inc.*,
   531 U.S. 457 (2001) ...........................................................................9

**Statutes**

17 U.S.C. § 101 ................................................................................6, 13

17 U.S.C. § 106(2) ................................................................................6

17 U.S.C. § 1202(b) .................................................................... *passim*

17 U.S.C. § 1202(b)(1) ................................................................ *passim*

17 U.S.C. § 1202(b)(3) ................................................................ *passim*

17 U.S.C. § 1202(c) ................................................................................4

**Other Authorities**

2 Melville B. Nimmer and David Nimmer,
    *Nimmer on Copyright*, § 8.09 (2024) ....................................6

3 William F. Patry,
    *Patry on Copyright* § 9.59 (2025) .........................................7

H.R. Rep.,
    No. 105-551 (1998) ...............................................................10

Jane C. Ginsburg, *Humanist Copyright,*
    2025 Melville B. Nimmer Memorial Lecture, Ziffrin Institute, UCLA Law
    School (February 13, 2025)...................................................16

Jhonny Antonio Cadavid, *The Origin and Purpose of Legal Protection for the
    Integrity of Copyright Metadata*,
    54 INT'L REV. OF INTELL. PROP. & COMPETITION L. 1179 (2023).......................11

S. Rep.,
    No. 105-190 (1998). ..............................................................10

*The Advantages of Adherence to the WIPO Copyright Treaty and the WIPO
    Performances and Phonograms Treaty (WPPT)*,
    INTERNATIONAL BUREAU OF WIPO
    https://www.wipo.int/export/sites/www/copyright/en/docs/
    advantages_wct_wppt.pdf (last accessed April 3, 2025). ...................................11

*WIPO-MOST Intermediate Training Course on Practical Intellectual Property Issues in Business*, November 6, 2003
https://www.wipo.int/edocs/mdocs/sme/en/wipo_ip_bis_ge_03/.
wipo_ip_bis_ge_03_4-main1.pdf, pp.3-4 (last accessed April 3, 2025) .............11

## PRELIMINARY STATEMENT[1]

The Authors Guild, Inc., the Association of American Publishers, the News/Media Alliance, and the International Association of Scientific, Technical and Medical Publishers (collectively, "*Amici*") respectfully submit this Memorandum of Law in Support of Plaintiffs-Appellants J. Doe 1, *et al.*  The District Court erroneously imposed an identicality requirement under 17 U.S.C. §§ 1202(b)(1) and 1202(b)(3) that contradicts the plain language and express Congressional purpose of the statute, and would undermine the United States' implementation of two international treaties.  Accordingly, the District Court's dismissal of Appellants' 17 U.S.C. § 1202(b) claims should be reversed, and its certified question should be answered in the negative as a matter of law.

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici* are all organizations that represent the professional interests of writers and other creators of copyrighted works. The identity and interests of each of *Amici* are set forth in the attached Appendix.

---

[1]  Neither the parties nor their counsel have authored this brief, and neither they nor any other person or entity other than counsel for *amici curiae* contributed money that was intended to fund preparing or submitting this brief.

## SUMMARY OF ARGUMENT

The controlling question of law identified in the District Court's decision granting leave for interlocutory appeal was "whether Sections 1202(b)(1) and 1202(b)(3) of the DMCA impose an identicality requirement." Order at *1-*2. That question should be answered in the negative, and, accordingly, the District Court's dismissal of Appellants' claims under 17 U.S.C. §§ 1202(b)(1) and 1202(b)(3) ("Section 1202") should be reversed. Defendants-Appellees engaged in unauthorized deletions and alterations of copyright management information ("CMI") in connection with Appellants' copyrighted works on a massive scale. The District Court dismissed Appellants' claims on the grounds that the copies of works distributed by Appellees were not *identical* to Appellants' original CMI-bearing works.

There is no support in the statute for imposing such a condition on the protections Congress created for copyright owners under the DMCA. Many of the cases relied on by Defendants-Appellees do not in fact support the imposition of an identicality requirement. Moreover, the practical effect of such a requirement would thwart Congress's clear intent in adopting Section 1202. This is particularly true in the context of textual works, which are uniquely susceptible to piracy involving the dissemination of incomplete or altered copies. Authors and publishers rely on CMI to protect their works and investments, provide attributions, and to let would-be

-2-

users know how to obtain permission. Accurate and unaltered content provenance information facilitates online access to works, rights management, and the development of healthy licensing markets. A rule requiring identicality between the original and infringing copies would render the statute effectively toothless as a tool to prevent removal or alteration of this information, since liability could be evaded by making immaterial changes to a copyrighted work.

## ARGUMENT

The District Court acknowledged that the requirement of identicality under 17 U.S.C. § 1202(b) is an issue of first impression in the Ninth Circuit. While concluding that there is substantial ground for disagreement on the question between district courts, the District Court did not purport to survey the relevant caselaw but concluded that a substantial ground for disagreement exists. In the District Court's words, "one of the best indications that there are substantial grounds for disagreement on a question of law is that other courts have, in fact, disagreed." Order at *2.

*Amici* respectfully note that the decisions cited by the District Court in favor of imposing an identicality requirement under § 1202 represent a minority view, even among the small number of authorities cited in the decision below. And, as *Amici* seek to show in this brief, this minority view is poorly reasoned and cannot be

reconciled with the plain language of the statute or its purpose of protecting authors' works in the digital environment.

## I.  17 U.S.C. §§ 1202(B)(1) AND 1202(B)(3) DO NOT IMPOSE AN IDENTICALITY REQUIREMENT.

### A.  An identicality requirement contradicts the plain meaning of the statute.

The Copyright Act defines CMI as "information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form," *e.g.*, the "title and other information identifying the work" and "the name of, and other identifying information about, the author of the work." *See* 17 U.S.C. § 1202(c).[2]

---

[2] The full statutory definition reads as follows: "'copyright management information' means any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work: **(1)** The title and other information identifying the work, including the information set forth on a notice of copyright. **(2)** The name of, and other identifying information about, the author of a work. **(3)** The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright. **(4)** With the exception of public performances of works by radio and television broadcast stations, the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work. **(5)** With the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual work. **(6)** Terms and conditions for use of the work. **(7)** Identifying numbers or symbols referring to such information or links to such information." 17 U.S.C. § 1202(c).

The substantive provisions relevant here, 17 U.S.C. § 1202(b)(1) and 17 U.S.C. § 1202(b)(3), prohibit certain conduct with respect to uses of a copyright owner's works:

> No person shall, without the authority of the copyright owner or the law—
>
> (1) intentionally remove or alter any copyright management information,
>
> …
>
> (3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,
>
>> knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

The plain language of these provisions cannot be reconciled with the erroneous position taken by Defendants-Appellees before the District Court, *i.e.*, that the removal or alteration of CMI (under § 1202(b)(1)), or the distribution, importation or public performance with requisite knowledge of removal or alteration of CMI (under § 1202(b)(3)) is not actionable *unless* the work or copy from which the CMI has been removed or altered is an otherwise-identical copy of the authorized copy that carried the proper CMI.

As the Supreme Court has frequently held, "Congress' intent is found in the words it has chosen to use." *See, e.g., West Virginia Univ. Hospitals, Inc. v. Casey*, 499 U.S. 83, 98 (1991) ("The best evidence of [Congress'] purpose is the statutory text adopted by both Houses of Congress and submitted to the President.").

Simply put, "our task is to apply the text, not to improve upon it." *Pavelic & LeFlore v. Marvel Entertainment Group, Div. of Cadence Industries Corp.*, 493 U.S. 120, 126 (1989).

When enacting § 1202(b)(1) and § 1202(b)(3), Congress chose not to impose an identicality requirement. There is no reference to such a requirement in the statute or accompanying legislative reports. To the contrary, § 1202(b)(3) imposes a knowledge requirement that speaks to "an infringement of *any right* under this title." The reference to rights under "this title," of course, includes the right to prepare derivative works under § 106(2) (right "to prepare derivative works based upon the copyrighted work"). By definition, derivative works are not identical to the works upon which they are based.[3]

Further, it is well-established that references to "copies" in the Copyright Act, including in Section 1202, encompass more than exact, verbatim copies. The copyright owner has the exclusive right to "reproduce the copyrighted work in

---

[3] 17 U.S.C. § 101: "A 'derivative work' is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work'." It is black-letter copyright law that "if the right to make derivative works . . . has been infringed then there has necessarily also been a violation of the reproduction or performance rights." 2 Nimmer on Copyright, § 8.09[A].

copies." 17 U.S.C. § 106(2). Infringement of that right is not limited to situations in which a user creates an identical copy of the original work. Rather, it is fundamental that infringement can be established through a showing that (as relevant here) the secondary work is *substantially similar* to the original. *See, e.g.*, *Funky Films, Inc. v. Time Warner Entm't Co., Ltd. P'ship*, 462 F.3d 1072, 1076 (9th Cir. 2006) ("Absent evidence of direct copying, proof of infringement involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.'" (internal quotation marks omitted)). That showing does not require identicality. *See, e.g.*, *Hunley v. Instagram, LLC*, 73 F.4th 1060, 1068 (9th Cir. 2023) ("For copyright purposes, 'copy' does not necessarily mean a duplicate of the original, but includes the original itself."); *Universal Pictures Co., Inc., v. Harold Lloyd Corp.*, 162 F.2d 354, 360 (9th Cir. 1947) ("Complete or substantial identity between the original and the copy is not required. Copying and infringement may exist, although the work of the pirate is so cleverly done that no identity of language can be found in the two works."); *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936) ("[N]o plagiarist can excuse the wrong by showing how much of his work he did not pirate."); 3 William F. Patry, *Patry on Copyright* § 9.59 (2025) ("Copying need not be verbatim [to constitute infringement]."). There is no indication that Congress intended the term "copies" as

used in section 1202 to have a different, more restrictive meaning than it has throughout the rest of the Copyright Act.

For these reasons, the District Court's interpretation of Sections 1202(b)(1) and 1202(b)(3) would require adding language to the statute beyond that which Congress chose to include. It is axiomatic that courts are no more at liberty to add an "absent word" to a statute than they are to render any of its terms mere surplusage. *See, e.g., Nichols v. United States*, 578 U.S. 104, 110 (2016) ("[W]hat the government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function."), quoting *Iselin v. United States*, 270 U.S. 245, 250-251 (1926). Here, the District Court's ruling improperly gives credence to perceived "omissions" in the statute by adding a substantive condition to the exercise of an author's right to ensure that any attribution and copyright management information included with the work is maintained. *See also Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004) ("[T]here is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted.").

Here, in accepting Defendants-Appellees' position and dismissing Appellants' claims, the District Court effectively altered the phrase "induce, enable, facilitate, or conceal an infringement of *any right under this title*" (emphasis added)

-8-

in § 1202(b)(3) to read "induce, enable, facilitate, or conceal an *identical* infringement of the *reproduction* right under this title." That is not how the statute reads, and the imposition of such a limitation would amount to a policy judgment that is not for the courts to make. *U.S. v. Locke*, 471 U.S. 84, 93 (1985) ("[T]he plain language of the statute simply cannot sustain the gloss appellees would put on it.... a literal reading of Congress' words is generally the *only* proper reading of those words.") (emphasis added).

Such a significant condition, which would deprive large numbers of authors of the protections Congress expressly gave them under § 1202(b), simply cannot be read into the statute by implication, when Congress gave no indication of imposing it and the language Congress *did* actually use does not require it. *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not . . . hide elephants in mouseholes."). *See also Life Receivables Trust v. Syndicate 102 at Lloyd's of London*, 549 F.3d 210, 216 (2d Cir. 2008):

> [W]e must interpret a statute as it is, not as it might be, since "courts must presume that a legislature says in a statute what it means and means in a statute what it says...." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). A statute's clear language does not morph into something more just because courts think it makes sense for it to do so.[4]

---

[4] Quoted in *Obsidian Finance Group, LLC v. Cox*, 2012 WL 1065484, at *13 (D. Or. Mar. 27, 2012).

**B.** **An identicality requirement frustrates the objectives of the DMCA and the WCT/WPPT treaties.**

The District Court's opinion also is at odds with Congress's manifest intent in enacting Section 1202. Far from intending to provide only a sliver of protection to copyright owners seeking to control their protected works in a digital environment, the legislative history shows that Congress intended Section 1202 as a broad tool to help maintain authoritative CMI to deter infringements more generally. As the House Judiciary Committee noted, "the digital environment poses a unique threat to the rights of copyright owners," and one impetus of the DMCA was to encourage copyright owners to make their works available digitally. H.R. Rep., No. 105-551, pt. 2, at 25 (1998). As part of that, "[CMI] is an important element in establishing an efficient Internet marketplace in copyrighted works free from governmental regulation. Such information will assist in tracking and monitoring uses of copyrighted works, as well as licensing of rights and indicating attribution, creation and ownership." S. Rep., No. 105-190, at 16 (1998).

This approach is most consistent with U.S. treaty obligations. The DMCA was notably adopted to implement the World Intellectual Property Organization ("WIPO") Copyright Treaty and the Performances and Phonograms Treaty ("WCT" and "WPPT"), which include protections for rights management information ("RMI"), codified in Section 1202 as copyright management information. *See, e.g.*, H.R. Rep., No. 105-551, pt. 2, at 25 (1998). As WIPO explains:

In order to function with the ease and speed that are the hallmarks of well functioning digital networks, it is important that whenever a work or an object of related rights is requested and transmitted over the network, the fact of the use is registered together with all the information necessary to ensure that the agreed payment can be transferred to the appropriate right owner(s). Various technologies in this respect are available or being developed which will enable the necessary feedback to the right owners. It is crucial, however, that such information is not removed or distorted, because the remuneration of the right owners would in that case not be paid at all, or it would be diverted. From a practical point of view, this would be as prejudicial to the interests of the right owners as an outright infringement of the rights.[5]

Accordingly, treaty provisions related to rights management information "are intended to ensure that rightholders can effectively use technology to protect their rights and to license their works online."[6] *See also* Jhonny Antonio Cadavid, *The Origin and Purpose of Legal Protection for the Integrity of Copyright Metadata*, 54 INT'L REV. OF INTELL. PROP. & COMPETITION L. 1179, 1998-99 (2023) ("The protection of RMI was to be thought of as a measure to promote the creation of copyright metadata infrastructures and DRM systems. Copyright metadata interoperability would allow online access to be maximised, and provide for royalty

---

[5]WIPO-MOST Intermediate Training Course on Practical Intellectual Property Issues in Business, November 6, 2003, https://www.wipo.int/edocs/mdocs/sme/en/wipo_ip_bis_ge_03/wipo_ip_bis_ge_03_4-main1.pdf, pp. 3-4 (last accessed April 3, 2025).

[6] *The Advantages of Adherence to the WIPO Copyright Treaty (WCT) and the WIPO Performances and Phonograms Treaty (WPPT)*, INTERNATIONAL BUREAU OF WIPO, https://www.wipo.int/export/sites/www/copyright/en/docs/advantages_wct_wppt.pdf, pp. 3 (last accessed April 3, 2025).

-11-

management, digital rights management, licensing, rights clearance, and information retrieval.").

These considerations remain pressing given the rapid proliferation of generative artificial intelligence (AI) models and applications. These technologies often rely on copyrighted content for training and real-time retrieval purposes, and metadata can help effectuate emerging licensing systems and serve as indicators of authority and provenance. CMI can play an important role in facilitating efficient licensing markets, providing information about content origin and ownership and making it easier to detect infringing uses. Because licensed uses and infringing uses may include derivative works and other non-identical copies, *e.g.,* including stripping metadata for the purpose of creating non-identical copies, the imposition of an identicality requirement would reduce the scope of the protection the treaties and the DMCA were intended to codify.

To summarize, the plain statutory language, and the express purpose of Congress to protect authors against the unattributed (or misattributed) exploitation of their works in the digital environment, combined with this Court's proper deference to the legislative branch and the enacted text in matters of statutory interpretation, overwhelmingly favor Appellants. The question certified for interlocutory appeal should therefore be answered in the negative, and the dismissal of Appellants' § 1202(b) claims should be reversed.

## II.    THE WEIGHT OF AUTHORITY REJECTS
##         AN IDENTICALITY REQUIREMENT.

The authorities cited by the District Court, as it identified a "substantial ground for difference of opinion" on the certified question, do not support the imposition of an identicality requirement.  Of the five authorities cited in the Order at *2, the majority – *Beijing Meishe Network Tech. Co. v. Tiktok Inc.*, 2024 WL 3522196 (N.D. Cal. 2024); *Oracle Int'l Corp. v. Rimini Street Inc.*, 2023 WL 4706127 (D. Nev. 2023); *ADR Int'l Ltd. v. Inst. for Supply Mgmt. Inc.*, 667 F.Supp.3d 411 (S.D. Tex. 2023) – reject the contention that § 1202(b) prohibits CMI deletion or alteration with respect to identical copies only.  *Real World Media LLC v. Daily Caller, Inc.*, 744 F. Supp. 3d 24 (D.D.C. 2024), not cited below, also rejects this conclusion.

Of all the authorities cited by the District Court, on both sides of the question, the most extensive analysis by far is set forth in *ADR Int'l*, drawing heavily from district court rulings from the Ninth Circuit.  The court in that case squarely rejected an identicality requirement:

> When interpreting a statute, the court "does not look at a word or a phrase in isolation. The meaning of a statutory provision is often clarified by the remainder of the statutory scheme . . . ." *Ramos-Portillo v. Barr*, 919 F.3d 955, 960 (5th Cir. 2019). . . . . Significantly, the definition of "copies" lacks any requirement for an identical copy. *See* 17 U.S.C. § 101. Thus, the § 101 definition of "copies" "strongly supports the notion that copies include more than just the original work." *Huffman [v. Activision Publishing Inc.*], 2020 WL 8678493 [(E.D. Tex. at 2020)] at *12.

*ADR Int'l* at 426-27.

-13-

Neither of the contrary authorities cited by the District Court in its September 27, 2024 Order, *i.e. Kirk Kara Corp. v. Western Stone & Metal Corp.*, 2020 WL 5991503 (C.D. Cal. 2020) and *Anderson v. Stability AI Ltd.*, 744 F. Supp. 3d 956 (C.D. Cal. 2024), offers any analysis of the statutory language whatsoever. None. Notably, *Anderson* simply cites to the District Court's January 2024 ruling in this very case, and the District Court then cited *Anderson* in its own September 2024 ruling that is the subject of this appeal. *See Anderson* at 971. In effect, the District Court cited itself as its own authority to substantiate the proposition that there is "substantial ground for disagreement" on this question.

*Kirk Kara* is no more persuasive. As *ADR Int'l* correctly observes:

> Although the court in Kirk Kara held the DMCA requires identical copies, the caselaw it cited does not support its holding. [Citation omitted]. The court relied on *Fischer [v. Forrest*, 286 F. Supp. 3d 590 at 609-10, (S.D.N.Y. 2018)], which did not employ an identical copies requirement. To the contrary, the Fischer court stated that "[i]n those cases where claims of removal of CMI have been held viable, the underlying work has been *substantially* or entirely reproduced." Fischer, 286 F. Supp. 3d at 609 (emphasis added). Likewise, the Kirk Kara court cited two other cases, but neither mentioned nor employed an identical copies requirement. *See* Kirk Kara, 2020 WL 5991503, at *6 (citing *Kelly v. Arriba Soft Corp*., 77 F. Supp. 2d 1116, 1122 (C.D. Cal. 1999) (cleaned up), and *Frost-Tsuji Architects v. Highway Inn, Inc*., No. 13-00496, 2015 WL 263556, at *2 (D. Haw. Jan. 21, 2015) (cleaned up). Because the cases the court relied on did not stand for the proposition that the DMCA only applies to identical copies, the Kirk Kara decision is unpersuasive.

*ADR Int'l* at 427.

*Amici* respectfully note that *Kirk Kara* is no more binding on this Court than it was on the Texas district court that decided *ADR Int'l.* And given *Kirk Kara*'s lack of statutory analysis and misplaced reliance on its own cited authorities, it should not have any persuasive effect.

The caselaw cited in the District Court's January 22, 2024 order, which initially dismissed the § 1202(b) claims with leave to amend, 2024 WL 235217, at *9, is similarly unpersuasive. It consists entirely of three cases. The first, *Advanta-STAR Automotive Research Corp. of Am. v. Search Optics, LLC*, 672 F.Supp.3d 1035, 1057 (S.D. Cal. 2023), cites only *Kirk Kara* and *O'Neal v. Sideshow, Inc.*, 583 F. Supp. 3d 1282 (C.D. Cal. 2022) – and *O'Neal* only cites *Kirk Kara, id.* at 1287. The second case was *Kirk Kara*. The final case relied on below, *Frost-Tsuji Architects v. Highway Inn, Inc.*, No. 13-00496, 2015 WL 263556, at *2 (D. Haw. Jan. 21, 2015), *aff'd*, 700 F. App'x 674 (9th Cir. 2017)), did not impose an identicality requirement. *See ADR Int'l, supra* at 427.

In short, the "substantial grounds for disagreement" on the question of an identicality requirement under § 1202(b) do not involve two equally sound positions. On the Appellants' side are the plain language of the statute, an unbroken line of Supreme Court authority forbidding courts from adding to or "improving" the statutory text, and the underlying policy of protecting copyright owners' works in the digital environment. On the Defendants-Appellees' side are a complete lack of

-15-

statutory analysis and a small handful of cases that reference each other and *Kirk Kara*, the latter of which purports to derive an identicality requirement from three cases that do not impose such a requirement, *i.e. Fischer v. Forrest, Kelly v. Arriba Soft,* and *Frost-Tsuji v. Highway Inn*.

For these reasons, leading scholars who have examined this issue have rejected Defendants-Appellees' interpretation:

> The "identicality rule" offers a particularly egregious judicial gloss on § 1202(b).  There is no statutory basis for the rule (applied in California federal district courts but not in other circuits) which so obviously circumvents § 1202(b). . . . Now that the 9th Circuit has agreed to hear an interlocutory appeal on the application of the "identicality" rule, one may hope that the rule's doctrinal and consequential flaws lead to its rejection, lest § 1202(b) be rendered completely ineffective.

Jane C. Ginsburg, *Humanist Copyright,* 2025 Melville B. Nimmer Memorial Lecture, Ziffrin Institute, UCLA Law School (February 13, 2025).

In support, Prof. Ginsburg quoted *Real World Media LLC v. Daily Caller, Inc.*, 744 F. Supp. 3d 24, 40 (D.D.C. 2024), in which the District of Columbia federal district court recently followed the Nimmer treatise to find that "it would be odd if a defendant could evade DMCA liability by removing or altering CMI in a copied work but only disseminating 99% rather than 100% of that work."  The Nimmer treatise itself demonstrated the absurdity of the identicality requirement with an even more pointed example: "If plaintiff owns the copyright to a 300-page book and defendant propounds a work in which a single sentence is missing from that work,

-16-

the two are not *identical*—but are still beyond doubt *substantially similar*. The authority supposedly requiring *identity* fails to withstand scrutiny." *See* Nimmer § 12A.10 (emphasis original)(internal citations omitted).

## III.    CONCLUSION

For the foregoing reasons, and the reasons set forth in Appellants' Memorandum of Law, the certified question should be answered in the negative and the dismissal of Appellants' claims under § 1202(b) should be reversed.

Dated:  April 16, 2025

Respectfully submitted,

*/s/ Robert Clarida*
Robert Clarida
Anisha Mirchandani
**REITLER KAILAS & ROSENBLATT LLP**
885 Third Avenue, 20th Floor
New York, NY 10022
Tel: (212) 209-3044
rclarida@reitlerlaw.com
amirchandani@reitlerlaw.com

*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 24-7700

I am the attorney or self-represented party.

**This brief contains** | 4,155 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [            ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Robert Clarida | **Date** | April 16, 2025

*(use* "s/[typed name]" *to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                           -18-                           *Rev. 12/01/22*

## APPENDIX

### IDENTITY AND INTEREST OF *AMICI CURIAE*

Founded in 1912, *Amicus* The Authors Guild, Inc. (the "Guild") is a national non-profit association of over 16,000 professional, published writers of all genres including periodicals and other composite works. The Guild works to promote the rights and professional interests of authors in various areas, including copyright, freedom of expression, and fair pay. Many Guild members earn their livelihoods through their writing. Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field. The Guild's members are the creators on the front line, fighting for their constitutional rights under copyright to reap financial benefits from their labors.

*Amicus* The Association of American Publishers ("AAP") represents book, journal, and education publishers in the United States on matters of law and policy, including major commercial houses, small and independent houses, and university presses and other noncommercial scholarly publishers. AAP seeks to promote an effective and enforceable framework that enables publishers to create and disseminate a wide array of original works of authorship to the public on behalf of their authors and in furtherance of informed speech and public progress.

Add.1

*Amicus* The News/Media Alliance, is the voice of the news and magazine industries, representing over 2,200 diverse publishers in the United States—from the largest groups and international outlets to hyperlocal sources, from digital-only and digital-first to print. Its members are trusted and respected providers of quality journalism.

*Amicus* The International Association of Scientific, Technical & Medical Publishers ("STM") advances trusted research for the benefit of society by fostering collaboration and innovation among its members and the wider scholarly community. STM represents 147 member publishers in 17 countries, who publish approximately sixty percent (60%) of all English-language scientific, technical and medical papers.