No. 24-7700

IN THE
# United States Court of Appeals for the Ninth Circuit

J. DOE, 1; J. DOE, 2-5,
individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants*,

*v.*

GITHUB, INC., a Delaware corporation; MICROSOFT CORPORATION, a
Washington corporation; OPENAI, INC., a Delaware nonprofit
corporation; OPENAI, LP, a Delaware limited partnership; OPENAI GP,
LLC, a Delaware limited liability company; OPENAI STARTUP FUND GP I,
LLC, a Delaware limited liability company; OPENAI STARTUP FUND I,
LP, a Delaware limited partnership; OPENAI STARTUP FUND
MANAGEMENT, LLC, a Delaware limited liability company; OPENAI
OPCO, LLC; OPENAI, LLC; OPENAI GLOBAL, LLC; OAI CORPORATION;
OPENAI HOLDINGS, LLC; OPENAI HOLDCO, LLC; OPENAI INVESTMENT;
OPENAI STARTUP FUND SPV I, LP; OPENAI STARTUP FUND SPV GP I,
LLC,

*Defendants-Appellees*.

On Petition for Permission to Appeal an Order from the
United States District Court for the Northern District of California
No. 4:22-cv-06823-JST, Hon. Jon S. Tigar

**RESPONSE BRIEF FOR DEFENDANTS-APPELLEES
GITHUB, INC. AND MICROSOFT CORPORATION
(REDACTED)**

Annette L. Hurst
Nicholas González
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Christopher J. Cariello
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*Additional Counsel Listed on Inside Cover*

Jonas Q. Wang
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
2100 Pennsylvania Ave NW
Washington, DC 20037

Alyssa M. Caridis
Geoffrey C. Shaw
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
355 S. Grand Avenue, Suite 2700
Los Angeles, CA  90071

*Counsel for Defendants-Appellees*
*GitHub, Inc. and Microsoft Corporation*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, GitHub, Inc. states that Microsoft Corporation is its parent company and owns 10% or more of GitHub's stock.  Microsoft Corporation hereby states that it has no parent company, and no publicly-held corporation owns 10% or more of its stock.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Christopher J. Cariello*
Christopher J. Cariello
*Counsel for Defendants-Appellees*
*GitHub, Inc. and Microsoft Corporation*

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES ....................................................iv

INTRODUCTION ............................................................ 1

JURISDICTIONAL STATEMENT ............................................. 5

STATEMENT OF THE ISSUES.............................................. 5

STATEMENT OF THE CASE ............................................... 6

    Congress Enacts § 1202 To Combat Mass Copying And
        Distribution Of Digital Copies. ............................... 6

    GitHub Develops Copilot, A Software Code Generator Built
        On A Large Language Model. ................................. 8

    Plaintiffs Claim That Copilot's Code Suggestions Violate
        § 1202 By Failing To Provide Attribution, But Struggle
        To Show Standing. .......................................... 11

    Plaintiffs' Bid To Establish Standing Fails To Reveal
        Matching Code Suggestions In Ordinary Usage Of
        Copilot. .................................................... 14

    The District Court Dismisses The § 1202(b) Claims With
        Prejudice.................................................... 19

SUMMARY OF ARGUMENT ............................................... 20

STANDARD OF REVIEW.................................................. 24

ARGUMENT ............................................................. 25

I.    Plaintiffs Lack Article III Standing To Assert § 1202 Claims. ..... 25

II.   Plaintiffs Fail To Plausibly Allege A § 1202(b) Claim.................. 34

    A.    The district court correctly dismissed Plaintiffs'
           § 1202(b) claims based on the absence of identical
           copies. .................................................. 36

        1.     Plaintiffs fail to satisfy the plain statutory requirement of *removal* of information conveyed in connection with *copies* of a work .................................. 37

        2.     The district court properly relied on the absence of identical copies to find that Plaintiffs could not plausibly allege removal from copies of a work ........... 46

        3.     Plaintiffs' alternative approach is wrong and unworkable ................................................................ 52

    B.    Plaintiffs' § 1202(b) claims fail because they do not allege an objective likelihood of infringement of their works. .................................................................. 55

    C.    Plaintiffs' training-based theory is unpled, waived, and cannot state a viable claim. .................................. 64

CONCLUSION ........................................................................ 67

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Advanta-STAR Auto. Rsch. Corp. of Am. v. Search Optics, LLC,*
672 F. Supp. 3d 1035 (S.D. Cal. 2023)................................... 19, 49, 50

*Apple Comput., Inc. v. Microsoft Corp.,*
35 F.3d 1435 (9th Cir. 1994).............................................. 61

*Bounce Exch., Inc. v. Zeus Enter. Ltd.,*
No. 15-cv-3268, 2015 WL 8579023 (S.D.N.Y. Dec. 9, 2015).............. 42

*Buchholz v. Meyer Njus Tanick, PA,*
946 F.3d 855 (6th Cir. 2020)............................................ 31

*Chandler v. State Farm Mut. Auto. Ins. Co.,*
598 F.3d 1115 (9th Cir. 2010)........................................... 25

*In re Cinematronics, Inc.,*
916 F.2d 1444 (9th Cir. 1990)........................................... 36

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)..................................................... 31

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
539 U.S. 23 (2003)...................................................... 39

*Davis v. Fed. Election Comm'n,*
554 U.S. 724 (2008)..................................................... 26

*Design Basics, LLC v. WK Olson Architects, Inc.,*
No. 17-cv-7432, 2019 WL 527535 (N.D. Ill. Feb. 11, 2019)............... 41

*Falkner v. Gen. Motors LLC,*
393 F. Supp. 3d 927 (C.D. Cal. 2018) .................................. 40

*Faulkner Press, L.L.C. v. Class Notes, L.L.C.,*
756 F. Supp. 2d 1352 (N.D. Fla. 2010) ................................. 41

iv

*Fed. Election Comm'n v. Cruz*,
  596 U.S. 289 (2022) ............................................................. 32

*Fields v. Twitter, Inc.*,
  881 F.3d 739 (9th Cir. 2018) ...................................... 24, 25

*Friedman v. Live Nation Merch., Inc.*,
  833 F.3d 1180 (9th Cir. 2016) .......................................... 52

*Frost-Tsuji Architects v. Highway Inn, Inc.*,
  No. 13-cv-00496, 2015 WL 263556 (D. Haw. Jan. 21, 2015) ........ 41, 50

*Google LLC v. Oracle Am., Inc.*,
  593 U.S. 1 (2021) ............................................................. 62

*Harrington v. Pinterest, Inc.*,
  No. 20-cv-05290, 2021 WL 4033031 (N.D. Cal. Sept. 3, 2021) ........... 59

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) .......................................................... 32

*Intercept Media, Inc. v. OpenAI, Inc.*,
  767 F. Supp. 3d 18 (S.D.N.Y. 2025) ................................... 66

*Jacobsen v. Katzer*,
  535 F.3d 1373 (Fed. Cir. 2008) ........................................ 61

*Kelly v. Arriba Soft Corp.*,
  77 F. Supp. 2d 1116 (C.D. Cal. 1999) ................................ 41

*Kirk Kara Corp. v. W. Stone & Metal Corp.*,
  No. 20-cv-1931, 2020 WL 5991503 (C.D. Cal. Aug. 14, 2020) ...... 48, 49

*Lee v. Am. Nat'l Ins. Co.*,
  260 F.3d 997 (9th Cir. 2001) ........................................... 25

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .......................................................... 26

*McGee v. S-L Snacks Nat'l*,
  982 F.3d 700 (9th Cir. 2020) ...................................... 20, 26

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005) ............................................................... 58

*Microsoft Corp. v. AT&T Corp.*,
550 U.S. 437 (2007) ................................................................. 6

*Murphy v. Millennium Radio Grp. LLC*,
650 F.3d 295 (3d Cir. 2011) ................................................. 41

*N.Y. Times Co. v. Microsoft Corp.*,
No. 23-cv-11195, 2025 WL 1009179 (S.D.N.Y. Apr. 4, 2025) ............ 66

*Nat. Res. Def. Council v. U.S. Env't Prot. Agency*,
857 F.3d 1030 (9th Cir. 2017) .............................................. 37

*Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Gonzales*,
468 F.3d 826 (D.C. Cir. 2006) .............................................. 31

*Nelsen v. King County*,
895 F.2d 1248 (9th Cir. 1990) ........................................ 21, 29

*Philpot v. Alternet Media, Inc.*,
No. 18-cv-4479, 2018 WL 6267876 (N.D. Cal. Nov. 30, 2018) ........... 59

*Pinkert v. Schwab Charitable Fund*,
48 F.4th 1051 (9th Cir. 2022) ............................................. 30

*Smith v. Hughes Aircraft Co.*,
22 F.3d 1432 (9th Cir. 1993) ............................................... 66

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*,
108 F.4th 1128 (9th Cir. 2024) ........................................... 25

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ............................................................... 25

*Stevens v. Corelogic, Inc.*,
899 F.3d 666 (9th Cir. 2018) ..................................... *passim*

*Sun Microsystems, Inc. v. Microsoft Corp.*,
188 F.3d 1115 (9th Cir. 1999) ............................................ 61

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ........................................................... 26

*Tremblay v. OpenAI, Inc.,*
  716 F. Supp. 3d 772 (N.D. Cal. 2024) ............................... 59

*United States v. 5.96 Acres of Land,*
  593 F.2d 884 (9th Cir. 1979) ............................................ 25

*United States v. Philip Morris USA, Inc.,*
  396 F.3d 1190 (D.C. Cir. 2005) ........................................ 36

*Vegan Outreach, Inc. v. Chapa,*
  454 F. App'x 598 (9th Cir. 2011) ..................................... 25

**Statutes**

Copyright Act, 17 U.S.C. § 101 *et seq.*

  § 101 .............................................................................. 38, 52

  § 106A(a)(1)(A) .................................................................. 39

  § 512(c) ............................................................................... 63

  § 1201 ................................................................................... 7

  § 1202 ......................................................................... *passim*

  § 1202(b) ..................................................................... *passim*

  § 1202(b)(1) ........................................................................ 12

  § 1202(b)(3) ........................................................................ 13

  § 1202(c) ................................................................... 7, 38, 53

28 U.S.C. § 1292 ....................................................................... 35

28 U.S.C. § 1292(b) ...................................................... 20, 25, 35

vii

## Rules and Regulations

Fed. R. Civ. P. 12(b)(1) ................................................................ 13, 14, 24

Fed. R. Civ. P. 12(b)(6) ...................................................................... 24, 35

## Other Authorities

4 Nimmer on Copyright § 12A.10[B][1][a] ............................................. 39

H.R. Rep. No. 105-551(I) (1998) ....................................................... 38, 39

Nicholas Carlini et al., *Quantifying Memorization Across Neural Language Models* (Mar. 6, 2023),
https://arxiv.org/pdf/2202.07646.pdf ................................................... 60

U.S. Copyright Office, *The Digital Millennium Copyright Act of 1998* (Dec. 1998),
https://www.copyright.gov/legislation/dmca.pdf ............................ 7, 40

Webster's Third New International Dictionary (1993) .......................... 38

# INTRODUCTION

The technology at issue in this case is the product of two immensely transformative human endeavors. The first is the public library that is open-source software code—a triumph of collective ingenuity built on the notion that software code should be freely available for all to study, use, build upon, and share. The second is the Large Language Model, or LLM—a triumph of computer science capable of learning patterns in large amounts of data, then generating brand new context-appropriate output based on those patterns. Defendants GitHub, Inc., a software development platform, and its corporate parent Microsoft Corp., combined these kindred advances to create a coding tool called GitHub Copilot.[1] Trained on vast amounts of public code, Copilot can generate real-time code suggestions that suit a developer's purposes, allowing developers to access the collective insights of open-source software like never before.

Plaintiffs are five pseudonymous detractors who raced into court to become the first to challenge an LLM. Targeting an LLM based on

---

[1] Microsoft's suite of AI-powered tools is also called "Copilot." This case concerns only GitHub Copilot, referred to as "Copilot" for ease.

open-source software code was a strange choice. After all, if the whole point of open-source software is that anyone is free to learn from and build upon it, surely an LLM is, too. So, rather than challenging Copilot's training on open-source code, Plaintiffs instead theorized that Copilot's generated outputs actually just *reproduce* code from the training set. They claimed that if Copilot does so without attribution, it violates § 1202(b) of the DMCA—an antipiracy provision that prohibits tampering with "copyright management information," or CMI.

The case sputtered from the start. Plaintiffs' problem was that they could not allege that Copilot had ever reproduced anything resembling *their* code, leaving them without standing to seek damages. And so Plaintiffs had no choice: They had to put their reproduction hypothesis to the test. It failed. Try as they might to get Copilot to do what they claimed it would, Plaintiffs could allege only that a few brief snippets of Copilot's generated outputs sometimes resemble "a modified format, variation, or ... functional equivalent" of code in the training set. 3-ER-259. The district court made quick work of Plaintiffs' admissions, applying case law holding that "no DMCA violation exists where the works are not identical." 3-ER-259.

The decision dismissing the § 1202(b) claims in the Second Amended Complaint should be affirmed on any of three grounds.

*First,* Plaintiffs lack Article III standing because they fail to allege that Copilot has or will output their copyrighted code. Though they allege their code is among the billions of lines Defendant OpenAI used to train Codex—the LLM underlying Copilot—they offer no reason Copilot would register *their* code as significant or suggest it as output. Again, Plaintiffs disproved their own hypothesis. Even when trying to injure themselves, they could coax only short *variations* of their code, and only by typing their own code *character-for-character* as a prompt— a contrivance no real-world user would employ. After three complaints, Plaintiffs' failure to allege injury confirms its nonexistence. *Infra* § I.

*Second*, on the merits, the district court properly dismissed the § 1202(b) claims because Copilot's outputs are (at most) merely modifications, variations, or functional equivalents of Plaintiffs' code. Plaintiffs caricature the rule the district court applied as a freestanding, unbending requirement that a defendant's purportedly offending end-product must be a dead-literal match for the plaintiff's original. The identicality rule is no such thing. As the case law bears

3

out, the rule enforces § 1202(b)'s requirement that a defendant "remove" CMI from a "copy." It recognizes that where the defendant's version is not identical, this is typically a dispositive indication that the defendant *created* some modified version, rather than tampering with CMI on a copy. The rule was properly applied here because the Complaint does not plausibly allege that Copilot's generated snippets are copies of Plaintiffs' works from which CMI has been removed. *Infra* § II.A.

*Third*, the claims fail for the independent reason that the Complaint does not allege that any CMI removal is objectively likely to facilitate or conceal copyright infringement, as required by *Stevens v. Corelogic, Inc.*, 899 F.3d 666 (9th Cir. 2018). Here the emptiness of Plaintiffs' claims is most stark. Plaintiffs name no copyrighted work, allege no instance of infringement of their code, plead no plausible pattern or modus operandi of infringement driven by the lack of CMI, and never explain how developers' uses of short, generated snippets of functional software code will yield significant copyright infringement at all. Because Plaintiffs cannot allege that Copilot has a copyright problem, they cannot allege a CMI problem, either. *Infra* § II.B.

This Court should affirm.

4

## JURISDICTIONAL STATEMENT

Microsoft and GitHub agree with Plaintiffs' jurisdictional statement, except that Plaintiffs lack Article III standing—and therefore the district court lacked jurisdiction—for § 1202(b) claims. *Infra* § I.

## STATEMENT OF THE ISSUES

1. Plaintiffs' theory of injury is that Defendants' product could output coding suggestions matching their code without attribution. But their Second Amended Complaint reveals that the only instances where something like this has or could happen were Plaintiffs' own self-inflicted outputs, while conceding that matching outputs are exceedingly rare. Do Plaintiffs lack Article III standing because they do not plausibly allege injury-in-fact, traceable to Defendants, that is redressable by a claim under § 1202 of the DMCA?

2. A claim under § 1202(b) of the DMCA requires active tampering with copyright management information conveyed in connection with a copy of the plaintiffs' works. But the Complaint at most alleges short snippets of generated code suggestions that are at best variations or modifications from existing code, without also

5

reproducing CMI. Did the district court properly apply case law requiring identical copies to dismiss Plaintiffs' § 1202(b) claims?

3. Plaintiffs advance no copyright infringement claim, allege no instance of copyright infringement resulting from removal of CMI, and allege no pattern of conduct or modus operandi suggesting that removal of CMI would facilitate infringement. Should the district court's dismissal of Plaintiffs' § 1202(b) claims be affirmed on the alternative basis that Plaintiffs fail to allege an objective likelihood of copyright infringement, as required by *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 671 (9th Cir. 2018)?

## STATEMENT OF THE CASE

### *Congress Enacts § 1202 To Combat Mass Copying And Distribution Of Digital Copies.*

In 1998, Congress was concerned with "the ease with which pirates could copy and distribute a copyrightable work in digital form." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 458 (2007) (internal quotation marks omitted). The Napster Age was dawning. DSL and cable broadband launched, and suddenly anyone with a PC and a decent internet connection could convert any song into digital form and share it throughout the world. Digital copies of photos or books could be

6

made with a few clicks, then posted on websites or message boards. And easy replication and distribution of bootleg movies was not far behind.

Of course, existing copyright law already prohibited this conduct. But the United States had recently joined the 1996 World Intellectual Property Organization (WIPO) treaties, committing to two "technological adjuncts to the exclusive rights granted by copyright law." U.S. Copyright Office, *The Digital Millennium Copyright Act of 1998* (Dec. 1998), https://www.copyright.gov/legislation/dmca.pdf ("USCO DMCA Summary"). Congress honored this commitment through twin provisions in the DMCA. The first, § 1201, bars the "[c]ircumvention of copyright protection systems" (i.e., "technological measures") used by copyright owners to control access to their works. 17 U.S.C. § 1201. The second, at issue in this case, protects the "[i]ntegrity of copyright management information," *id.* § 1202, by prohibiting "tampering with [CMI]" in order to facilitate piracy, USCO DMCA Summary at 2.

Reflecting concerns about digital copies, § 1202(c) expressly defines CMI as certain types of information—"title and other

7

information identifying the work," "name of … the author[s]," etc.—
"conveyed in connection with copies … of a work." Subsection (b) of
§ 1202, as relevant here, specifically prohibits "intentionally remov[ing]
or alter[ing]" information so conveyed or "distribut[ing], import[ing] for
distribution," or "publicly perform[ing] works, copies of works, or
phonorecords knowing that [CMI] has been removed or altered." And
Congress expressly linked a violation to the furtherance of piracy. To
be liable, someone must remove or alter CMI "knowing, or … having
reasonable grounds to know, that it will induce, enable, facilitate, or
conceal an infringement." § 1202(b).

### GitHub Develops Copilot, A Software Code Generator Built On A Large Language Model.

Three decades on, we are in the midst of a new technological
explosion, this time occasioned by advances in the fields of machine
learning and artificial intelligence. The LLM is one such advance. 3-
ER-232. An LLM is a species of "generative AI"—so-called because it is
capable of *generating* new content in response to a user prompt. 3-ER-
232-33.

As alleged in the Complaint, an LLM is created by "analyzing a
corpus of material called training data." 3-ER-185. Through this

training process, the model "detects statistically significant patterns in its training data." 3-ER-204. Then, when a user "prompts" the model through a user interface, the LLM uses "a complex probabilistic process [to] predict what the most likely solution to a given prompt … is." 3-ER-204. In this way, LLMs are capable of "simulat[ing] human reasoning or inference," but at mind-bending speed and scale. 3-ER-185, 3-ER-204.

An LLM's ability to generate natural language responses to queries will be familiar to anyone who has used much-feted "chatbots" like Anthropic's Claude or OpenAI's ChatGPT. But LLMs have a wide range of capabilities that enable "a variety of use cases." 3-ER-232-33. One is that they can "generate software code." 3-ER-232.

GitHub understood how powerful a tool this could be for software developers. Founded in 2008, GitHub was built to "support open-source development." 3-ER-185-86, 3-ER-229. Its tens of millions of developers use GitHub to store their software code online, and "[m]ost open-source programmers" do so in "'public' repositories, meaning that anyone could view [and] access them." 3-ER-185-86, 3-ER-229-30.

GitHub's Terms of Service make explicit what any developer already knows—that software in public repositories will be included in a "search index" and "share[d]" with other users. 1-GH-SER-104-05. In support of its open-source mission, GitHub's Terms of Service do not preclude anyone from copying publicly available code on its site. *Id.* This allows others to find useful code, then incorporate, adapt, or build upon it in their own projects. *See generally* 3-ER-229-30. Individual developers can decide whether to apply an open-source software license to the code in their repositories, allowing other developers to use and modify that code subject to certain terms. 3-ER-194 n.4.

To build its Copilot tool, GitHub collaborated with OpenAI. OpenAI's role was to train an LLM called "Codex," which OpenAI trained on "billions of lines of source code from publicly available sources, including … public GitHub repositories." 3-ER-205. Through this process, Codex "inferred certain statistical patterns governing the structure of code." 3-ER-199. Once incorporated into GitHub's user-facing Copilot tool, the model relies on its derived understanding of the "structure" of code to generate new code that predicts what a developer

10

working on a project may need based on "whatever variables Codex or Copilot have identified as relevant." 3-ER-204.

In plain terms, Copilot is an AI coding assistant. As a developer types lines into a code editor, Copilot treats this as a "prompt[]" and "emit[s] a possible completion of that code," "suggest[ing] code and entire functions in real-time." 3-ER-197. This assistant does not "understand the meaning of software code," 3-ER-198, or its "semantics," 3-ER-204, the way a human does. It generates a predicted snippet of code that might come next based on "patterns" and "variables." 3-ER-204. It is then up the developer to reject, use, adapt, or build upon that suggestion as appropriate.

### Plaintiffs Claim That Copilot's Code Suggestions Violate § 1202 By Failing To Provide Attribution, But Struggle To Show Standing.

In November 2022, pseudonymous Plaintiffs filed a putative class-action against GitHub and Microsoft for offering the Copilot tool, and OpenAI for its role in training the underlying LLM. 2-GH-SER-261-316. The initial Complaint asserted a dozen causes of action under disparate theories—everything from breach of contract to unfair competition under the Lanham Act to state-law privacy claims. *See* 2-

11

GH-SER-296-313.  The district court dismissed most of these claims over the course of three rounds of motion practice.  1-ER-3-17 (order on motion to dismiss Second Amended Complaint); 3-ER-245-61 (order on motion to dismiss First Amended Complaint); 1-GH-SER-116-40 (order on motion to dismiss initial complaint).

At issue in this appeal is Plaintiffs' novel attempt to adapt § 1202—the statute Congress passed 30 years ago to address mass piracy—to generative AI.  Plaintiffs' theory is that Copilot, when generating new code suggestions, "reproduces the[ir] code … without attribution."  3-ER-208 (capitalization omitted).  They allege that they "published Licensed Materials they owned a copyright interest in to at least one GitHub repository" subject to an open-source license.  3-ER-188-89.  These materials were "ingested by Copilot" during training.  3-ER-208.  Plaintiffs say that this code "is sometimes returned to users as Output," 3-ER-208, but that Copilot does not include "attribution, the copyright notice, or the License Terms" associated with the underlying code.  3-ER-207.

Plaintiffs have never asserted a copyright infringement claim.  Instead, they allege that Copilot's outputs violate § 1202(b)(1)'s

prohibition on "intentionally remov[ing] or alter[ing]" CMI and

§ 1202(b)(3)'s prohibition on "distribut[ing]" copies of works "knowing

that [CMI] has been removed or altered."[2]  *See* 3-ER-233-39.  According

to Plaintiffs' initial Complaint, the putative class's DMCA claims would

entitle it to more than $9 billion in statutory damages.  2-GH-SER-314

n.41.

But as Defendants explained in a motion to dismiss under Rule

12(b)(1), Plaintiffs lacked standing:  Their Complaint did not plausibly

allege that Copilot had ever emitted *their* code at all.  They did not

identify their code or its function.  They did not allege that it would be

part of a "statistically significant pattern[] in [the] training data," 3-ER-

204, that Codex or Copilot might detect.  And they did not allege that

any of their code might be a predicted suggestion based on "whatever

variables Codex or Copilot have identified as relevant."  3-ER-204.

Plaintiffs claimed merely that "Copilot reproduces code from training

---

[2] Plaintiffs also claim breach of open-source license provisions that
affirmatively "require … that attribution be given, … inclusion of a
copyright notice, … and … inclusion of the terms of the applicable
[license]."  3-ER-239.  Those claims have not been dismissed.

data 'about 1% of the time,'" 1-GH-SER-124, without any reason to think their code would be in the 1%.

The district court agreed. It held that "Plaintiffs do not allege that they themselves have suffered the injury they describe." 1-GH-SER-123. They had therefore "failed to establish an injury-in-fact sufficient to confer standing for their claims for damages." 1-GH-SER-125. But the court nevertheless found the initial Complaint "may support standing for injunctive relief." 1-GH-SER-124. The district court found that Plaintiffs' 1% allegation was enough to "plausibly allege that there is at least a substantial risk that Defendants' programs will produce Plaintiffs' licensed code as output." *Id.*

### *Plaintiffs' Bid To Establish Standing Fails To Reveal Matching Code Suggestions In Ordinary Usage Of Copilot.*

Having found standing to pursue injunctive relief, the district court initially rejected Defendants' challenges on the merits of Plaintiffs' § 1202(b) claims. Defendants had argued that the initial Complaint failed to allege "active conduct that removes or alters CMI" from a copy of their works. 1-GH-SER-133-34. But the district court accepted generalized allegations of removal of CMI "from licensed code," 1-GH-SER-133-34.

14

Defendants had also argued that Plaintiffs failed to allege any removal or alteration of CMI "knowing, or … having reasonable grounds to know, that it will induce, enable, facilitate, or conceal … infringement," § 1202(b). Defendants pointed to *Stevens v. Corelogic, Inc.*, 899 F.3d at 674, which requires "specific allegations as to how identifiable infringements 'will' be affected" by CMI removal. But the district court held that *Stevens*' rule applies only at summary judgment. 1-GH-SER-135.

Plaintiffs, however, were not yet ready to let go of their claim for multi-billion-dollar statutory penalties. (They would later drop their prayer for § 1202 damages entirely. 3-ER-242-43.) Rather than litigate claims for injunctive relief, Plaintiffs elected to amend their Complaint to try to establish standing for damages. They added pages of new allegations that involved "prompting Copilot" to try to get it to "emit[]" the code in Plaintiffs' repositories. 3-ER-208. It apparently worked for three of five Plaintiffs, for which Plaintiffs included "examples" of purported "unlawful behavior." 3-ER-208. To induce these examples, Plaintiffs typed in their own code verbatim, typically for many lines on

15

end, before receiving a short snippet of code similar to—but different from—something in their repositories.  3-ER-208.

Take for example the allegations with respect to Doe 1's code.  3-ER-210-12.  As shown below, the original code is 54 lines of repetitive instructions for ███████████████ .  Doe 1's original code appears in the left column; the right column shows Plaintiffs' prompt highlighted in orange and Copilot's suggestion highlighted in blue; and for ease of review, the boxes show the many lines on end Plaintiffs typed verbatim from Doe 1's own code to generate a suggestion.

**Doe 1's code:**                    **Prompt and Output:**

Plaintiffs thus entered, character for character, 22 lines of Doe 1's code. Copilot then generated output of 18 additional lines of code. Plaintiffs call these 18 lines a "modified format" of the *32* lines of Doe 1's original code that follows the initial 22 they used as a prompt. 3-ER-169. Plaintiffs did not allege that any real-world user could or would ever engage in this type of prompt manipulation. And they acknowledged that even with this manipulation, the output "is not an exact match for Doe 1's code." 3-ER-213-14.

The other purported examples Plaintiffs offered similarly involved manipulative prompts that yielded short, modified snippets of code. Plaintiffs never alleged that any real-world user did or would enter the prompts they did. Their code repositories were publicly available anyway. They were forced to concede that if Copilot ever emitted something close to code in the training set, "more often" it was a "variation[]" from existing code. 3-ER-208. And they acknowledged that GitHub provides a "user-settable Copilot filter called 'Suggestions matching public code,'" which allows users to exclude from output suggestions any matching "excerpts of 'about 150 characters.'" 3-ER-222.

18

***The District Court Dismisses The § 1202(b) Claims With Prejudice.***

Over the course of two motions to dismiss (with a second amended complaint in between), GitHub and Microsoft renewed their challenges to standing and the merits—this time to a Complaint that proved Plaintiffs' reproduction theory wrong.

Over its two opinions, the district court acknowledged the "various grounds" raised by Defendants. 1-ER-6. It found that some Plaintiffs had standing, but ultimately "f[ound] one argument dispositive" on the merits: "Plaintiffs … fail Section 1202(b)'s identicality requirement." 1-ER-6. The district court observed that "'[c]ourts have held that no DMCA violation exists where the works are not identical.'" 3-ER-174 (quoting *Advanta-STAR Auto. Rsch. Corp. of Am. v. Search Optics, LLC*, 672 F. Supp. 3d 1035, 1057 (S.D. Cal. 2023)). The Complaint "does not identify even a single example of Copilot producing an identical copy of any work." 1-ER-6-7 (internal quotation marks omitted). The court agreed that Plaintiffs could not plausibly allege that Copilot would "reproduce verbatim copies of code" "through its normal operation or how any such verbatim outputs are likely to be anything beyond short and common boilerplate functions." 1-ER-6-7 (internal quotation marks

19

omitted). So despite finding that Plaintiffs had established standing, the court dismissed the § 1202 claims with prejudice on the merits.

Upon Plaintiffs' motion, the district court certified its order for interlocutory appeal under 28 U.S.C. § 1292(b). 2-ER-46-50. It pointed to three district court cases declining to embrace the identicality rule the district court relied upon. 2-ER-48. And it agreed that resolving the issue "would materially advance … this particular case" and also "others in the Circuit raising the same issue." *Id.* The district court stayed the litigation pending any appeal. 2-ER-49-50.

## SUMMARY OF ARGUMENT

**I.** Plaintiffs lack Article III standing to assert § 1202(b) claims because they have failed to plausibly allege injury in fact.

To establish standing for a particular claim, a plaintiff must allege personal and individual injury redressable through that cause of action. *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 705 (9th Cir. 2020). Plaintiffs' theory of injury for their § 1202(b) claims is that code in the training set is "sometimes returned to users as Output" without attribution. 3-ER-208. But Plaintiffs have repeatedly failed to plausibly allege that

Copilot, in real-world operation, ever has or ever would emit their software code.

Plaintiffs attempted to manufacture standing by entering strings of their own code as prompts to coax Copilot to elicit outputs with short snippets resembling their code. Courts have held, however, that where the purported injury is conjectural or hypothetical, a plaintiff cannot create standing by generating self-inflicted injury. And Plaintiffs do not allege that any real-world user would ever enter the prompts they did. The district court erred in finding that Plaintiffs' tactic established standing.

Nor do Plaintiffs plausibly allege threatened injury by pointing to alleged research that "'about 1% of the time'" snippets of Copilot output may match "well-known code." 3-ER-234. Plaintiffs do not allege that their code is well-known or even replicated beyond their own repositories. And in any event, a probabilistic estimate of harm is not enough to confer standing. *See Nelsen v. King County*, 895 F.2d 1248, 1250 (9th Cir. 1990). Because Plaintiffs have failed to make an individualized showing that output-based injury has materialized or is certainly impending, they lack standing.

**II.** Even if Plaintiffs had standing, they cannot state a claim under § 1202(b).

**A.** In finding that Copilot's short, non-matching snippets of generated code cannot support a claim, the district court correctly relied on the rule requiring that a plaintiff must allege removal of CMI from an identical copy of their works.

The result in this case—and the identicality rule the district court applied—flows from two plain, unambiguous textual elements of § 1202: the definition of CMI as information "conveyed in connection with *copies* … of a work," and § 1202(b)'s focus on "remov[al]" of CMI. The ultimate aim in applying § 1202(b) is to evaluate, in light of the context and circumstances, whether the plaintiff has established that the defendant actively tampered with CMI conveyed in connection with a copy of a work. Plaintiffs' own allegations about how Copilot works refute any notion that it actively removes CMI from a copy. They allege only that Copilot generates new code based on "inferred … statistical patterns governing the structure of code," 3-ER-199, providing no account of how or from what purported copies Copilot actively removes CMI.

The identicality rule the district court applied is rooted in the same bedrock textual requirement of "removal"; the lack of an identical copy is, absent other allegations of removal, a dispositive factor establishing that the defendant merely created some new CMI-less end-product, rather than reproducing a pirated copy and tampering with CMI to conceal it. Case law applying this rule establishes that it is not, as Plaintiffs suggest, a rigid requirement of dead-literal identicality, but a sensible approach to enforcing the removal requirement. The district court properly relied upon it as such.

Plaintiffs' alternative approach, by contrast, is both wrong and unworkable. Plaintiffs advance an exceedingly capacious rule under which a § 1202(b) claim lies against any "substantially similar," or even merely "derivative," end-product that lacks CMI—even if there is no basis for inferring that the defendant engaged in any act of tampering directed to CMI at all. This approach cannot be squared with § 1202(b)'s text or structure. And it would convert a narrow tool Congress enacted to address pirated copies into a broad attribution right previously unrecognized in American law.

23

**B.** Plaintiffs' claims also fail on the independent ground that they do not plausibly allege a likelihood that removal of CMI from their works will facilitate copyright infringement, as required by *Stevens v. Corelogic, Inc.*, 899 F.3d 666 (9th Cir. 2018). Plaintiffs advance no copyright claim, point to no copyrighted work or instance of infringement, and allege no "modus operandi" or "pattern of conduct" suggesting that the absence of CMI would lead to infringement of their works.

**C.** Finally, Plaintiffs' attempt to assert a new theory of liability based on purported removal of CMI during training is unpled, waived, and meritless. As the district court found, and Plaintiffs did not contest, Plaintiffs did not advance a training-based theory. 1-GH-SER-123 n.7; 1-GH-SER-171. So unsurprisingly, the Complaint does not plausibly allege the elements of a training-based § 1202(b) claim.

## STANDARD OF REVIEW

This Court reviews de novo a district court's decision on a motion to dismiss under Rules 12(b)(1) and 12(b)(6), "accepting all factual allegations in the complaint as true and construing them in the light most favorable to the nonmoving party." *Fields v. Twitter, Inc.*, 881

24

F.3d 739, 743 (9th Cir. 2018) (citation omitted); *see Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1136 (9th Cir. 2024). This Court also reviews de novo questions of statutory interpretation. *Fields*, 881 F.3d at 743.

## ARGUMENT

### I.    Plaintiffs Lack Article III Standing To Assert § 1202 Claims.

"Every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) (cleaned up). A plaintiff's standing to assert a claim is a jurisdictional question, *Chandler v. State Farm Mutual Automobile Insurance Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010), and one this Court routinely evaluates in interlocutory appeals under § 1292(b).[3]

---

[3] *See United States v. 5.96 Acres of Land*, 593 F.2d 884, 887 (9th Cir. 1979) ("Although a motions panel did grant the [§ 1292(b)] Petition, we are free to reconsider [Plaintiff's] standing on appeal."); *Vegan Outreach, Inc. v. Chapa*, 454 F. App'x 598, 600 (9th Cir. 2011) (explaining in § 1292(b) appeal that the Court is "'obliged' to evaluate standing as a threshold requirement under Article III"); *see also Lee v. Am. Nat'l Ins. Co.*, 260 F.3d 997, 1001 (9th Cir. 2001) ("[A]lthough the standing question was not expressly certified to this court, we have ... interlocutory jurisdiction to decide all questions fairly raised by the

25

This appeal should begin and end with that inquiry. After three complaints, the most Plaintiffs allege is that sometimes Copilot may emit a suggestion resembling some of the *billions* of lines of code in the training set, and that their code is somewhere among those billions. That infinitesimal chance is insufficient to yield standing for a § 1202 claim.

**A.** "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Standing is claim specific—a plaintiff must allege it as to "each claim … and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (cleaned up). It is also "personal and individual," *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 705 (9th Cir. 2020) (cleaned up)—the plaintiff must "be himself among the injured," *Lujan*, 504 U.S. at 563.

---

order under review, of which the district court's earlier ruling concerning standing … is one.").

So, to establish standing here, Plaintiffs had to allege not just a tangible injury redressable through a § 1202 claim, but also that *they* have suffered or imminently will suffer that injury.  It is not enough to say that Copilot *might* do something injurious to *someone*.

**B.**  The analysis starts with Plaintiffs' asserted injury.  For their § 1202 claims, Plaintiffs have repeatedly made clear that the theory of injury is that billions of publicly available lines of source code were "ingested by Copilot" during training and that some are "sometimes returned to users as Output" without attribution.  3-ER-208.  As the district court recognized, this output-without-attribution is the asserted injury; Plaintiffs "do not allege that they were injured by Defendants' use of licensed code as training data" alone.  1-GH-SER-123 n.7.[4]

Next comes the all-important question:  Assuming that Plaintiffs' software code is indeed some infinitesimal portion of the training data, has or will Copilot ever *output* that source code without attribution, thus (purportedly) injuring Plaintiffs?  After three attempts at pleading,

---

[4] For the first time on appeal, Plaintiffs include a three-paragraph argument suggesting a training-based theory of injury for § 1202 claims.  The Complaint alleges no such thing.  We address Plaintiffs' failure to plead, and repeated waiver of, any such theory of § 1202 injury or liability below.  *Infra* § II.C.

Plaintiffs have alleged nothing that would suggest the answer is Yes. Quite the opposite, Plaintiffs allege that Copilot suggestions match something in the training data a mere "*1% of the time*," 3-ER-234 (emphasis added), and offer not the slightest reason to think their code would ever be among the 1%.

According to the Complaint, LLMs like Codex work by "detect[ing] statistically significant patterns in [the] training data." 3-ER-204. If an LLM sees "Boil water and cook pasta until al dente" or the steps for a proper French omelette repeatedly in its training data, it will deem that pattern significant and its model weights will reflect as much. Across three complaints, Plaintiffs have brought nothing to the table. They allege nowhere that their source code appears frequently enough to be part of any detectable statistical pattern.

Similarly, Plaintiffs acknowledge that, at the output stage, Copilot's generated suggestions are driven by a "a complex probabilistic process [to] predict … the most likely solution to a given prompt." 3-ER-204. In other words, Copilot is predicting what is useful to a developer—what code sequence may naturally come next—based on what that developer is coding. Yet Plaintiffs offer no allegations

28

concerning what their code does; what functions it offers and the circumstances under which it is useful; that their code has been used with any frequency; or why Copilot's "probabilistic process" would ever be likely to identify code like theirs as a predicted solution.

Once more in the same vein: Plaintiffs allege that when Copilot generates suggestions, it "returns the solution it has found in the most projects when those projects are somehow weighted to adjust for whatever variables Codex or Copilot have identified as relevant." 3-ER-204. Yet Plaintiffs do not allege that their code has been "found in the most projects"—or even more than one—nor that this code would be identified by any "variable[] Codex or Copilot have identified as relevant."

Ultimately, Plaintiffs have alleged merely that their code is among billions of lines in the training set, and that some of those lines may be emitted at some point. This Court has explained that a "probabilistic estimate that … general circumstances … may produce harm" is not enough to confer standing. *Nelsen v. King County*, 895 F.2d 1248, 1250 (9th Cir. 1990). Plaintiffs do not even provide that, let alone an individualized showing that output-based injury has

"materialized" or is "certainly impending." *Pinkert v. Schwab Charitable Fund*, 48 F.4th 1051, 1055 (9th Cir. 2022) (cleaned up).

**C.** Plaintiffs' attempt to fill the gap with outputs procured by their manipulative prompts fails. These "examples," included in the Complaint for three of five Doe Plaintiffs, show that Plaintiffs prompted Copilot with verbatim lines of their code and purportedly elicited a rough match for subsequent lines of code. *Supra* 15-18. But Plaintiffs nowhere explain why someone who already had a full copy of their code would type it into Copilot character-for-character. Nor do they allege even generally that anything like the outputs they elicited could be generated through ordinary Copilot use.

The district court nevertheless found that these examples conferred standing as to the Doe Plaintiffs who provided them. It did not dispute Plaintiffs' failure to allege that "a real-world user plausibly has or would" enter the prompts Plaintiffs did, nor Plaintiffs' inability to allege that their code "frequently recurs" or that "anyone would want to copy [it]." 3-ER-252. That should have defeated standing. But the district court found Plaintiffs' self-inflicted examples *themselves* constitute injury permitting them to seek damages (though, again,

30

Plaintiffs would later drop any claim for § 1202 damages from the case,

3-ER-242-43).  The district court's ruling is legal error.

Where plaintiffs fail to allege even the bare likelihood that a

hypothesized injury might occur, they cannot "manufacture standing

merely by inflicting harm on themselves." *Clapper v. Amnesty Int'l*

*USA*, 568 U.S. 398, 416 (2013).  Courts have "consistently held [that]

self-inflicted harm doesn't satisfy the requirements for standing" both

because it "does not amount to an 'injury' cognizable under Article III"

and because any such injury "would not be fairly traceable to the

defendant's challenged conduct." *Nat'l Family Planning &*

*Reproductive Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir.

2006) (collecting cases); *see also Buchholz v. Meyer Njus Tanick, PA*, 946

F.3d 855, 866-67 (6th Cir. 2020) (collecting authorities and explaining

that "[a] self-inflicted injury, by definition, is not traceable to anyone

but the plaintiff").

The district court declined to apply this rule, finding that "a

plaintiff is not required to suffer an injury only inadvertently."  3-ER-

251-52.  It noted authority finding standing where an injury was

"willingly incurred" or where a "tester" subjected itself to an unlawful

practice. *Id.* (citing *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 297 (2022); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374-75 (1982)). And it thought that whatever outputs Plaintiffs elicited were traceable to Defendants because they were "derived from Defendants' programs." 3-ER-252 n.4.

There is a vast difference between *subjecting* oneself to a genuinely threatened injury—as occurred in the cases the district court cited—and *creating* an otherwise implausible injury yourself—as Plaintiffs did here. If you post all of your medical information to Facebook, you cannot claim standing to sue Meta for its exposure. True, the exposure is "derived" from the way Facebook shares the information you post. But you are the one who operated Facebook in a manner that generated an injury that was otherwise "hypothetical or conjectural" at best.

Plaintiffs' tactic is no different. This Court should reject it.

**D.** The remainder of Plaintiffs' allegations do not come close to establishing even the threatened injury necessary to seek injunctive relief. In finding otherwise, the district court relied upon allegations that "both Codex and Copilot were trained on data that included all

public GitHub repositories"; "that the programs reproduce well-known code in response to related prompts"; and that "GitHub's own internal research shows that Copilot reproduces code from training data 'about 1% of the time.'" 1-GH-SER-124; *see* 3-ER-234. This establishes that the chances of injury are tiny, not likely.

To be clear, the "internal research" the district court relied upon does not suggest that *everything* in the training set has a 1% chance of appearing as a code suggestion. What it suggests is that 1% of outputs will contain a snippet matching *something* in the program's vast training set, typically "well-known code" that many developers have used in many projects. This hardly establishes "a substantial risk that Defendants' programs will reproduce *Plaintiffs'* licensed code as output in the future." 3-ER-250 (quoting 1-GH-SER-124) (cleaned up; emphasis added).

The same goes for Plaintiffs' reliance on an alleged "user-settable Copilot filter called 'Suggestions matching public code,'" which allows users to block matching "excerpts of 'about 150 characters.'" 3-ER-222. Plaintiffs suggested that this proved the existence of such matches. What it actually establishes is that outputs that are already unlikely

33

under Plaintiffs' allegations are even *less* likely in Copilot's real-world operation.

Because Plaintiffs fail to allege that Copilot ever has or will output their code, they lack standing to pursue § 1202(b) claims. This Court should so hold and affirm the dismissal of those claims on standing grounds.

## II. Plaintiffs Fail To Plausibly Allege A § 1202(b) Claim.

In any event, the district court correctly held that Plaintiffs failed to state a claim under § 1202(b). On the issue the district court thought worthy of certification, it correctly found that Plaintiffs cannot base claims on Copilot's short, non-matching snippets of generated code under the rule requiring plaintiffs to allege removal of CMI from an identical copy of their works. *Infra* § A. Plaintiffs' claims also fail on the independent ground that the Complaint does not plausibly allege a likelihood that removal of CMI from their works will facilitate copyright infringement, as required by *Stevens v. Corelogic*. *Infra* § B. And Plaintiffs' last-ditch attempt to create a new theory of liability based on purported removal of CMI during training fails because the theory is unpled, waived, and meritless. *Infra* § C.

Before turning to these points, a brief word on Plaintiffs' attempts to confine the scope of this appeal. Regarding the district court's identical-copy ruling, Plaintiffs devote an entire section of their brief (OB46-49) to restricting Defendants from arguing that "[w]hat is sometimes dubbed the 'identicality' requirement in fact reflects a broader throng of decisions reinforcing § 1202(b)'s requirement of 'removal' of CMI." 3-ER-137. Plaintiffs will surely also argue that this Court cannot apply *Stevens* as an alternative ground for affirmance. 1-GH-SER-8-9 (Plaintiffs arguing this at § 1292 motion stage).

After seeking this Court's interlocutory intervention, it is telling that Plaintiffs try so hard to preclude full appellate review. These are de novo issues entailing application of law to Plaintiffs' allegations under the familiar Rule 12(b)(6) standard. Defendants' arguments (unlike Plaintiffs' new theory) were fairly and repeatedly raised before the district court. All are material to the order certified. *See* 28 U.S.C. § 1292(b) (court certifies "order," not issue). And Defendants raised them at the petition stage before this Court, so Plaintiffs can hardly complain that they lacked notice. 3-ER-120-54.

In urging this Court to accept this appeal, Plaintiffs claimed the need for "crucial guidance for similar cases." 2-ER-36-40. Now they ask for a decision so narrow it would be meaningless even in *this* case. If this Court reaches the merits, it should conduct genuine review of the order certified. That means addressing any argument that was fairly presented to the district court, "material to the [certified] order," and necessary to resolve whether the § 1202(b) claims may proceed. *See In re Cinematronics, Inc.*, 916 F.2d 1444, 1449 (9th Cir. 1990); *accord United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1194-96 (D.C. Cir. 2005) (judicial economy warrants addressing "fairly included" issues).

### A. The district court correctly dismissed Plaintiffs' § 1202(b) claims based on the absence of identical copies.

The district court correctly rejected Plaintiffs' attempt to predicate § 1202(b) claims on rare Copilot suggestions that may be "a modified format, variation, or … functional equivalent" of parts of Plaintiffs' code. 3-ER-259 (internal quotation marks and brackets omitted). And it properly did so by applying cases that "have held that no DMCA

violation exists where the works are not identical." 3-ER-259 (internal citation omitted).

Plaintiffs make an elaborate show of attacking a rigid, free-standing requirement of literal identicality that they claim will yield "absurd" results. OB38. This is an exercise in caricature. As Plaintiffs' own description of the case law elsewhere lets on, the lack of identicality matters because it is a central—and often dispositive—indication "that the defendant ha[s] [not] removed CMI at all" within the meaning of § 1202(b), OB43. The rule did its job here, confirming Plaintiffs' failure to plausibly allege § 1202(b)'s bedrock textual requirements.

> **1. Plaintiffs fail to satisfy the plain statutory requirement of *removal* of information conveyed in connection with *copies* of a work.**

**a.** Plaintiffs' textual analysis focuses on the lack of the word "identical" in § 1202(b). OB23-24. But the result in this case—and the identicality rule the district court applied—flows from two plain, unambiguous textual elements of § 1202, understood in light of the "language and design of the statute as a whole." *Nat. Res. Def. Council*

37

*v. U.S. Env't Prot. Agency*, 857 F.3d 1030, 1036 (9th Cir. 2017) (internal quotation marks omitted).

The first is the definition of CMI as information "conveyed in connection with *copies* … of a work." § 1202(c) (emphasis added). The definition makes clear that CMI is not information that is somehow associated with a work in the abstract. It is information specifically connected with the "*material objects* … in which [the] work is fixed," 17 U.S.C. § 101 (definition of "copies"; emphasis added). To be clear, these "material objects" could be physical copies or digital copies. The point is that the statute centers on a particular object with which CMI is conveyed.

The second key textual element is § 1202(b)'s focus on "remov[al] or alter[ation]" of CMI. The plain meaning of remove is "to move by lifting, pushing aside, or taking away or off" or "to get rid of." Webster's Third New International Dictionary 1921 (1993). And to alter is "to cause to become different." *Id.* at 63. Plaintiffs generally agree with these definitions. OB23. The statute thus bars certain affirmative acts taken to tamper with the CMI conveyed with physical or digital "copies"—i.e., material objects in which a work is embodied. *See* H.R.

38

Rep. No. 105-551(I), at 22 (1998) ("Section 1202 imposes liability for specified acts.").  Classic examples are "defacing or altering the title page of a book" or "delet[ing] the electronic information that may accompany a computer file."  4 Nimmer on Copyright § 12A.10[B][1][a].

This focus on affirmative tampering with material objects makes good sense considering the overarching aims of the DMCA.  As the House Committee explained, the WIPO Treaty was concerned with "rapid dissemination of perfect copies," which would "facilitate pirates." H.R. Rep. No. 105-551(I), at 9; *see id.* ("The digital environment now allows users of electronic media to send and retrieve perfect reproductions of copyrighted material …"); *supra* 6-8.  In addressing that concern, Congress did not create a new, broad-based attribution right guaranteeing inclusion of particular information along with anything resembling a work, let alone a small snippet of a work. *Contrast* 17 U.S.C. § 106A(a)(1)(A) (creating narrow attribution right for certain visual works); *see Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34-35 (2003) (recognizing § 106A's "right of attribution is carefully limited and focused").  What Congress enacted is

a "technological adjunct," USCO DMCA Summary, *supra*, barring particular types of acts that facilitate or conceal pirated copies.

**b.** District courts have consistently held the line, lest § 1202(b) sweep in passive, incidental conduct far beyond the mass digital piracy § 1202 was meant to address.

In *Falkner v. General Motors LLC*, for example, the plaintiff painted a mural in a parking garage that covered two walls, one of which contained the plaintiff's pseudonym. 393 F. Supp. 3d 927, 929 (C.D. Cal. 2018). A professional photographer later took a picture that "showed only one of the two walls constituting the mural, and the wall that was not included was the wall on which Plaintiff had placed his pseudonym." *Id.* The plaintiff claimed that not including the pseudonym from the original mural violated § 1202(b), but the court disagreed. "[F]raming a photograph" in a way that "simply chose not to include" a portion—and thus "fail[ing] to include" CMI—is not "removal" or "alteration" of CMI "under the common usages of the terms." *Id.* at 938.

Courts have similarly rejected § 1202(b) claims where a defendant merely excerpted lecture notes from an "electronic textbook" without

40

reproducing CMI "printed on the boxes containing the … textbook" and "within the textbook's software," *Faulkner Press, L.L.C. v. Class Notes, L.L.C.*, 756 F. Supp. 2d 1352, 1356, 1359 (N.D. Fla. 2010); "copied various elements and features of" floorplans but "omit[ted]" CMI, *Design Basics, LLC v. WK Olson Architects, Inc.*, No. 17-cv-7432, 2019 WL 527535, at *2, *5 (N.D. Ill. Feb. 11, 2019); "bas[ed] a drawing on [plaintiff's] work" but did not "remove[] the [CMI] from [plaintiff's] original work," *Frost-Tsuji Architects v. Highway Inn, Inc.*, No. 13-cv-00496, 2015 WL 263556, at *3 (D. Haw. Jan. 21, 2015), *aff'd*, 700 F. App'x 674 (9th Cir. 2017); or used a "crawler" that took "images from the context of Plaintiff's Web sites where their [CMI] was located," "converted them to thumbnails," but "did not include" CMI. *Kelly v. Arriba Soft Corp.*, 77 F. Supp. 2d 1116, 1122 (C.D. Cal. 1999), *rev'd on other grounds*, 336 F.3d 811 (9th Cir. 2003).

Courts have had little trouble, moreover, identifying genuine examples of active removal of CMI. For example, deliberate cropping of a photo to include all but a "gutter credit" constitutes active conduct removing the credit. *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 300-05 (3d Cir. 2011). Similarly, where a defendant copied source

code that originally had CMI "[w]eav[ed]" *within* it, the court recognized that an otherwise identical version was the result of active removal. *E.g.*, *Bounce Exch., Inc. v. Zeus Enter. Ltd.*, No. 15-cv-3268, 2015 WL 8579023, at *2-3 (S.D.N.Y. Dec. 9, 2015).

**c.** As the above cases reflect, the ultimate aim in applying § 1202(b) is to evaluate, in light of the context and circumstances, whether the plaintiff has established that the defendant actively tampered with CMI conveyed in connection with a copy of a work. A simple way to decide this appeal is to adopt and apply that standard, because Plaintiffs fail to satisfy it.[5]

Their Complaint claims that "Copilot reproduces the code of the Named Plaintiffs without attribution," 3-ER-208 (capitalization omitted), and parrots the words "removed or altered" throughout. *E.g.*, 3-ER-233-36. But Plaintiffs allege virtually nothing about the *copies* of their works ostensibly at issue. Nor do they say anything about where

---

[5] Plaintiffs misleadingly label this a "newly raised argument." OB48. It is not. Defendants repeatedly raised the definition of CMI, the requirement of removal, and each of the authorities cited here, while equating them with the identicality requirement the district court ultimately applied. *See* 2-GH-SER-248-49; 3-GH-SER-364-66; 3-GH-SER-335-41.

CMI (including license information) might appear in connection with copies of their code, or venture any plausible account of how Copilot actively *removed* that CMI in generating its outputs.

Indeed, Plaintiffs' generalized allegations about Copilot *refute* the notion that Copilot either outputs copies of Plaintiffs' works or actively strips CMI from such copies. Again, per Plaintiffs' description, Copilot is a "generative AI" model built on "inferred … statistical patterns governing the structure of code." 3-ER-199, 3-ER-207. The predictions it generates are the "most likely solution to a given prompt" based on "whatever variables Codex or Copilot have identified as relevant." 3-ER-204. And a mere "1%" of the time one of these outputs "may contain code snippets longer than ~150 characters that match[] code from the training data." 3-ER-234.

That means that *99% of the time* Copilot's generated outputs are either (a) exceedingly small snippets roughly the length of this sentence, (b) do not match *anyone*'s work, or (c) both. The notion that any of this could be a "copy" with which CMI is conveyed is fanciful. And even if there were some basis for concluding that Copilot's generated suggestions frequently matched code in the training data,

there would *still* be no basis for concluding that Copilot actively tampers with CMI. Plaintiffs have pled the opposite: Copilot generates its outputs based on the model's inferences as to the "structure of code" and real-time calculated predictions as to code that might come next in a developer's project. That these predictions happen not to include CMI does not mean that CMI has been *removed* from a *copy* under any natural meaning of those words.

Plaintiffs' own attempts to generate examples only prove that Copilot works this way. Were it possible to summon copies of copyrighted works without CMI, Plaintiffs would have identified the copyrighted works, included the claimed copies of those works, and pointed to the CMI that was actively removed from that work. Then the district court, this Court, and Defendants—who are owed notice of Plaintiffs' claims—could evaluate whether these allegations raise an inference of removal of CMI from a copy.

Instead, as the district court found and Plaintiffs do not dispute, Plaintiffs were able to point only to short suggestions constituting "a modified format, variation, or … functional equivalent" of parts of Plaintiffs' code. 3-ER-259 (internal quotation marks and brackets

44

omitted).  Plaintiffs do not even allege that these suggestions—e.g., Doe 1's rudimentary ███████, *supra* 16-18, or Doe 2's list of the ████ ███████████████████████████████ 3-ER-208-14—are copies of copyrighted works.  And even if the 20-some-odd-line "functional equivalents" of Plaintiffs' generic code were considered copies of works, there is, again, no indication that Copilot actively tampered with CMI in generating its suggestions.

Plaintiffs offer only two brief responses to the above.  First, they baldly state that the Complaint "allege[s] that Codex and Copilot output their works (with slight modifications) and with the CMI removed."  OB48.  But that is just a formulaic recitation of elements, not a plausible allegation of facts establishing the what and how that could form the basis for a claim.

Second, Plaintiffs claim a "classic fact dispute," promising that they "intend to show that Codex and Copilot reproduce their works— with the CMI removed and only superficial changes."  OB49.  Intentions are not allegations.  Plaintiffs have had three opportunities to plausibly allege what they "intend to show," and failed to get Copilot to "reproduce their works" at all, let alone in a manner that suggests that

Copilot tampered with CMI connected to copies of those works. And again, their own allegations establish that the way Copilot functions is to generate predicted, relevant code—that its predictions do not also reproduce CMI is no more a "removal" than the photographic framing, excerpting, or format changes courts have consistently held not to give rise to liability.

> **2. The district court properly relied on the absence of identical copies to find that Plaintiffs could not plausibly allege removal from copies of a work.**

The district court reached the same result for the same reason when it applied the rule requiring identical copies. Plaintiffs attempt to depict this as a "rigid identicality requirement," OB33, that would be satisfied even if a defendant makes an exact copy, removes CMI, then makes trivial changes. Neither the district court's decision nor the case law it applied supports this account. The identicality rule is rooted in the same bedrock textual requirement of "removal" discussed above. It recognizes that in most cases, the lack of an identical copy is a dispositive factor establishing that the defendant merely created some new CMI-less end-product, rather than reproducing a pirated copy and

tampering with CMI to conceal it. The rule is sound and the district court did not err in applying it here.

To see how the identicality and removal requirements are of a piece, consider again the cases referenced above involving the framing of photographs, excerpting of text, or reformatting of an original. *Supra* 40-42. Each of those scenarios involves an original copy containing CMI, then a defendant's partial or modified end-product that lacks CMI. In each, that end-product was sufficiently different from the original that there was no reason to infer that the defendant tampered with any CMI. Rather, the framed photo, excerpt, and reformatted version made clear that the defendant had incidentally not included CMI in creating something different.

But now consider a scenario where the end result is identical to the original copy containing CMI. There the inference is the opposite— the defendant has almost certainly duplicated the work in its entirety, while actively excising the CMI. So by focusing on the existence of an identical copy, the identicality rule ensures that § 1202(b) addresses cases of active removal, while excluding those where the defendant

generated something new without including CMI conveyed with some different original.

The authority the district court relied upon illustrates that this is precisely the function of the identicality rule. *See* 1-ER-6-7. In *Kirk Kara Corp. v. Western Stone & Metal Corp.*, the plaintiffs accused the defendant of infringing certain ring designs, and also included a claim under § 1202(b). No. 20-cv-1931, 2020 WL 5991503, at *1 (C.D. Cal. Aug. 14, 2020). The complaint featured side-by-side photographs purporting to support the CMI-removal claim. Pictured below on the left is plaintiff's photo, with CMI included on the inside of the ring; on the right is defendant's photo of the allegedly infringing ring, with no CMI.



Compl., ¶ 11, *Kirk Kara Corp. v. W. Stone & Metal Corp.*, 20-cv-1931 (C.D. Cal. Feb. 27, 2020).

The court dismissed the claim. "Based on a review of the side-by-side images included in the Complaint, the Court can determine that, while the works may be *substantially similar*, Defendant did not make *identical* copies of Plaintiff's works and then remove the engraved CMI." 2020 WL 5991503, at *6. The point was not to create some freestanding, unbending identicality requirement; the lack of identicality was significant because it exposed that the defendant had not removed CMI from a copy. In reaching this conclusion, *Kirk Kara* applied the very same cases we cite above (at 40-42) regarding the removal requirement.

Another case the district court relied upon, *Advanta-STAR Automotive Research Corp. of America v. Search Optics, LLC*, is similar, and similarly sensible. 672 F. Supp. 3d 1035, 1057 (S.D. Cal. 2023); *see* 1-ER-7. At issue were copyrighted vehicle comparisons. 672 F. Supp. 3d at 1051. The defendant's comparisons contained some of the sections of the plaintiff's, with similar "arrangement of information," "factual information … presented in a markedly similar way," and text suggesting that "numerous … paragraphs are copied verbatim." *Id.* at 1049-50. That was sufficient for a copyright infringement claim. *Id.* at

1053-54. But when it came to the § 1202(b) claims, the court found that merely "copy[ing] protected aspects" of a work is not enough to show distribution of a copy of a work from which CMI was removed. *Id.* at 1057 (citation omitted).

And as for the district court's third case, *Frost-Tsuji Architects v. Highway Inn, Inc.*, take it from Plaintiffs: "[T]he court observed that the copies there were not identical as part of a broader explanation that the plaintiff submitted no evidence that the defendant had removed CMI at all." OB43 (citing *Frost-Tsuji*, No. 13-cv-0496, 2015 WL 263556 (D. Haw. Jan 21, 2015); internal quotation marks omitted). Plaintiffs thus agree that in the very case the district court relied upon, the identicality requirement and the requirement of removal are of a piece. OB43.

Plaintiffs are therefore wrong to suggest that the district court was applying some ultra-literal identicality requirement. *See* OB36-38. The cases the court relied upon viewed the absence of identical copies as a dispositive indication that the defendants had not tampered with CMI. So it is here, because Plaintiffs at best allege rare, short, modified snippets of output based on statistical predictions. *Supra* 15-18.

50

Plaintiffs' dire warning that the district court's rule will produce "absurd results" is therefore overblown. OB38. Plaintiffs say that under a strict identicality rule, "a defendant could evade DMCA liability by removing or altering CMI in a copied work but only disseminating 99% rather than 100% of that work." OB37 (internal quotation marks omitted). They spin up stylized examples in which a defendant "stripped," "removed," or "cropped" out CMI, then made obviously trivial changes. OB37-38.

The reason Plaintiffs must resort to hypotheticals is that the identicality rule has not actually produced these "absurd" results in practice. Courts have not reflexively applied the rule where the context and circumstances establish that a defendant actively tampered with CMI. And if this Court is the least bit concerned that they might, it can simply make clear that an affirmative act of "remov[al] or alter[ation]" of CMI is both necessary and sufficient for a § 1202(b) claim, and that the lack of identicality should be treated not as a rule unto itself, but as a weighty factor that will often drive the result. That approach would lead to the right result in each of Plaintiffs' stylized hypotheticals, just as it does in this case.

### 3. Plaintiffs' alternative approach is wrong and unworkable.

Plaintiffs do not clearly advance a standard of their own. But they appear to support an exceedingly capacious rule under which a § 1202(b) claim lies against any "substantially similar," OB42, or even merely "derivative," OB39 n.12, end-product that lacks CMI—even if there is no basis for inferring that the defendant engaged in any act connected to CMI at all. And indeed, they need such a rule to state a claim based on the short "variation[s]" or "functional[] equivalent[s]" they claim Copilot emits. 3-ER-259-60. This sweeping approach cannot be squared with § 1202(b)'s text or structure. And it would convert a tool for thwarting mass piratical copying into a broad attribution right previously unrecognized in American law.

Plaintiffs' textual argument centers on the statute's general definition of the word "copies" in § 101, which Plaintiffs note "does not suggest copies must be identical." OB24-25. Plaintiffs then leap to the observation that for purposes of an *infringement* claim, "[a] 'striking similarity' between the works may give rise to a permissible inference of copying." OB26 (quoting *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016)). Because copy*ing* does not require

identicality, Plaintiffs conclude that "[t]he Copyright Act … has never required an identical copy when it uses the term 'copies.'" OB28. And this must mean that anything a defendant produces that could support an infringement claim must also be sufficient for a § 1202 claim—from a song that borrows a few notes of melody, to a reprinted passage of a novel, to a new piece of fan fiction.

The problem with Plaintiffs' copyright dissertation is that it ignores the context in which the word "copy" is used in § 1202—a statute not about infringement, but about the "integrity" of CMI. As explained above, CMI is expressly defined as information "conveyed in connection with a copy," § 1202(c), which in turn is a "material object." *Supra* 38. So § 1202's focus is not "copies" or "copying" of works in the abstract, as with Plaintiffs' cited authorities. It is about particular information conveyed with particular copies—the copies to which the purportedly tampered-with CMI is connected. It makes no sense to speak of removing CMI from something (like a derivative work) with which the CMI was never connected.

Take, for example, a *Twilight* novel. The CMI is the title, author, and copyright notice conveyed inside the cover in connection with *copies*

of the book. If a defendant authors derivative fan fiction that lifts some elements from *Twilight*, the end-result may well constitute copyright infringement. Plaintiffs' cited cases might even shorthand this conduct as "copy*ing*." But it would make no sense to treat the defendant's fan fiction as a copy that is the subject of a CMI claim. It is a non sequitur to accuse the fan-fiction author of removing CMI from a copy of a work of fan fiction with which no CMI was ever conveyed in the first place. The same goes for Copilot's alleged "variations" and "functional equivalents." For all the Complaint alleges, Copilot generated these suggestions from its inferred statistical patterns without reproducing CMI—no allegations suggest that Copilot's outputs *remove* CMI from a copy the original.

The consequences of adopting Plaintiffs' alternative reading would be staggering. This Court would have to conclude that all that is required for a § 1202 claim is that the defendant produced something resembling a Plaintiff's work, without including CMI. The cases discussed above about framing photographs, excerpting from books, or reformatting works would all be summarily overruled. *Supra* 40-42. Indeed, if you were to extract, or even paraphrase, this page of this brief

without also including the information on the cover or signature pages, Plaintiffs would say that you have created a "copy" of the brief and "removed" CMI from it.

It is unfathomable that Congress intended such sweep. Plaintiffs' approach cannot be reconciled with the ordinary meaning of "remove" and "copy." And § 1202's aim, reflected in its text and structure, was to supplement copyright protection, not swallow it whole with a limitless attribution right. This Court should reject Plaintiffs' approach, apply the statutory requirement of affirmative removal of CMI from copies, and affirm the district court.

### B. Plaintiffs' § 1202(b) claims fail because they do not allege an objective likelihood of infringement of their works.

Plaintiffs' claims fail for the independent reason that the Complaint does not allege that any removal of CMI has an objective likelihood of facilitating or concealing infringement of Plaintiffs' works, as required for a § 1202(b) claim under *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 675 (9th Cir. 2018). This pleading defect is stark. Just as in *Stevens*, Plaintiffs cannot allege "any particular act of infringement by anyone," "a pattern of such infringement likely to recur in the future,"

or any "instance in which the removal of CMI … induced, enabled, facilitated, or concealed an infringement." *Id.* (brackets omitted).

Though the district court did not address this argument in the order certified for appeal, GitHub and Microsoft raised it fully in the underlying motion. 3-ER-177-78. GitHub and Microsoft also indicated in their opposition to Plaintiffs' petition for permission to appeal that they would raise this argument as an alternative ground for affirmance. 3-ER-150-52. Nothing prevents this Court from applying *Stevens* to the Complaint in the first instance, *supra* 35-36, and judicial economy strongly favors doing so if necessary to resolve whether Plaintiffs state a § 1202(b) claim.

**1.** Section 1202 carries what is sometimes called a "double scienter" requirement. The first requirement is "intentional[]" tampering with CMI (for (b)(1)) or the "knowing" distribution of copies from which CMI has been removed or altered (for (b)(2)). The second requirement, at issue here, is that to be liable, a defendant must have committed a prohibited act "knowing, or … having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement." § 1202(b).

*Stevens* addressed this latter requirement in the context of a technology that was alleged to strip CMI from preexisting digital copies. The plaintiffs were photographers who challenged the defendant's software program, which "downsample[d]" (i.e., condensed the size of) images for use in electronic real estate listings, and in the process failed to preserve the CMI metadata from the plaintiffs' photographs. *Stevens*, 899 F.3d at 671. The plaintiffs argued that they satisfied the "reasonable grounds to know" requirement because when CMI is removed, "one method of identifying an infringing photograph has been impaired, [such that] someone might be able to use their photographs undetected." *Id.* at 673 (footnote and italics omitted).

This Court rejected the plaintiffs' speculation that stripping CMI could facilitate or conceal infringement. Although a § 1202 plaintiff "need not show that any specific infringement has already occurred," this Court explained, it still "must make an affirmative showing … that the defendant was aware or had reasonable grounds to be aware of the *probable future impact* of its actions." *Id.* at 674 (emphasis added). This requires "an affirmative showing, such as by demonstrating a past 'pattern of conduct' or 'modus operandi'" "from which one can infer that

future infringement is likely … to occur as a result of the removal or alteration of CMI." *Id.* at 674-75.

The requirement of an objective likelihood of future infringement makes good sense where a defendant is accused of offering a technology that may, through ordinary operation, incidentally remove (or not reproduce) CMI. If infringement is merely a "general possibility," *id.* at 673, there is no plausible inference that the defendant's operation of the technology connotes the sort of culpable facilitation or concealment of infringement § 1202 targets. And that goes double where the accused technology often—or, say, 99% of the time—implicates no preexisting work or CMI at all. *Cf. Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932-33 (2005) (secondary copyright infringement "absolves the equivocal conduct of selling an item with substantial lawful as well as unlawful uses, and limits liability to instances of more acute fault than the mere understanding that some of one's products will be misused").

Courts have applied *Stevens*, including at the pleading stage, to reject claims where a plaintiff is unable to raise the inference of an

objective likelihood that infringement will result from removal or alteration of CMI.[6]

**2.** Plaintiffs cannot come close to satisfying the *Stevens* rule. Plaintiffs have never advanced a copyright infringement claim in this case. They have never pointed to a copyrighted work. They have never described a copyrighted work or explained the scope of any such protection over that work. They have never pointed to a Copilot output that ostensibly infringes any copyrighted portion of their code. And they allege no "modus operandi" or "pattern of conduct" under which anyone has ever infringed their work, either through use of Copilot or any other way.

For much the same reasons discussed above, *supra* 27-34, 42-51, Plaintiffs' generalized allegations about how Copilot works do not fill the void. Plaintiffs' own failed attempts to coax Copilot to emit something resembling their code establish how unrealistic it is that

---

[6] *See Harrington v. Pinterest, Inc.*, No. 20-cv-05290, 2021 WL 4033031, at *6-7 (N.D. Cal. Sept. 3, 2021); *Philpot v. Alternet Media, Inc.*, No. 18-cv-4479, 2018 WL 6267876, at *5 (N.D. Cal. Nov. 30, 2018); *Tremblay v. OpenAI, Inc.*, 716 F. Supp. 3d 772, 779 (N.D. Cal. 2024).

Copilot will ever emit Plaintiffs' code at all, let alone anything copyrighted.

Plaintiffs similarly rely on an academic paper that suggests the theoretical possibility that if "prompted appropriately," 3-ER-207, "with long code excerpts that are very similar to the training data," Copilot could emit "memorized code," 3-ER-176 (citing Carlini Study). That paper explicitly says that "GitHub Copilot … reportedly rarely emits memorized code in benign situations." Nicholas Carlini et al., *Quantifying Memorization Across Neural Language Models* 6 (Mar. 6, 2023), https://arxiv.org/pdf/2202.07646.pdf. The paper thus directly undermines Plaintiffs' theory. It says matches are rare and require the sort of elaborate prompting that Plaintiffs tried without success, and that no one other than Plaintiffs would ever try at all.

Nor does it help Plaintiffs to claim that "[w]ithout the CMI associated with the Licensed Materials, Copilot users are induced or enabled to copy the Licensed Materials," unaware of "whether Output is owned by someone else and subject to restrictions on use." 3-ER-236. That was exactly the sort of generalized speculation this Court rejected in *Stevens*, where Plaintiffs claimed removal of CMI "might" conceal

infringement. 899 F.3d at 673. *Stevens* requires awareness that the defendant's actions "'*will* induce, enable, facilitate, or conceal' infringement." *Id.* (emphasis added). A "general possibility" that CMI removal can lead to infringement is not enough. *Id.* at 673-74.

Finally, and perhaps most importantly, even if Plaintiffs could allege (a) a likelihood that Copilot would output something resembling their work without CMI; and (b) a likelihood that the absence of CMI would lead a Copilot user to use that code, that *still* would not establish that the user's conduct is *infringing*. This case is about short snippets of software code, itself a largely functional form of expression that carries only thin copyright. To establish that a developer's use of a small amount of someone else's code constitutes copyright infringement, a plaintiff would have to show the copyrightability of such material in light of doctrines of merger and scènes à faire, *see Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444-45 (9th Cir. 1994); "virtually identical" copying, *see id.* at 1444; and the absence of a license, *compare Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115 (9th Cir. 1999), *with Jacobsen v. Katzer*, 535 F.3d 1373 (Fed. Cir. 2008). On top of all that, the plaintiff would have to contend with the doctrine of fair

use, which is at its strongest when it comes to software code.  *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021).

Again, look no further than Plaintiffs' own examples.  Plaintiffs do not even attempt to allege that if a user deployed Doe 2's list of ███ or Doe 1's instructions for ███████████ in a larger coding project that this would constitute copyright infringement.  That Plaintiffs cannot allege likely infringement even as to their own examples directly refutes the notion that "future infringement is *likely* … to occur as a result of the removal or alteration of CMI."  *Stevens*, 899 F.3d at 675 (emphasis added).

**3.**  When Defendants raised *Stevens v. Corelogic* in their motion to dismiss the initial complaint, the district court declined to apply it for two reasons.  Neither suffices to excuse Plaintiffs' pleading failures.

The district court first seemed to view *Stevens* as applicable only "in the *summary judgment* context," noting that "[a]t the pleading stage, mental conditions generally need not be alleged with specificity." 1-GH-SER-135.  This misunderstands the nature of *Stevens*'s rule. Though the rule is trained at one of § 1202(b)'s twin scienter requirements, it is an objective standard.  That is why the failure to

point to an instance of infringement, a pattern of infringing conduct, or a modus operandi of infringement doomed the plaintiffs in *Stevens*. It is entirely appropriate to expect plaintiffs to plausibly allege objective facts like this and to dismiss claims where these allegations are insufficient. Again, other courts have done just that. *Supra* 59 n.7.

Second, the district court pointed to allegations purporting to establish that "GitHub regularly processe[s] DMCA takedowns [under § 512(c)'s safe harbor provisions], such that it was aware its platform was used to distribute code with removed or altered CMI." 1-GH-SER-135. The Complaint alleges nothing of the sort. It merely references that "GitHub … also has extensive experience with the DMCA" through its "Takedown Policy." 3-ER-237-38. It does not allege a single instance in which GitHub processed a DMCA takedown because it involved removed or altered CMI. More critically, this allegation hardly suggests that removal of CMI in the context of Copilot's generated outputs *will* result in infringement. At most, this allegation amounts to the sort of "general possibility" of infringement *Stevens* rejected. 899 F.3d at 673-74. In any event, the district court at the time was evaluating the complaint *before* Plaintiffs tried and failed to get Copilot to emit copies

of their material.  These new allegations only confirm that Plaintiffs cannot allege likely future infringement of their works, meriting dismissal.

### C.  Plaintiffs' training-based theory is unpled, waived, and cannot state a viable claim.

Finally, Plaintiffs tack on to the end of their brief a three-paragraph argument that "Defendants"—without specifying which—violated § 1202(b) when training Codex because they "took exact copies of the code, removed the CMI, and used those exact copies (sans CMI) to train their AI models."  OB50-51.  This is the first time in this litigation Plaintiffs have even mentioned such a theory.  This unpled, waived, meritless argument cannot save Plaintiffs' § 1202(b) claims.

Plaintiffs try to knit together a training-based § 1202(b) theory from stray bits of their Complaint.  OB50.  For example, they point to the generic statement in the introduction that "Defendants stripped [CMI] from their code," 3-ER-187 (¶ 11), or in the class allegations that "GitHub and OpenAI caused Codex and Copilot to ingest and distribute Licensed Materials," 3-ER-195 (¶ 49).  The paragraphs articulating the basis for the § 1202 cause of action, however, plainly advance an argument based on what Copilot allegedly "emit[s]," "outputs," or

"distributes," with no training-based theory in sight. 3-ER-234-36 (¶¶ 206-09, 218-20, 224). In short, the theory has always been based on "omitting, altering and/or concealing CMI from Copilot's Output." 3-ER-236 (¶ 224).

Over three motions to dismiss, a motion to reconsider, a motion to certify the order, and a petition for permission to appeal, Plaintiffs never advanced a training-based § 1202(b) theory.[7] The only time Plaintiffs so much as insinuated a training-based *injury* was in connection with their breach-of-license claims. But the district court held that "Plaintiffs' complaint does not describe such an injury" or allege that "use of licensed code to train Codex and Copilot constituted a

---

[7] *See, e.g.*, 2-GH-SER-210 (Opposition to GitHub and Microsoft's Motion to Dismiss Original Complaint; Plaintiffs' theory is that "Defendants distributed copies" of Plaintiffs' works while removing "CMI from output"; no training-based theory); 1-GH-SER-65 (Opposition to GitHub and Microsoft's Motion to Dismiss First Amended Complaint; Plaintiffs' theory is that Copilot "reproduce[ed] CMI as output"; no training-based theory); 1-GH-SER-42 (Motion to Reconsider; Plaintiffs' theory is that "Copilot emits verbatim copies" of Plaintiffs' works; no training-based theory); 1-GH-SER-24 (Opposition to GitHub and Microsoft's Motion to Dismiss Second Amended Complaint; Plaintiffs' theory is that "Copilot produces … copies of Plaintiffs' licensed code" without CMI; no training-based theory); 2-ER-27 (Petition for Permission to Appeal; Plaintiffs' theory is that Copilot "emitted copies of the[ir] code … with CMI removed or altered"; no training-based theory).

breach of the open-source license." 1-GH-SER-123 n.7. When the district court expressed doubt that training could violate any attribution requirement in any open-source license, Plaintiffs' counsel conceded, "Perhaps it doesn't." 1-GH-SER-171. Plaintiffs thus waived any argument that the Complaint states a training-based injury. *See Smith v. Hughes Aircraft Co.*, 22 F.3d 1432, 1438 (9th Cir. 1993) (argument raised for the first time on appeal is waived).

Plaintiffs do not come close to stating a claim anyway. The Complaint contains no allegations at all detailing who allegedly stripped CMI from code or how this was allegedly accomplished during training. *See Intercept Media, Inc. v. OpenAI, Inc.*, 767 F. Supp. 3d 18, 31-32 (S.D.N.Y. 2025) (dismissing CMI claim for failure to allege that Microsoft engaged in CMI removal); *N.Y. Times Co. v. Microsoft Corp.*, No. 23-cv-11195, 2025 WL 1009179, at *18 (S.D.N.Y. Apr. 4, 2025) (same). Nor, for much the same reasons addressed above in connection with Plaintiffs' output-based theory, does the Complaint articulate any theory as to why removal of CMI during training would likely facilitate or conceal infringement.

## CONCLUSION

The district court's order dismissing Plaintiffs' § 1202(b) claims with prejudice should be affirmed.

July 11, 2025                                Respectfully submitted,


                                             /s/ Christopher J. Cariello
Annette L. Hurst                             Christopher J. Cariello
Nicholas González                            ORRICK, HERRINGTON &
ORRICK, HERRINGTON &                              SUTCLIFFE LLP
    SUTCLIFFE LLP                            51 West 52nd Street
405 Howard Street                            New York, NY 10019
San Francisco, CA 94105                      (212) 506-5000
(415) 773-5700

                                             Alyssa M. Caridis
Jonas Q. Wang                                Geoffrey C. Shaw
ORRICK, HERRINGTON &                         ORRICK, HERRINGTON &
    SUTCLIFFE LLP                                SUTCLIFFE LLP
2100 Pennsylvania Ave NW                     355 S. Grand Avenue, Suite 2700
Washington, DC 20037                         Los Angeles, CA 90071
(202) 339-8400

*Counsel for Defendants-Appellees*
*GitHub, Inc. and Microsoft Corporation*

67

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 24-7700

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/Christopher J. Cariello                **Date** July 11, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                        *New 12/01/18*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-7700

I am the attorney or self-represented party.

**This brief contains <u>12,377</u> words,** including _____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs;
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Christopher J. Cariello      **Date** July 11, 2025
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/22*