No. 24-7700

# In the United States Court of Appeals for the Ninth Circuit

---

J. Doe 1, *et al.*,

*Plaintiffs-Appellants,*

v.

Github, Inc., *et al.*,

*Defendants-Appellees.*

---

*On Appeal from the United States District Court for the Northern District of California, Oakland, No. 4:22-cv-06823, Hon. Jon S. Tigar*

---

## BRIEF OF OPENAI APPELLEES

---

Joseph C. Gratz
Tiffany Cheung
Morrison & Foerster LLP
  425 Market Street
  San Francisco, CA 94105

Lisa S. Blatt
Thomas G. Hentoff
Claire R. Cahill
Erin M. Sielaff
Claire L. Lazar
Williams & Connolly LLP
  680 Maine Avenue SW
  Washington, DC 20024
  (202) 434-5000
  lblatt@wc.com

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1
STATEMENT OF JURISDICTION ......................................................6
ISSUE PRESENTED..............................................................................6
STATEMENT OF THE CASE ...............................................................6
    A.    Statutory Background ...............................................6
    B.    Factual Background .................................................9
    C.    Procedural History ................................................13
SUMMARY OF ARGUMENT.............................................................19
ARGUMENT .......................................................................................23
I.    Article III Forecloses Plaintiffs' DMCA Claim.......................23
    A.    Plaintiffs Lack Standing to Challenge the Potential
         Dissemination of Similar Code Without CMI.............24
    B.    Plaintiffs Lack Standing to Challenge the Alleged Removal of
         CMI at the Training Stage and This Claim Anyway Is Moot .....30
II.    Section 1202(b) Requires the Actual Removal or Alteration of
    Copyright Management Information from Existing Works..................32
III.    Plaintiffs' Contrary Approach Is Wrong ................................45
    A.    Plaintiffs Attack a Strawman Identicality Requirement ............46
    B.    Plaintiffs' Apparent Theory of Liability Produces Untenable
         Results .....................................................................51
IV.    Plaintiffs' Input Theory Is Not Before the Court ...................54
CONCLUSION.....................................................................................59
ADDENDUM ............................................................................... Add.1

# TABLE OF AUTHORITIES

Page

## CASES

*ADR Int'l Ltd. v. Inst. for Supply Mgmt. Inc.*,
667 F. Supp. 3d 411 (S.D. Tex. 2023) ................................49, 50

*Advanta-STAR Auto. Rsch. Corp. of Am. v. Search Optics, LLC*,
672 F. Supp. 3d 1035 (S.D. Cal. 2023) ...............................42, 43

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) .............................................................52

*Bain v. Film Indep., Inc.*, 2018 WL 6930766 (C.D. Cal. Aug. 9, 2018) ......50, 51

*Beijing Meishe Network Tech. Co. v. TikTok Inc.*,
2024 WL 3522196 (N.D. Cal. July 23, 2024) .........................50

*Canela v. Costco Wholesale Corp.*, 971 F.3d 845 (9th Cir. 2020) .....................23

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ..................................25, 26, 31

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................28, 29

*Colony, Inc. v. Comm'r*, 357 U.S. 28 (1958) ....................................................35

*Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960 (9th Cir. 2007)................32

*Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121 (2025)...........................31

*Dolls Kill, Inc. v. Zoetop Bus. Co.*,
2022 WL 16961477 (C.D. Cal. Aug. 25, 2022) .......................41

*Enter. Tech. Holdings, Inc. v. Noveon Sys., Inc.*,
2008 WL 11338356 (S.D. Cal. July 29, 2008)........................51

*Falkner v. Gen. Motors, LLC*, 393 F. Supp. 3d 927 (C.D. Cal. 2018) ........38, 39

*Faulkner Press, LLC v. Class Notes, LLC*,
756 F. Supp. 2d 1352 (N.D. Fla. 2010) .................................38, 39

*FEC v. Cruz*, 596 U.S. 289 (2022)....................................................................30

*Ferdik v. Bonzelet*, 963 F.2d 1258 (9th Cir. 1992) ..........................................16

*Fischer v. Forrest*, 968 F.3d 216 (2d Cir. 2020) ..............................................9

*Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180 (9th Cir. 2016) ...........41

*Friends of the Earth, Inc. v. Bergland*, 576 F.2d 1377 (9th Cir. 1978)...........32

*Frost-Tsuji Architects v. Highway Inn, Inc.*,
2015 WL 263556 (D. Haw. Jan. 21, 2015) ............................42

*GC2 Inc. v. Int'l Game Tech.*, 391 F. Supp. 3d 828 (N.D. Ill. 2019) ................50

*Gruver v. Midas Int'l Corp.*, 925 F.2d 280 (9th Cir. 1991)..............................58

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ..................................30

*ICONICS, Inc. v. Massaro*, 192 F. Supp. 3d 254 (D. Mass. 2016) ..................51

ii

Page

Cases—continued:

*Intercept Media, Inc. v. OpenAI, Inc.*,
    767 F. Supp. 3d 18 (S.D.N.Y. 2025)................................................50

*Kim v. United States*, 121 F.3d 1269 (9th Cir. 1997) ........................54

*Kipp Flores Architects, LLC v. Pradera SFR, LLC*,
    2022 WL 1105751 (W.D. Tex. Apr. 13, 2022) ........................40, 49

*Kirk Kara Corp. v. Western Stone & Metal Corp.*,
    2020 WL 5991503 (C.D. Cal. Aug. 14, 2020) ........................42, 43

*Lee v. Am. Nat'l Ins. Co.*, 260 F.3d 997 (9th Cir. 2001) ................23, 24

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)..........................24, 31

*MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928 (9th Cir. 2010) ...........8

*Mills v. Green*, 159 U.S. 651 (1895).........................................24

*Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295 (3d Cir. 2011) ..........50

*Murthy v. Missouri*, 603 U.S. 43 (2024)......................................29

*NASD Disp. Resol., Inc. v. Jud. Council*,
    488 F.3d 1065 (9th Cir. 2007)........................................23, 24

*Nelsen v. King County*, 895 F.2d 1248 (9th Cir. 1990) ..............25, 26, 28, 32

*New Parent World, LLC v. True to Life Prods., Inc.*,
    2024 WL 4277865 (D. Ariz. Sept. 24, 2024) ........................48, 49

*Oracle Int'l Corp. v. Rimini Street, Inc.*,
    2023 WL 4706127 (D. Nev. July 24, 2023)................................50

*Pinkert v. Schwab Charitable Fund*, 48 F.4th 1051 (9th Cir. 2022) ...............28

*Raw Story Media, Inc. v. OpenAI, Inc.*,
    756 F. Supp. 3d 1 (S.D.N.Y. 2024)....................................27, 28

*RAZ Imps., Inc. v. Regency Int'l Bus. Corp.*,
    2020 WL 4500627 (N.D. Tex. Aug. 5, 2020) ............................50

*Real World Media LLC v. Daily Caller, Inc.*,
    744 F. Supp. 3d 24 (D.D.C. 2024) ......................................49

*Renee v. Duncan*, 686 F.3d 1002 (9th Cir. 2012) ............................23

*SellPoolSuppliesOnline.com, LLC v. Ugly Pools Ariz., Inc.*,
    804 F. App'x 668 (9th Cir. 2020) ......................................41

*Spinelli v. NFL*, 903 F.3d 185 (2d Cir. 2018)................................41

*Splunk Inc. v. Cribl, Inc.*, 662 F. Supp. 3d 1029 (N.D. Cal. 2023)................50

*Spokeo, Inc. v. Robbins*, 578 U.S. 330 (2016) ..........................24, 28

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)..................23

iii

Page

Cases—continued:

*Stevens v. CoreLogic, Inc.*, 899 F.3d 666 (9th Cir. 2018).............................8, 9
*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ..............................26
*Tremblay v. OpenAI, Inc.*, 716 F. Supp. 3d 772 (N.D. Cal. 2024) ............39, 40
*Williams v. Gaye*, 895 F.3d 1106 (9th Cir. 2018)...............................52

## STATUTES

Copyright Act, 17 U.S.C. §§ 101-122 ...........................................47, 54
    § 101 ...................................................................47
    § 102 ...................................................................47
17 U.S.C.
    § 504 ..................................................................9, 53
    § 506 ....................................................................9
    § 1201 ................................................................6, 36
    § 1202 ...............................................................*passim*
    § 1203 ..............................................................6, 9, 53
    § 1204 ..............................................................6, 9, 53
    § 1205 ...................................................................6
28 U.S.C. § 1292 ............................................................18, 23, 24

## OTHER AUTHORITIES

*The Advantages of Adherence to the WIPO Copyright Treaty (WCT) and the WIPO Performances and Phonograms Treaty (WPPT)*,
    Int'l Bureau of WIPO, https://tinyurl.com/2mmwd4ew ..............................44
*Am. Heritage Coll. Dictionary* (3d ed. 1997) ...............................34, 36
Mark Chen et al., *Evaluating Large Language Models Trained on Code*
    (2021), https://arxiv.org/pdf/2107.03374 .................................12, 13
H. Rep. 105-551, pt. 1 (1998) ................................................45
Krystal Hu, *ChatGPT Sets Record for Fastest-Growing User Base*,
    Reuters (Feb. 2, 2023) ......................................................9
*License for Copilot Generated Code #6034*,
    GitHub Cmty., https://tinyurl.com/2frm69yh..................................12
*Merriam-Webster's Collegiate Dictionary* (10th ed. 1997) .....................34, 36
*New Oxford Dictionary of English* (1998).......................................35

Page

Other Authorities—continued:

Records of the Diplomatic Conference on Certain Copyright and
    Neighboring Rights Questions, Vol. II,
    World Intell. Prop. Org. (1996) ....................................................44
S. Rep. No. 105-190 (1998) ......................................................6, 7, 45
*Webster's Third New Int'l Dictionary* (1993) .............................35, 37
WIPO Copyright Treaty, Apr. 12, 1997, Preamble .............................6

**INTRODUCTION**

Generative AI goes far beyond connecting users with already-existing sources, as search engines do. Instead, generative AI creates content tailored to users' specific requests in real time, making it possible for every student to have a tutor, every employee to have an assistant, and, in this case, every programmer to have a partner to help create even more innovative software.

Codex and Copilot are generative AI tools that create computer code, the instructions that tell a computer what to do. Like other generative AI models, Codex developed its capacity to create by training on a vast corpus of examples: here, billions of lines of code that programmers made publicly available online. Codex was engineered to learn from these examples the patterns that make code effective. The collective insights it gathered are encoded in a statistical model that can interpret a user's request and generate code that it predicts will help the user complete his task. Codex has powered the AI product Copilot, and together, these AI tools act as assistants for individual programmers around the world.

Decades earlier, Congress enacted the Digital Millennium Copyright Act of 1998 ("DMCA"). That statute protects the "[i]ntegrity" of "copyright management information" ("CMI")—information like the author's name, the

work's title, or the work's terms and conditions of use that is conveyed along with the copyrighted work. 17 U.S.C. § 1202(c). Because CMI helps copyright owners track and monitor copyright violations involving their works, section 1202(a) prohibits falsifying CMI, while 1202(b)—the provision at issue in this appeal—bars "remov[ing] or alter[ing]" the copyrighted work's CMI or distributing works from which CMI "has been removed" when the other elements of the Act are met.

Plaintiffs are five computer programmers whose code—which they publicly shared on an online platform called GitHub—was allegedly used to train Codex and Copilot. Plaintiffs allege that Defendants violated the DMCA because Codex and Copilot could *potentially* generate (or "output") Plaintiffs' code in response to user prompts without including information from Plaintiffs' open source licenses, including the copyright notices, title, authorship attribution, terms and conditions, and identifying numbers or symbols.

But district courts nationwide, citing the plain meaning of "remove" and "alter," hold that section 1202(b) prohibits only the manipulation of CMI attached to a copyright owner's existing work. In other words, if a new author generates his own work—even a substantially similar and infringing work to

2

another copyright owner's—and fails to add the other copyright owner's CMI, the new author does not violate the DMCA because he did not "remove" or "alter" another copyright owner's CMI. That new author may have omitted, excluded, or left out CMI, but he cannot be described as having "removed" it, as the DMCA requires.

To differentiate between situations where someone *deleted* CMI from existing works (potentially unlawful removals or alterations under the DMCA) and where someone produced similar works but failed to *add* CMI (lawful under the DMCA), courts have adopted what is termed an "identicality requirement" as shorthand. The identicality requirement provides a general rule of thumb recognizing that when defendants violate the DMCA by *removing* CMI, the original existing work and "infringing" work are typically identical (but for the removal of CMI). By contrast, when new authors generate their own new work without *adding* CMI—which is perfectly lawful under the DMCA—there are often variations between the "infringing" copy and the plaintiff's original work.

The district court below joined that consensus in holding that, here, Plaintiffs failed to show a *removal* of CMI based on alleged "modification[s]" or "variations" between their original work and the new work Defendants'

3

generative AI tools created. 3-ER-259. Plaintiffs received two chances to amend, but still failed to allege that Codex or Copilot had ever removed or altered CMI from "an identical copy of any work." *See* 1-ER-7. So the district court dismissed their DMCA claim with prejudice.

Plaintiffs sought an interlocutory appeal of this ruling. Plaintiffs argued that the district court had dismissed their output-based DMCA claim by adopting a hyper-technical "identicality requirement" that would require dismissal of any DMCA claim alleging a defendant removed CMI and a single word from a plaintiff's work, leaving the two works "not otherwise identical." That argument is a strawman. The district court reached the correct result and employed the correct reasoning. In the rare instances where Plaintiffs allege that newly generated code is similar to code in the training data, Codex and Copilot did not "remove" or "alter" CMI; rather, they allegedly created similar code without appending CMI. That is not a DMCA violation.

A contrary conclusion would transform the DMCA from a narrow statute focused on protecting copyright owners' CMI to a sweepingly broad statute that Congress could not have contemplated. Every copyright owner could automatically have a DMCA claim with most (if not all) copyright claims. Or as here, copyright owners could have a DMCA claim even in the absence of

any alleged copyright infringement claim at all. Such a result would allow plaintiffs to sidestep the registration requirements that traditional copyright claims impose for statutory damages while simultaneously accessing the DMCA's enhanced statutory damages.

Perhaps recognizing the weakness of the "output" theory asserted below (and despite persuading this Court to review on that theory), Plaintiffs radically change their theory here to an "input" theory based on Codex's and Copilot's training. They now argue that Codex and Copilot—during the training stage, at some unspecified point in time and through some unspecified process—removed CMI from Plaintiffs' code and that *this* alleged removal violated the DMCA. But the complaint does not allege an input theory. No wonder the district court never addressed such a theory and stated in no uncertain terms at the first motion-to-dismiss hearing that this case "is not about training." SER-110.

But even putting aside the merits, Plaintiffs lack standing to bring their DMCA claim based on the code generated by Copilot and Codex because their purported injury is both hypothetical and manufactured. Plaintiffs also lack standing to bring their DMCA claim based on training, since any injury is not redressable. Moreover, their requested injunction (the only relief sought on

the DMCA claim) is moot.

This Court should therefore affirm the dismissal of Plaintiffs' DMCA claim.

## STATEMENT OF JURISDICTION

For the reasons set out below, the district court lacked subject-matter jurisdiction over Plaintiffs' DMCA claim. *Infra* pp. 23-32. Otherwise, OpenAI agrees with the statement of jurisdiction in Plaintiffs' brief.

## ISSUE PRESENTED

Whether the district court properly dismissed Plaintiffs' claim under 17 U.S.C. § 1202(b) of the DMCA.

## STATEMENT OF THE CASE

### A.  Statutory Background

Congress passed the DMCA in 1998 to implement two treaties adopted by the World Intellectual Property Organization ("WIPO") in 1996: the Copyright Treaty and the Performances and Phonograms Treaty. *See* 17 U.S.C. §§ 1201-1205; *see* S. Rep. No. 105-190, at 2 (1998). These treaties aimed to address technology's "profound impact … on the creation and use of literary and artistic works." WIPO Copyright Treaty, Apr. 12, 1997, Preamble.

The DMCA implements the treaties by empowering copyright owners

6

to track, monitor, and detect the dissemination of their copyrighted works. *See* S. Rep. No. 105-190, at 16. To do so, the statute protects the "[i]ntegrity of copyright management information." 17 U.S.C. § 1202. CMI includes several categories of "information conveyed in connection with copies" of a work. *Id.* § 1202(c). An emblematic example of CMI is the copyright page in a book— which includes the author's name, the book's title, information about the copyright owner, and the ISBN. The statute specifies many common types of CMI, including:

- "The title and other information identifying the work," *id.* § 1202(c)(1);

- "The name of, and other identifying information about, the author of a work," *id.* § 1202(c)(2);

- "The name of, and other identifying information about, the copyright owner of the work," *id.* § 1202(c)(3);

- "Terms and conditions for use of the work," *id.* § 1202(c)(6); and

- "Identifying numbers or symbols referring to such information or links to such information," *id.* § 1202(c)(7).

Section 1202(a) prohibits "provid[ing]" or "distribut[ing]" CMI "that is false." *Id.* § 1202(a)(1)-(2). And, as relevant here, section 1202(b) prohibits

7

"intentionally remov[ing] or alter[ing] any" CMI, *id.* § 1202(b)(1); "distribut[ing] or import[ing] for distribution" CMI knowing that CMI "has been removed or altered" without authorization, *id.* § 1202(b)(2); and "distribut[ing], import[ing] for distribution, or publicly perform[ing] works" or copies "knowing that [CMI] has been removed or altered" without authorization, *id.* § 1202(b)(3).

Situated within the broader copyright infringement regime, the DMCA is a narrow statute meant "to mitigate the problems presented by copyright enforcement in the digital age." *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 942 (9th Cir. 2010). Section 1202(b) claims thus require elements on top of removal or alteration. Plaintiffs must show that defendants (1) "intentionally" removed or altered the CMI (or distributed works "knowing" that CMI had been removed or altered without authorization) *and* (2) had reason to know their actions taken with respect to the CMI "will induce, enable, facilitate, or conceal an infringement of any right under this title." 17 U.S.C. § 1202(b). That language sets up a strict double scienter requirement that "limit[s] liability … to instances in which the defendant knows or has a reasonable basis to know that the removal or alteration of CMI or the distribution of works with CMI removed will aid infringement." *Stevens*

8

*v. CoreLogic, Inc.*, 899 F.3d 666, 674-75 (9th Cir. 2018).

Because the DMCA aims to "prevent[] fraud and misinformation," *Fischer v. Forrest*, 968 F.3d 216, 222 (2d Cir. 2020) (citations omitted), it governs a narrower set of claims than copyright infringement. Yet it provides more severe statutory penalties without requiring the copyright registration needed to access statutory damages for copyright infringement claims. The DMCA imposes penalties ranging from $2,500 to $25,000 for *each violation* of section 1202. 17 U.S.C. § 1203(c)(3)(B). Statutory damages under the DMCA thus outstrip ordinary copyright infringement statutory damages, which max out at $30,000 *per work*. *See id.* § 504(c)(1). And the DMCA goes further than statutory damages—providing for criminal penalties if the violation is "willful[] and for purposes of commercial advantage or private financial gain," *id.* § 1204(a), like traditional copyright infringement, *id.* § 506(a)(1).

### B. Factual Background

OpenAI spearheaded the generative AI boom in late 2022 with a product that became "the fastest-growing consumer application in history." Krystal Hu, *ChatGPT Sets Record for Fastest-Growing User Base*, Reuters (Feb. 2, 2023), https://tinyurl.com/ywvusd7n. Unlike search engines, generative AI tools do more than connect users with already-existing sources. They

generate real-time responses tailored specifically to users' requests in a variety of contexts, including computer programming. 3-ER-185, 197, 232-33 ¶¶ 2, 58, 200.

Computer programmers typically write software in human-readable code known as "source code," which is then compiled or interpreted into "object code" that computers can understand. *See* 3-ER-205 ¶ 95. Codex is a generative AI tool designed to write source code when instructed by a programmer, essentially acting as the programmer's assistant. 3-ER-197 ¶ 58.

Codex developed its capability like a student who scours examples of code to learn how to write his own. But Codex studied *millions* of examples in a process known as "train[ing]." 3-ER-234 ¶ 210. In particular, Codex started as a model that could learn "statistically significant patterns" from a broad corpus of coding examples known as a training dataset. 3-ER-198-99, 204 ¶¶ 64, 93. OpenAI's engineers designed the model to learn the patterns that make code effective. 3-ER-198-99 ¶ 64. Codex was then trained on billions of lines of code that programmers voluntarily post on a website called GitHub, which is operated by GitHub, Inc. and owned by Microsoft Corporation. 3-ER-186, 201, 234 ¶¶ 5, 8, 78, 210. Programmers worldwide upload open source code to GitHub for others, for free, to modify, use, and

distribute; some programmers attach licenses to their code containing terms and conditions of use.[1]  3-ER-234 ¶ 210; Doe Br. 4.

The product that emerged from Codex's training can process user prompts and, almost instantly, propose potential code in response.  3-ER-197 ¶ 58.  For example, a law firm associate dabbling in programming may want to write code that computes her remaining number of vacation days.  She could prompt Codex with her initial line of code:

function remainingVacationDays(totalDays, usedDays) {

and based on the patterns that Codex learned during training, Codex will propose a possible completion of her code.  *See* 3-ER-197 ¶ 58.

Microsoft uses Codex to power the generative AI tool called Copilot on its own platform.  3-ER-186-187, 201 ¶¶ 6, 8, 12, 79.

Two important features of generative AI are critical here.  First, generative AI *creates new content*, unlike search engines that connect users with already-existing content.  As detailed in the second amended complaint, Codex and Copilot generate new functional code in real time based on patterns

---

[1] The code at issue here was made available on GitHub under open source licenses. 3-ER-188-89 ¶¶ 19-23.  Those licenses do not purport to restrict any activity that does not independently violate copyright law. *E.g.*, 3-ER-226-27 ¶ 162.  Here, however, there was no copyright infringement claim asserted in the operative complaint.

learned from studying billions of lines of code. 3-ER-198-99, 205 ¶¶ 64, 95. "The models do not contain a database of code, and they do not 'look up' snippets" from the training dataset. *License for Copilot Generated Code #6034*, GitHub Cmty., https://tinyurl.com/2frm69yh (source quoted in 3-ER-206-07 ¶ 102). Rather, the tools are engineered to uncover "statistical patterns governing the structure of code." 3-ER-199 ¶ 64. They can then apply those patterns to "algorithmically simulate[] human reasoning or inference" and produce useful responses tailored to users' prompts. 3-ER-185 ¶ 2. As a result, the code suggested by Codex or Copilot varies from examples in the training dataset.

Plaintiffs do not allege that the AI tools retain code from the training dataset after the training process concludes. Quite to the contrary, the complaint incorporates by reference a research paper explaining that in the "rare instances" that AI-generated code resembles snippets of training-data code, "it is due to the predictive weightings in the model rather than retention and copying of specific code." Mark Chen et al., *Evaluating Large Language Models Trained on Code* 13 (2021), https://arxiv.org/pdf/2107.03374 (discussing Codex generating code) (cited in 3-ER-201 ¶ 75). The researchers explained that these instances only arise when the generated code "consisted

of common expressions or conventions within the programming language that appeared over and over again in the training data." *Id.* In other words, while Codex and Copilot are influenced by and learn from the training data, they do not keep or distribute copies of that data. *See id.*

Second, generative AI *requires user prompts* to create output. As the operative complaint recognizes, Codex and Copilot do not work in a vacuum— they only produce code in response to user requests. 3-ER-197 ¶ 58.

## C. Procedural History

Plaintiffs are anonymous computer programmers who made their licensed open source code "freely available to anyone" on GitHub. Doe Br. 4; 3-ER-188-89 ¶¶ 19-23. They filed a putative class action against various OpenAI entities (collectively "OpenAI"), GitHub, and Microsoft, raising claims under various state laws and the DMCA premised on Defendants' alleged use of their code to create Codex and Copilot. Following three rounds of motions to dismiss, the district court dismissed the vast majority of Plaintiffs' claims, including the DMCA claim at issue in this interlocutory appeal.

As to the DMCA claim, the complaint alleges that Plaintiffs' code posted on GitHub was included among the "billions of lines of public code" used to train Codex. 3-ER-205, 208 ¶¶ 95, 109 (second amended complaint). Plaintiffs

allege that Copilot, powered by Codex, can output code that resembles their own, and that the absence of their copyright notices, title and identifying information, authorship attribution, and terms and conditions of use in such potential outputs constitutes removal or alteration of CMI in violation of sections 1202(b)(1) and 1202(b)(3) of the DMCA. 3-ER-233-35 ¶¶ 205-06, 211.

1. ***Original Complaint.*** Plaintiffs initially sought $9 billion in damages and an injunction on their DMCA claim. *See* SER-46, 79; 2-ER-37. At the hearing on the motion to dismiss, Plaintiffs framed their DMCA claim in terms of the output that Codex and Copilot generate in response to user prompts. *See* SER-95-100. And at that same hearing, when asked whether training Codex and Copilot on Plaintiffs' code even violated the licenses, Plaintiffs' counsel replied that "[p]erhaps it doesn't." SER-92. Plaintiffs' counsel even argued multiple times that "the models ingested all of the code … including the licenses." SER-96; *accord* SER-97 ("Codex and Copilot ingests these licenses and then spits out the output without the attribution…."); SER-98 ("Copilot knows that it is ingesting licenses and it knows not to spit that out."). Accordingly, the district court later commented that this case "is not about training." SER-110.

The district court then held that Plaintiffs lacked standing to seek

14

damages under the DMCA because they had not alleged "that they themselves have suffered the injury they describe," i.e., the reproduction of their "code as output with missing or incorrect attribution, copyright notices, and license terms." SER-44. Instead, Plaintiffs had only alleged that their licensed code was exposed to an "increased and imminent risk of misappropriation," which was "not sufficiently concrete to confer standing for damages." SER-44 (citation omitted). The court gave Plaintiffs leave to amend. SER-61.

2. ***First Amended Complaint.*** Plaintiffs filed an amended complaint with alleged examples of Copilot outputting code that resembles their code without CMI. *See* 3-ER-247-48. To produce these examples, three Plaintiffs prompted Copilot with verbatim lines of their own code, until Copilot suggested code that resembled the next several lines of their code. 3-ER-247-48. The other two Plaintiffs did not include any examples of Copilot generating code similar to parts of their code. Although the court held that the new allegations conferred standing for damages on the three Plaintiffs who had included alleged examples in the complaint, the court held the amended complaint nonetheless failed to allege that Defendants removed or altered CMI from an identical copy of a copyrighted work. 3-ER-253, 258. The court recognized that Copilot's "output is a 'modified format,' 'variation[],' or the

15

'functional[] equivalent' of the licensed code," and the failure to allege otherwise was "a 'fundamental defect' 'endemic to Plaintiffs' theory of [section] 1202(b) liability.'" 3-ER-259 (citations omitted). The district court denied Plaintiffs' motion for reconsideration. *See* 1-ER-6 n.5.

3. ***Second Amended Complaint.*** Plaintiffs' second amended complaint (the operative complaint[2] in the instant appeal) drops the request for DMCA statutory damages.[3] 3-ER-233-39. Instead, the operative complaint solely seeks a permanent injunction requiring Copilot (but not Codex) to include CMI "along with any Output." 3-ER-242 ¶ 263; *see also* 3-ER-238 ¶ 233 (requesting only injunction). The requested injunction makes no mention of Codex's and Copilot's training. *See* 3-ER-242 ¶ 263.

The operative complaint newly alleges that Copilot offers a duplicate-detection feature that users can turn on to identify and block output that

---

[2] Plaintiffs' second amended complaint superseded the original and first amended complaints, making it the only complaint at issue here. *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992).

[3] Because no operative complaint seeks damages, Plaintiffs incorrectly represented in their petition for permission to appeal that "if Plaintiff-Petitioners succeed on their DMCA claim, … potential damages could reach billions of dollars." 2-ER-37. Indeed, in their opposition to the motion to dismiss the second amended complaint, Plaintiffs limited their characterization of their DMCA claim to seeking "injunctive relief." SER-15.

matches small portions of public code, about 150 characters in length, available on GitHub. 3-ER-222-23 ¶¶ 145-48. Plaintiffs allege that the mere existence of this feature allows some users to "receive identical code from GitHub," and therefore, "there is a substantial risk, if not certainty" that Copilot will output code identical to Plaintiffs' own code in the future. 3-ER-222-23 ¶¶ 144-49.

The operative complaint also contains four examples of Copilot generating code that resembles Plaintiffs' code, but *not one single instance* of Codex or Copilot output that is identical to Plaintiffs' code. 3-ER-209-21 ¶¶ 113-37. Plaintiffs produced every example in the operative complaint in the same way: They prompted Copilot with at least one verbatim line of existing open source code, matching each character exactly, and only then did the tool propose code resembling subsequent lines of the existing code. 3-ER-197-200, 202-03, 209-21 ¶¶ 60-61, 71, 84, 86, 113-37. In one example, Plaintiffs prompted Copilot with 22 consecutive lines of licensed code before it generated similar output. 3-ER-212-13 ¶ 119. Notwithstanding this made-for-litigation use of Copilot, Plaintiffs never allege how any ordinary user's prompts could ever produce a similar result. Instead, Plaintiffs generally claim that about 1% of the time, Copilot output "may contain some code snippets longer than ~150 characters" matching code in the training data, and based only on this statistic,

"Copilot has violated the DMCA at least tens of thousands of times." 3-ER-206-07 ¶ 102.

Plaintiffs try to equate the absence of CMI in AI output with removal or alteration. 3-ER-195, 207 ¶¶ 49, 103; Doe Br. 10-11. And they suggest that CMI ought to be generated whenever AI produces any code similar to a snippet of code that exists elsewhere. *See* 3-ER-206-07 ¶¶ 102-03. Plaintiffs thus apparently mean that to avoid DMCA liability, AI models must take a user's prompt, generate output, compare that output to all existing works online, identify all existing works with a similar snippet, and then produce the full license from each and every existing work.

The district court dismissed the DMCA claim with prejudice, holding that Plaintiffs had again failed to satisfy the statute's identicality requirement. 1-ER-6-8.[4]

4. ***Plaintiffs' Interlocutory Appeal.*** Plaintiffs moved under 28 U.S.C. § 1292(b) to certify the district court's order for interlocutory appeal. *See* 2-ER-115. The district court granted that motion. 2-ER-49-50. Plaintiffs then

---

[4] The court did not address the other bases that Defendants advanced below for dismissing the DMCA claim. 1-ER-6. And Plaintiffs' state law breach-of-contract claim survived dismissal and is pending before the district court. *See* 1-ER-17.

18

petitioned this Court for permission to appeal. 2-ER-20-45. They asked this Court to review "whether 17 U.S.C. § l202(b) requires that copies of works be 'identical' in order for liability to attach." 2-ER-25. This Court granted permission to appeal. SER-3-4.

Before the district court, Plaintiffs advanced an *output theory* focused on the potential dissemination of code similar to their own without CMI. And Plaintiffs petitioned for permission to appeal based on the same output theory; their statement of the issue—focusing on identical copies—only affects DMCA liability for allegations that Codex and Copilot removed CMI when the tools output code that is at most similar to Plaintiffs' code. *See* 2-ER-25. Yet on appeal, Plaintiffs' opening brief introduces an *input theory* focused on the training process. Plaintiffs argue that Defendants somehow stripped open source code of CMI before directing the AI tools to learn from it. Doe Br. 10, 50. And they claim that "[t]hose allegations satisfy even the district court's interpretation of the DMCA." Doe Br. 50.

## SUMMARY OF ARGUMENT

The district court properly dismissed Plaintiffs' DMCA claim, a decision this Court should affirm for two independent reasons.

I. Plaintiffs' DMCA claim cannot surmount Article III's hurdles.

Plaintiffs do not clearly define the injury from the purported DMCA violation. Plaintiffs (at 1) initially assert that an alleged injury arises when Copilot and Codex generate code similar to Plaintiffs' (without CMI) in response to user prompts. But any injury based on Codex's or Copilot's output is conjectural, hypothetical, and manufactured. The injury is conjectural and hypothetical because Plaintiffs have never alleged that ordinary users would ever, much less are likely to, enter prompts into Copilot or Codex that cause the tools to generate variations of Plaintiffs' code. Instead, Plaintiffs generally allege that, 1% of the time, Copilot outputs 150-character snippets that match someone's existing code. But Plaintiffs do not explain how that allegation applies to their code. That deficit is fatal to their claim.

The injury is also manufactured because Plaintiffs' only examples of Copilot generating similar code occurred when Plaintiffs themselves prompted Copilot with verbatim lines of their own code. The made-for-litigation nature of Plaintiffs' examples short-circuits the plausibility of their allegations that Copilot is likely to output the same or even similar code in response to user prompts, further undercutting their standing to sue.

Plaintiffs (at 51) also assert that the DMCA violation occurred when CMI was allegedly stripped from their code when Copilot and Codex were

20

trained notwithstanding any future dissemination. Plaintiffs (at 1, 51-52) claim this is a "heartland" DMCA violation, but they never explain how their requested relief—a permanent injunction requiring Copilot to include CMI in its output—could redress that injury. For this same reason, Plaintiffs' input theory is also moot.

II. To the extent Plaintiffs continue to raise their output-based DMCA claim, that claim also fails on the merits. The DMCA is a narrowly tailored statute aimed at prohibiting specific conduct: removing or altering existing CMI on existing works. The statute does not impose liability when a defendant creates a new (even if infringing) work and fails to append Plaintiffs' CMI to that work.

The text of section 1202(b) penalizes those who "remove" or "alter" CMI. Congress could have (but did not) prohibit omitting, failing to add, or leaving off CMI. District courts have overwhelmingly held that failing to include CMI in an allegedly infringing new work is not the same thing as altering it or removing it from an existing work. History and the backdrop against which Congress legislated show the statute does not, as Plaintiffs' theory would do, drastically expand copyright infringement's remedies and scope. Under Plaintiffs' view, section 1202's liability extends past infringing works to *any*

similar work that fails to include CMI, thereby amounting to a new free-standing federal right of attribution.

III.   Plaintiffs argue that the DMCA includes no literal identicality requirement.   But when a defendant possesses a work identical to the plaintiff's work but without any CMI, that strongly supports a conclusion that the defendant actually removed the CMI in violation of the DMCA, as opposed to merely creating a new work and failing to tack on the plaintiff's CMI afterwards.  The district court's reference to identicality covers much the same ground.

On appeal, Plaintiffs never clearly articulate their own theory of DMCA liability.  However, for the operative complaint's allegations to state a DMCA violation, this Court would need to distort the statute beyond recognition, turning almost every copyright infringement claim into a colorable DMCA claim too.   Worse still, Plaintiffs' theory would turn every copyright infringement claim that lacks merit (like in this case) into a DMCA claim, supplanting traditional copyright infringement claims with section 1202(b).

IV.  Plaintiffs pivoted on appeal from the operative complaint's focus on Copilot's and Codex's output to a new theory premised on the alleged removal of CMI from Plaintiffs' code at the training stage.  That late-stage theory,

which Plaintiffs repeatedly eschewed before the district court, finds no well-pleaded support in the allegations of Plaintiffs' second amended complaint and should be rejected.

## ARGUMENT

## I.    Article III Forecloses Plaintiffs' DMCA Claim

It is axiomatic that this Court must assure itself of its jurisdiction before considering the merits of a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). Lack of standing is "a non-waivable jurisdictional defect that may be raised at any time, even on appeal after failing to raise it in the district court." *Renee v. Duncan*, 686 F.3d 1002, 1012 (9th Cir. 2012). Likewise, mootness is a jurisdictional issue that this Court has "an independent obligation to consider." *See NASD Disp. Resol., Inc. v. Jud. Council*, 488 F.3d 1065, 1068 (9th Cir. 2007) (citation omitted). And here, standing and mootness are both "material" to the certified order in this interlocutory appeal because they are jurisdictional issues that resolve the entire appeal. *See Canela v. Costco Wholesale Corp.*, 971 F.3d 845, 848-49 (9th Cir. 2020) (citation and emphasis omitted) (finding jurisdiction under 28 U.S.C. § 1292(b) to decide subject-matter jurisdiction after sua sponte ordering supplemental briefing); *Lee v. Am. Nat'l Ins. Co.*, 260 F.3d 997, 1001 (9th Cir.

2001) (reviewing standing question that was "not expressly certified" under section 1292(b) because it was "fairly raised by the order under review").

## A. Plaintiffs Lack Standing to Challenge the Potential Dissemination of Similar Code Without CMI

Plaintiffs "must clearly ... allege facts" showing an injury that is (1) concrete, particularized, and actual or imminent; (2) traceable to the challenged conduct; and (3) redressable by a favorable decision. *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 338 (2016) (citation omitted); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Article III also requires that the Court "can give [Plaintiffs] any effective relief in the event that it decides the matter on the merits in [their] favor." *See NASD Disp. Resol.*, 488 F.3d at 1068 (citation omitted); *accord Mills v. Green*, 159 U.S. 651, 653 (1895). Plaintiffs cannot satisfy these two burdens, whether they frame their DMCA claim as arising out of the potential creation of similar code in response to user prompts (output theory) or the training of the AI tools (input theory).[5]

1. To start, Plaintiffs' alleged dissemination-based output injury is "conjectural or hypothetical." *See Lujan*, 504 U.S. at 560 (citation omitted).

---

[5] In addition to flunking Article III's requirements, Plaintiffs' input theory is newly raised on appeal and not fairly encompassed in the operative complaint. The substance of the input theory (or lack thereof) is addressed below. *Infra* pp. 54-58.

To have standing to obtain injunctive relief, as Plaintiffs seek on their DMCA claim here, Plaintiffs must allege they are "likely to suffer future injury." *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). "[W]hat a plaintiff must show is not a probabilistic estimate that the general circumstances to which the plaintiff is subject may produce future harm, but rather an individualized showing that there is 'a very significant possibility' that the future harm will ensue." *Nelsen v. King County*, 895 F.2d 1248, 1250 (9th Cir. 1990) (citation omitted).

Plaintiffs have not met that burden. Rather than make allegations specific to their own code, Plaintiffs claim generally that there is a 1% chance that Copilot may produce some snippets of someone's code. 3-ER-206-07, 234 ¶¶ 102-03, 207. The complaint contains no comparable allegation for Codex. And Plaintiffs have not explained how that statistic interacts with *their* code. Indeed, Plaintiffs never allege that the 1% metric applies equally to all code posted on GitHub. Rather, the operative complaint alleges that the chances of reproduction increase based on various factors, including "the number of times an example has been duplicated." 3-ER-207 ¶ 104 (citation omitted). But Plaintiffs provide no such details about their own code.

Regardless, the 1% theory also fails under bedrock standing principles.

"Standing … is not an ingenious academic exercise in the conceivable … [but] requires … a factual showing of perceptible harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (alterations in original) (citation omitted). As a result, standing theories that turn on "a statistical probability that some … members are threatened with concrete injury" do not suffice. *Id.* at 497-98; *accord Nelsen*, 895 F.2d at 1251 (noting courts "cannot base a determination of standing upon the naked statistical assertion"). Plaintiffs' attempt to use the 1% allegation to claim they are at risk of future harm therefore does not suffice. Without any links between the generic 1% statistic and Plaintiffs' own code, the alleged future harm is "no more than conjecture." *Lyons*, 461 U.S. at 108; *accord Nelsen*, 895 F.2d at 1250.

Plaintiffs also argue that Copilot's duplicate-detection feature gives reason to believe that Copilot likely will emit similar code to their own. *See* 3-ER-222-23 ¶¶ 145-49; Doe Br. 12-14. But that feature allows users to block output that matches short snippets of public code, which makes it even less likely that any ordinary user would ever receive code similar to Plaintiffs' as output from Copilot.

At bottom, Plaintiffs have not alleged that ordinary users are likely to enter prompts that will cause Codex or Copilot to generate *Plaintiffs'* code

without the licenses. Plaintiffs allege that their code was among billions of lines of code used to train Codex and Copilot. 3-ER-205, 234 ¶¶ 95, 210. And Plaintiffs allege that when a user prompts Codex or Copilot, the AI tool uses the statistical patterns learned from its training to generate an answer. 3-ER-197-99 ¶¶ 58, 64. The sheer scale of training data and the sheer number of patterns learned from that data make the likelihood that Codex or Copilot will output code similar to Plaintiffs' extremely "remote." *See Raw Story Media, Inc. v. OpenAI, Inc.*, 756 F. Supp. 3d 1, 7 (S.D.N.Y. 2024) (rejecting standing for injunction on similar grounds).

The best Plaintiffs can do is allege only four examples of code from only three of the five Plaintiffs. And to generate those examples, Plaintiffs had to feed multiple lines of their own code into Copilot in order to prompt the tool to generate similar code—an unusual, made-for-litigation use of the product. *Supra* p. 17. Outside these manufactured examples, Plaintiffs have not identified any instances where Copilot has or will generate code similar to Plaintiffs'. They have no standing. *See Raw Story*, 756 F. Supp. at 7.

The district court held that Plaintiffs had adequately alleged a sufficient risk of future harm, reasoning that "Defendants ask too much of Plaintiffs at the pleading stage." SER-46 n.9. But at the pleading stage, Plaintiffs "must

clearly ... allege facts demonstrating each element" of standing. *Spokeo*, 578 U.S. at 338 (citation omitted). Here, Plaintiffs have not alleged "the details necessary" to show a reasonable likelihood that Codex or Copilot will generate their code in response to user prompts. *See Pinkert v. Schwab Charitable Fund*, 48 F.4th 1051, 1054-55 (9th Cir. 2022); *see also Raw Story*, 756 F. Supp. at 7 (granting motion to dismiss for lack of standing). Since Plaintiffs have not alleged "a very significant possibility" of future harm, their DMCA claim must be dismissed. *See Nelsen*, 895 F.2d at 1250 (citation omitted).

2. Furthermore, Plaintiffs must allege an injury traceable to the alleged DMCA violation and cannot do so "merely by inflicting harm on themselves" to "manufacture standing." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). In this case, Plaintiffs' dissemination-based injuries are manufactured and therefore are not traceable to any alleged wrongdoing by Defendants.

The operative complaint alleges that Codex and Copilot "emit[]" Plaintiffs' code without including CMI in response to user prompts. 3-ER-208 ¶¶ 109-10. To substantiate this generic allegation, the complaint includes four examples of Copilot (but not Codex) outputting code similar to Plaintiffs' code. 3-ER-208-21 ¶¶ 112-38. In order to generate those examples, however,

28

Plaintiffs had to feed Copilot multiple, verbatim lines of Plaintiffs' own code to prompt the tool to create some variation of the remainder of the code in response. *See, e.g.*, 3-ER-212-13 ¶ 119. If anything, Plaintiffs' examples show that a user would need to already have a complete copy of Plaintiffs' code— and presumably already have Plaintiffs' CMI—in order to prompt Copilot to generate any code resembling Plaintiffs'.

Plaintiffs do not allege a specific instance of Copilot generating code similar to their own outside the made-for-litigation examples Plaintiffs themselves crafted using multiple, verbatim lines of their own code. That reality negates the complaint's other conclusory allegations that Copilot and Codex will likely output Plaintiffs' code in response to prompts from ordinary users in the future. In other words, the second amended complaint's "failure to establish traceability for past harms—which can serve as evidence of expected future harm—'substantially undermines [Plaintiffs'] standing theory.'" *See Murthy v. Missouri*, 603 U.S. 43, 70 (2024) (quoting *Clapper*, 568 U.S. at 411).

The court below held that Plaintiffs plausibly alleged that there is "at least a substantial risk that Defendants' programs will reproduce Plaintiffs' licensed code as output in the future." 3-ER-251-53 (citation omitted). But the

district court overlooked that Plaintiffs themselves had to supply many lines of their own code to elicit Copilot to generate similar code, thereby manufacturing their own injury. As a result, the district court's citations to cases in which the plaintiffs "willingly incurred" injuries under unlawful statutory schemes but still had standing were inapt. 3-ER-251-52 (first quoting *FEC v. Cruz*, 596 U.S. 289, 297 (2022); and then citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374-75 (1982)). Plaintiffs here "voluntarily" coaxed Copilot to output code similar to their own without plausibly alleging that "they had been or were likely to be subjected to [such a result] in any event." *See Cruz*, 596 U.S. at 297. That distinguishes Plaintiffs from the tester plaintiffs in *Cruz* and *Coleman*. *See id.* (drawing similar distinction). Because the complaint does not plausibly allege that any ordinary user would repeat Plaintiffs' litigation-oriented, pre-complaint exercises, Plaintiffs' DMCA claim should be dismissed for lack of standing.

### B.  Plaintiffs Lack Standing to Challenge the Alleged Removal of CMI at the Training Stage and This Claim Anyway Is Moot

To the extent Plaintiffs (at 51) claim that the mere removal of CMI at the training stage violated the DMCA and therefore injured them—even if their code is never disseminated from the tools—then Plaintiffs both lack standing to sue and their claim is moot.

30

1.    Plaintiffs' alleged injury at the training stage suffers from redressability problems.  *See Lujan*, 504 U.S. at 568-71.  Redressability "serves to align injuries and remedies." *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2138 (2025).  Plaintiffs (at 51) imply that the alleged removal of CMI during training is "an obvious subsection 1202(b)(1) violation" that apparently injured them irrespective of whether Codex and Copilot ever disseminate code similar to their own.  But Plaintiffs now seek only an injunction to remedy their DMCA claim, requesting Defendants to change Copilot's "Output" to include CMI.  3-ER-242 ¶ 263; *supra* p. 16 & n.3.  Even if a DMCA violation had occurred when Codex and Copilot were trained, and even if that violation somehow had injured Plaintiffs notwithstanding any future dissemination of code similar to Plaintiffs', Plaintiffs never explain how an injunction targeted at Copilot's future outputs would resolve that statutory violation.  Since Plaintiffs' purported training-stage injury was allegedly completed when Codex and Copilot were trained, there is no allegation of a future harm (such as future removals of CMI at the training stage) and Plaintiffs therefore lack standing to seek an injunction.  *See Lyons*, 461 U.S. at 111-13; *e.g.*, 3-ER-233-39 ¶¶ 204-35 (describing training as having been completed and the risk of harm as stemming from dissemination of Plaintiffs'

code without CMI).

2.   Alternatively, Plaintiffs' request for an injunction on their input theory is moot. *See Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 963-64 (9th Cir. 2007).  "Where the activities sought to be enjoined have already occurred, and the appellate courts cannot undo what has already been done, the action is moot." *Friends of the Earth, Inc. v. Bergland*, 576 F.2d 1377, 1379 (9th Cir. 1978).  Just so here.  Plaintiffs (at 50-52) complain of an injury that allegedly occurred when Defendants removed the CMI from Plaintiffs' code while training Copilot and Codex.  Plaintiffs never explain how an injunction could undo that alleged damage from alleged actions that have already occurred.  So, for the same reasons that this claim is not redressable, it is also moot. *See Nelsen*, 895 F.2d at 1250 (recognizing overlap between standing and mootness).

## II.   Section 1202(b) Requires the Actual Removal or Alteration of Copyright Management Information from Existing Works

The complaint also fails on the merits.  With the rise of digital content and social media, content creators utilize tools like watermarks to help trace infringing digital content, to evince ownership of copyrighted works, and to deter would-be infringers by signaling the existence of copyright protection. Section 1202 of the DMCA forbids tampering with those tools, specifically

32

creators' use of CMI. Section 1202(b) reinforces creators' protective measures by penalizing those who, with the proper scienter, "remove or alter" CMI from existing creative works to enable copyright infringement—for example, by stripping the watermark from a PDF, deleting the title from an e-book, or cropping a photograph to cut out the photographer's signature.

Section 1202 does not require adding or including the original creator's CMI when a new author generates a work—including a substantially similar, infringing one, or as here, one that is not even alleged to be infringing. The district courts to address the issue overwhelmingly agree that—whether colloquially termed an "identicality" requirement or an "existing" or "original" work requirement—a section 1202(b) action for removal of CMI requires the defendant to act with respect to CMI and works that already exist.

1. **Text.** Section 1202(b) prohibits three interrelated actions when taken "knowing, or … having reasonable grounds to know, that [the actions] will induce, enable, facilitate, or conceal [copyright] infringement." 17 U.S.C. § 1202(b). A person may not "intentionally remove or alter any copyright management information." *Id.* § 1202(b)(1). And once that CMI "has been removed or altered," a person may not "distribute or import" that CMI nor "distribute," "import," or "publicly perform" those "works, copies of works, or

33

phonorecords" from which that CMI has been removed or altered. *Id.* § 1202(b)(2)-(3). In other words, section 1202(b)(1) bars stripping a work of its accompanying CMI (such as a watermark) or changing that CMI. And if CMI has been removed or altered, sections (b)(2) and (b)(3) bar distributing altered CMI *or* distributing one component (the CMI or the work) without the other. Thus the hallmark feature of a section 1202(b) violation is that the CMI conveyed with a creator's content has been "remove[d]" or "alter[ed]," no matter whether defendants themselves removed the CMI or distributed the CMI or works after removal or alteration.

Those two words, "remove" and "alter," limit the scope of section 1202(b) violations. Congress' use of "remove" and "alter" prohibit actively manipulating the CMI connected to a work that already exists. Nothing in the text supports the notion that the statute penalizes mere failure to include attribution information when an author creates a new work that is substantially similar to another, generates a derivative work, or, as here, creates a new work that is not even alleged to be infringing.

Start with "remove." Contemporaneous dictionary definitions define "remove" as "[t]o take off," *Am. Heritage Coll. Dictionary* (3d ed. 1997), "[t]o get rid of," *Merriam-Webster's Collegiate Dictionary* (10th ed. 1997), or

"eliminate," *The New Oxford Dictionary of English* (1998); *Webster's Third New Int'l Dictionary* (1993). Thus, when an entree is "removed" from a menu, a comment is "removed" from an online forum, or a politician is "removed" from office, the word "removed" means that the thing (the entree, the comment, the politician) already existed in a certain setting (the menu, the forum, the office) and was subsequently taken away or eliminated.

Congress' decision to use "remove" means that section 1202(b) prohibits something more than merely omitting or leaving out CMI. *See, e.g.*, *Colony, Inc. v. Comm'r*, 357 U.S. 28, 32-33 (1958) (contrasting "reduce[]" with "[o]mit"). Removal refers to taking away from something that already exists; removal does not mean failing to include something in the process of creating or generating something else. For example, a grandchild *removed* from a will is disinherited, while a niece *excluded* from a will was never in the will when it was drafted in the first place. Or, more relevant here, if someone downloads a photograph and deletes the metadata from it, that person "remove[d]" or took away something that already exists. But someone who snaps a similar photograph of the same subject—or even takes a picture of the photograph— simply creates something new without the original photograph's metadata; a person does not "remove" metadata by failing to embed the original

35

photograph's metadata in that new work. A section 1202(b)(1) removal violation occurs only when someone *takes away* attribution information from an existing work, not when someone generates a work that is similar to or even based on another work and fails to include attribution information.

Indeed, the DMCA uses "remove" in other sections to similar effect. Section 1201 prohibits "circumvent[ing] a technological measure" and "circumventing protection afforded by a technological measure," which includes "avoiding, bypassing, *removing*, deactivating, or otherwise impairing a technological measure." 17 U.S.C. § 1201(a)(1)(A), (b)(1)(A), (b)(2)(A) (emphasis added). There, "remove" is closely focused on the literal removal of the already existing technological measure that protects an already existing work; it bears a comparable meaning in section 1202(b).

Congress' accompanying prohibition against "alter[ing]" CMI confirms that section 1202(b) covers only actions taken with regard to existing CMI on existing works. To "alter" means "[t]o change or make different; modify," *Am. Heritage Coll. Dictionary* (3d ed. 1997); "to make different without changing into something else," *Merriam-Webster's Collegiate Dictionary* (10th ed. 1997); or "to cause to become different in some particular characteristic (as measure, dimension, course, arrangement, or inclination) without changing

into something else," *Webster's Third New Int'l Dictionary* (1993). To state the obvious, to change something or make it different, it must already exist.

Further, for CMI to exist in the first place, it must qualify as information that is "conveyed in connection with copies … of a work." 17 U.S.C. § 1202(c). *Charlotte's Web*, for example, only became CMI once it was used as a title for an existing written work. And the name, E.B. White, only became CMI when it was added as the author of *Charlotte's Web*, an existing work. In other words, CMI only exists if a copyrighted work already exists too. Both the work and CMI must exist before they can be "alter[ed]" by a defendant. This, too, confirms that section 1202(b) does not apply to newly created (even arguably infringing) works that leave off the original author's CMI.

Had Congress wanted to authorize penalties for creating a substantially similar work (or, as here, simply a non-infringing new work) without including another's CMI, there were a myriad of other ways it could have phrased section 1202(b). Congress could have prohibited omitting, leaving out, excluding, or forgoing CMI, just to name a few. Or Congress could have affirmatively required all new works derived from or influenced by existing works to attribute the existing works' authors. But the plain language of the statute captures a different meaning.

37

2. ***Precedent.***  District courts nationwide overwhelmingly agree that the mere "failure to include copyright management information" does not "constitute[] removal or alteration." *Falkner v. Gen. Motors, LLC*, 393 F. Supp. 3d 927, 938 (C.D. Cal. 2018).  Instead, "an action for removal of copyright management information requires the information to be removed from a plaintiff's product or original work." *Faulkner Press, LLC v. Class Notes, LLC*, 756 F. Supp. 2d 1352, 1359 (N.D. Fla. 2010).  While some courts refer in shorthand to this as an "identicality" requirement and others refer to an "original work" requirement, the district courts hold that plaintiffs must allege that the defendant took something away from the existing work itself; it is insufficient if the complaint alleges the defendant generated a work but failed to add in CMI.

Consider, for instance, *General Motors*, where an artist sued General Motors for "remov[ing]" CMI (his signature) from a mural.  393 F. Supp. 3d at 938 (citation omitted).  The artist's mural stretched across two perpendicular parking garage walls; his signature ran along the bottom of just one wall.  *Id.* at 929.  A photographer snapped a photo of a Cadillac next to the wall that did not include the artist's signature, and General Motors later featured that photograph in an Instagram post.  *Id.* at 929-30.  The artist sued General

Motors under section 1202(b), alleging that General Motors "removed" his CMI by taking the picture "from an angle that renders Plaintiff's signature not visible." *Id.* at 938 (alteration and citation omitted). The court held that the photographer did not violate the DMCA since he had not "*removed* or *altered* Plaintiff's signature"—he had simply "chose[n] not to include the perpendicular mural wall" when generating his photograph. *Id.* "Fail[ing] to include [CMI]" is not the same as "removal or alteration." *Id.*

*Class Notes*, 756 F. Supp. 2d 1352, follows suit. There, the defendant sold compilations of class notes that summarized the plaintiff's electronic textbooks and course materials for students. *Id.* at 1355-56. The plaintiff alleged that the defendant removed CMI included in the textbooks' software "when it copied materials from the textbooks and film study questions into its note packages." *Id.* at 1359. The court rejected the DMCA claim because "nothing was removed from the copyrighted works." *Id.* Instead, the information "was allegedly copied into a different form and then incorporated into the note packages." *Id.*

And in *Tremblay v. OpenAI, Inc.*, the district court rejected a DMCA claim premised on an AI model distributing derivative works of the plaintiffs' books in response to user prompts "without the CMI included." 716 F. Supp.

39

3d 772, 779 (N.D. Cal. 2024). The court acknowledged that recreating, or copying, another's work may constitute copyright *infringement*. *Id.* at 779-80. But "recreat[ing] another's work … does not necessarily implicate the DMCA['s]" prohibition against removal of CMI. *Id.* Indeed, the DMCA "does not prohibit merely omitting CMI from an infringing work," like an unauthorized derivative work. *Id.* at 779 (citation omitted). Rather, "liability requires distributing the original 'works' or 'copies of [the] works'" from which CMI has been removed. *Id.* at 780 (quoting 17 U.S.C. § 1202(b)(3)). Since the plaintiffs alleged only that the defendant distributed derivative works without CMI, they failed to state a DMCA claim. *Id.*

Courts consistently reach the same conclusion whenever plaintiffs have repleaded an alleged copyright infringement claim as an alleged DMCA violation. For instance, a defendant did not violate section 1202(b) by "generat[ing] nonidentical renditions" of the plaintiff's architectural designs and failing to "affirmatively add[]" the plaintiff's CMI. *Kipp Flores Architects, LLC v. Pradera SFR, LLC*, 2022 WL 1105751, at *3 (W.D. Tex. Apr. 13, 2022). Nor did the defendants violate the DMCA when they knocked off the plaintiff's clothing designs, because distributing knockoffs "does not support an inference that Defendants removed or altered anything on Plaintiff's original

40

work." *Dolls Kill, Inc. v. Zoetop Bus. Co.*, 2022 WL 16961477, at *3 (C.D. Cal. Aug. 25, 2022) ("[r]e-creating another party's work may be unlawful," but that "does not necessarily implicate the DMCA"); *accord SellPoolSuppliesOnline.com, LLC v. Ugly Pools Ariz., Inc.*, 804 F. App'x 668, 670 (9th Cir. 2020) (rejecting DMCA claim "because Plaintiff has not shown that Defendants removed any of Plaintiff's CMI"); *Spinelli v. NFL*, 903 F.3d 185, 204-05 (2d Cir. 2018) (rejecting DMCA claim when the "complaint does not actually identify any instance in which CMI was removed").

The district court's reference to identicality in the decision below comports with these cases. *See* 1-ER-6-7. Generally, when someone strips CMI from a work, what remains is an identical copy (minus the CMI). For instance, in *Friedman v. Live Nation Merchandise, Inc.*, the "fact that the photographs [at issue] used by [the defendant] were exact copies of the images precisely as they appeared on [a licensed] website and in [the plaintiff's] book" led "to the compelling inference" that the defendant distributed copies of works from which the CMI had been removed. 833 F.3d 1180, 1188 (9th Cir. 2016). Meanwhile, when a defendant creates a work but simply fails to add CMI, there are likely differences between the defendant's work and the plaintiff's. Identicality, while not dispositive, often helps courts identify

whether the defendant *removed* CMI from the plaintiff's work or created a new work based on the plaintiff's work. In other words, identicality reflects the mine run of core DMCA violations.

The district court's case citations in the decision below, 1-ER-6-7, likewise demonstrate that courts reference identicality to explain that CMI must be removed from an existing work. In *Frost-Tsuji Architects v. Highway Inn, Inc.*, the court granted summary judgment to the defendants on a DMCA claim because no evidence showed that the defendants had removed CMI from the plaintiff's copyrighted architectural plans. 2015 WL 263556, at *3 (D. Haw. Jan. 21, 2015), *aff'd*, 700 F. App'x 674 (9th Cir. 2017) (mem.) (cited at 1-ER-7). The evidence showed only that the defendants possessed plans "similar" but "not identical" to plaintiff's plans. *Id.* Thus the lack of "identicality" confirmed that the defendants never removed or altered CMI on the plaintiff's existing work, as section 1202(b) requires. *See id.*

*Kirk Kara* and *Advanta-STAR*, which the court below also cited, use the "identicality requirement" in the same way. 1-ER-6-7. In *Kirk Kara Corp. v. Western Stone & Metal Corp.*, the defendant allegedly made engagement rings that looked like the plaintiffs' but lacked engraved CMI. 2020 WL 5991503, at *6 (C.D. Cal. Aug. 14, 2020) (cited at 1-ER-6). The court dismissed

42

the DMCA claim because the complaint did not allege that the defendant made a copy and "then remove[d] the engraved CMI." *Id.* Rather, the complaint alleged that the defendants made their own rings (inspired by the plaintiffs' rings) but without adding any of the plaintiffs' CMI. *See id.* That did not violate the DMCA. *See id.*

Same with *Advanta-STAR Automotive Research Corp. of America v. Search Optics, LLC*, 672 F. Supp. 3d 1035 (S.D. Cal. 2023) (cited at 1-ER-7). There the plaintiff sold written copyrighted comparisons of automobiles; the defendants allegedly published those comparisons on its website. *Id.* at 1041-42. But the defendants' automobile comparisons contained differences from the plaintiff's. *Id.* at 1057. The court reasoned that, although the plaintiff "plausibly alleged" the "copy[ing of] protected aspects of [plaintiff]'s expression" and those allegations could state a copyright infringement claim, it had "not plausibly alleged that [d]efendants distributed identical copies of [p]laintiff's comparison" without CMI in violation of the DMCA. *Id.* (citation omitted). The lack of identicality between the plaintiff's existing work and the defendants' work confirmed the defendants did not "remove[]" CMI and instead created a new work and left off the CMI. *See id.* (citation omitted).

3. ***Legislative and Treaty History.*** The historical backdrop also shows

that Congress limited the DMCA's reach to removals and alterations of CMI on existing works. Section 1202 implemented the WIPO Copyright and Performances and Phonograms Treaties. *Supra* pp. 6-7. Those treaties "safeguard[ed] the reliability and integrity of the online marketplace by requiring countries to prohibit the deliberate alteration or deletion of electronic 'rights management information.'" *The Advantages of Adherence to the WIPO Copyright Treaty (WCT) and the WIPO Performances and Phonograms Treaty (WPPT)* 3, Int'l Bureau of WIPO, https://tinyurl.com/2mmwd4ew.

During the treaty negotiations, delegates narrowed the scope of the CMI provisions in response to concerns about overbreadth, impeding legal activity, and imposing costly technical burdens. *See, e.g.*, Records of the Diplomatic Conference on Certain Copyright and Neighboring Rights Questions, Vol. II, 712-16 World Intell. Prop. Org. (1996) (statements from delegates). No delegate expressed the view that the articles prohibited omitting CMI from newly created (even potentially infringing) works. To the contrary, Singapore's delegation wanted to ensure that the treaties would not "impede the ability to create new multimedia works as compilation." *Id.* at 713.

Along these lines, the DMCA House Report similarly concluded that section 1202 "will operate to protect consumers from misinformation" from false CMI and "ensure the integrity of the electronic marketplace by preventing fraud and misinformation."  H. Rep. 105-551, pt. 1, at 10-11 (1998); *accord* S. Rep. No. 105-190, at 16.  At bottom, the legislative history contains no hint that the DMCA created a universal citation or attribution requirement for newly created works, as Plaintiffs argue it does here.

## III.  Plaintiffs' Contrary Approach Is Wrong

According to Plaintiffs (at 22, 34), the district court held that "unless the copy of the original is completely identical, except for the removal or alteration of CMI, there is no violation of subsection 1202(b)," even if the difference between the original and copy at issue is "just one letter."  But OpenAI has never advanced, and the district court did not articulate, that description of the "identicality requirement."  The district court, relying on the consensus of lower courts, instead held that generating an "output" that is a "modification," "variation[]," or the "functional[] equivalent" of Plaintiffs' work does not violate section 1202(b).  3-ER-259.  That holding is correct.  In the mine-run case, the lack of identicality between the original work and the at-issue work reflects the fact that the defendant did not remove or alter CMI from the

45

existing work (a DMCA violation) and instead generated something different and then failed to add CMI (not a DMCA violation). Plaintiffs spill much ink rebutting a theory no one advances without grappling with the startling consequences of their own theory, which could convert every traditional copyright infringement claim into a DMCA violation or even (as here) manufacture DMCA liability where no copyright claim exists.

### A. Plaintiffs Attack a Strawman Identicality Requirement

1. OpenAI agrees that strict identicality is not always dispositive because section 1202(b) is *not about making unauthorized copies of works*, whether identical or not. Rather, section 1202(b) is about making unauthorized changes to CMI on existing works. Therefore, if a defendant draws a mustache on an existing portrait and then strips the artist's signature from the portrait, he has still "remove[d]" CMI from the existing work, even though the portrait is not 100% identical to the plaintiff's original work. On the flipside, if a defendant photographs a painting hanging in a gallery and publishes it without including the artist and title information from the label on the gallery wall, the defendant has not "removed" metadata from the original painting, even if the defendant's photo is 100% identical to the plaintiff's work. As a result, Plaintiffs' outlandish hypotheticals (at 37-38) do not accurately

reflect how the identicality requirement is actually applied in practice.

Plaintiffs' various statutory-interpretation arguments (at 21-38) therefore help little in determining what does or does not violate section 1202(b). At most, Plaintiffs' arguments rule out a theory that a defendant only violates section 1202(b) by removing or altering CMI on identical "copies," because the statute's reference to "'copy' … does not require identicality."[6] Doe Br. 38.

But Plaintiffs (at 46-67) are incorrect that the rejection of a strict identicality requirement resolves this appeal. The salient fact is the complaint

---

[6] In arguing that "a 'copy' under the DMCA does not require identicality," Plaintiffs (at 38) confusingly blend two distinct concepts of copyright law. The word "[c]opies" in the Copyright Act refers to "material objects … in which a work is fixed." 17 U.S.C. § 101. "[O]riginal works of authorship" must be "fixed" in "copies" (i.e., a "tangible medium of expression") to receive copyright protection. *Id.* §§ 101, 102(a). In other words, a poem (a "work of authorship") is not copyrightable until "fixed" on a sheet of paper or in a book (a "copy").

Plaintiffs (at 24-28) treat the word "copies" as synonymous with a "reproduced" work, and therefore use cases describing "*copying*" (*i.e.*, an infringement of an author's reproduction right) to argue that section 1202(b)(3)'s reference to "copy" refers to works that have a "substantial[] similarity" to a plaintiff's. But that is not what the Copyright Act means by "copy." Indeed, a one-of-a-kind sculpture is a "copy" even if replicas of that sculpture are never produced. *Id.* § 101 ("The term 'copies' includes the material object ... in which the work is first fixed."). Plaintiffs' argument that section 1202(b)(3)'s and 1202(c)'s references to "copy" rebut an identicality argument thus fails under core copyright principles.

does not state a DMCA claim because it alleges that Codex and Copilot might generate code that is similar to Plaintiffs' code without appending CMI, which is not a removal of CMI. *Supra* pp. 32-45.

2. Plaintiffs (at 39-46) also claim to cite "better reasoned" out-of-circuit and district court cases that reject the hyper-technical, strawman "identicality requirement." But no case disputes that identicality (or lack thereof) typically reflects whether a plaintiff has alleged removal or alteration of CMI. And many of Plaintiffs' cited cases agree with—or at least defer consideration of—OpenAI's interpretation of section 1202(b) that plaintiffs must actually allege that defendants took CMI off existing works, not merely that a defendant generated a similar work and omitted CMI.

For instance, Plaintiffs (at 39) cite *New Parent World, LLC v. True to Life Productions, Inc.*, where the district court held only that section 1202(b) does "not require identical copies" because that reading would "lead to unreasonable results," but declined to "adopt a more precise construction of the statute at [that] point in the case." 2024 WL 4277865, at *2-3 (D. Ariz. Sept. 24, 2024). Thus the district court in *New Parent* did not address whether, as OpenAI argues in this appeal, DMCA claims must fail when a defendant generates a "distinct work."

48

Similarly, in *Real World Media LLC v. Daily Caller, Inc.*, the district court answered only the "narrow[], distinct question" of whether the alleged removal of CMI from "an *exact copy* of *portions* of an original work" stated a DMCA claim. 744 F. Supp. 3d 24, 40 (D.D.C. 2024) (emphases in original). It did so because otherwise "a defendant could evade DMCA liability by removing or altering CMI in a copied work but only disseminating 99% rather than 100% of that work." *Id.* As in *New Parent*, however, the *Real World* court expressly declined to decide whether creation of "a derivative work or an independent recreation can support a DMCA claim." *Id.* Thus, the court took no position on whether, as Defendants argue here, DMCA claims fail when an author generates an allegedly similar work to an existing work.

And, again, in *ADR International Ltd. v. Institute for Supply Management Inc.*, the court rejected only the "proposition that § 1202 requires a plaintiff to plead the allegedly infringing works are identical copies of the plaintiff's works." 667 F. Supp. 3d 411, 428-29 (S.D. Tex. 2023). Indeed, the court distinguished the plaintiff's allegations from other cases where courts have held that section 1202(b)'s use of the word "remove" meant "the plaintiff must allege that CMI was once present on the work and later removed or taken off." *Id.* at 428 (first citing *Kipp Flores*, 2022 WL 1105751, at *3; and

then citing *RAZ Imps., Inc. v. Regency Int'l Bus. Corp.*, 2020 WL 4500627, at *5 (N.D. Tex. Aug. 5, 2020)).

Plaintiffs (at 39-42) therefore have cited *no* case that expressly rejects OpenAI's interpretation here. *See Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 305 n.14 (3d Cir. 2011) (declining to decide if DMCA claim based on cropping gutter credit from photograph involved removal); *Intercept Media, Inc. v. OpenAI, Inc.*, 767 F. Supp. 3d 18, 23, 30 (S.D.N.Y. 2025) (holding that "separat[ing] the main article content" from its CMI for inclusion in training dataset adequately alleged removal, and not addressing identicality at all); *Beijing Meishe Network Tech. Co. v. TikTok Inc.*, 2024 WL 3522196, at *9 (N.D. Cal. July 23, 2024) (declining to decide whether identicality requirement exists at pleading stage); *Splunk Inc. v. Cribl, Inc.*, 662 F. Supp. 3d 1029, 1054 (N.D. Cal. 2023) (not considering identicality at all); *Oracle Int'l Corp. v. Rimini Street, Inc.*, 2023 WL 4706127, at *82 (D. Nev. July 24, 2023) (rejecting stringent identicality requirement), *aff'd in part, vacated in part, & rev'd in part on other grounds*, 123 F.4th 986 (9th Cir. 2024); *GC2 Inc. v. Int'l Game Tech.*, 391 F. Supp. 3d 828, 844 (N.D. Ill. 2019) (DMCA claim based on removal of CMI from artwork that was copied "in its entirety" and then modified); *Bain v. Film Indep., Inc.*, 2018 WL 6930766, at *5 (C.D. Cal. Aug.

9, 2018) (denying motion to dismiss DMCA claim with no analysis of identicality requirement); *ICONICS, Inc. v. Massaro*, 192 F. Supp. 3d 254, 272-73 (D. Mass. 2016) (not discussing identicality and denying summary judgment on DMCA claim based on uploading entire source code to server, deleting plaintiff's CMI, and adding defendants' CMI); *Enter. Tech. Holdings, Inc. v. Noveon Sys., Inc.*, 2008 WL 11338356, at *16 (S.D. Cal. July 29, 2008) (defendant copied entire code and replaced plaintiff's name with defendant's name).

## B. Plaintiffs' Apparent Theory of Liability Produces Untenable Results

Plaintiffs allege that Defendants violated section 1202(b) when their AI tools outputted similar code to Plaintiffs' without attribution. While Plaintiffs do not advance their *own* interpretation of section 1202(b) on appeal, their theory of liability would require the Court to convert section 1202(b) into a novel, judicially created attribution right. Indeed, under Plaintiffs' liability theory, section 1202(b) could impose massive statutory damages awards whenever a defendant creates and distributes a new original work that includes any portion of the plaintiff's work but lacks the plaintiff's CMI.

That is because in most copyright infringement cases, the defendant creates a substantially similar work to the plaintiff's and does not add the

author's name, copyright information, or the title of the work that the infringing piece copied. If Plaintiffs are right that the DMCA penalizes those who generate substantially similar works and fail to attach the original creator's CMI, then a section 1202(b) claim could apply whenever a work with CMI is infringed, supplanting traditional copyright claims while sidestepping the registration requirements that Congress imposed for such claims as a prerequisite to statutory damages.

For example, if a defendant could be found liable under section 1202(b) simply by creating a substantially similar work without including the plaintiff's CMI, then Robin Thicke and Pharrell Williams violated the DMCA when they wrote their best-selling single "Blurred Lines," because "nearly every bar of 'Blurred Lines' contains an area of similarity to [Marvin Gaye's song,] 'Got To Give It Up,'" but did not credit Gaye or his song. *See Williams v. Gaye*, 895 F.3d 1106, 1116, 1127 (9th Cir. 2018). And Andy Warhol could have violated the DMCA when he created his silkscreen "Prince Series" based on Lynn Goldsmith's photographs of Prince without her copyright attribution credit. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 515, 519-20 (2023).

Section 1202's structure makes clear that it is not the expansion of

copyright infringement liability that Plaintiffs wish it to be. Instead, as already discussed, the DMCA protects CMI applied to existing works. As the title conveys, section 1202 is focused on maintaining the "[i]ntegrity" of CMI, and prohibits falsifying it, removing it, or altering it. Section 1202 focuses exclusively on what a defendant does to the CMI itself; it does not create super-liability for reproducing copyrighted works.

Section 1202's penalty regime also strongly suggests that Congress did not design section 1202(b) as a super copyright infringement claim that supersedes traditional copyright claims, as Plaintiffs suggest. Section 1203(c)(3) allows up to $25,000 per violation, including each violation through distribution of a work stripped of CMI. On the scale of internet, a defendant who violates section 1202 by distribution could rack up vastly higher damages for an infringing work that omits CMI than the traditional copyright statutory damages, which are capped at $30,000 *per work*. 17 U.S.C. § 504(c)(1). Like traditional copyright infringement, section 1204(a) provides for criminal penalties if the violation is "willful[] and for purposes of commercial advantage or private financial gain." *Id.* § 1204(a). But there is no reason to think Congress intended to impose criminal penalties on the scale that would arise under Plaintiffs' DMCA theory (including for non-infringing violations that

would never have received criminal penalties under the Copyright Act) without providing a significantly clearer textual mandate than Plaintiffs can identify. *Cf. Kim v. United States*, 121 F.3d 1269, 1272 (9th Cir. 1997) (declining to interpret old version of statute to impose a "draconian penalty … absent a clear indication that such was Congress' intent" (citation omitted)).

## IV. Plaintiffs' Input Theory Is Not Before the Court

Before the district court, Plaintiffs claimed that Codex and Copilot output similar code without licenses, which they argued removed CMI in violation of the DMCA. All versions of their complaint delineated that theory. *Supra* pp. 13-18. Briefing and court orders below focused on that theory. 1-ER-6-8; 3-ER-258-60; SER-20-22, 54-57. And Plaintiffs premised this interlocutory appeal on that theory, because as Plaintiffs themselves argue, the identicality requirement only matters if the removal of CMI occurred when Copilot and Codex output code similar to Plaintiffs' code without their license information. *Supra* pp. 18-19; Doe Br. 50.

On appeal, however, Plaintiffs pivot to a new input-based theory: that Defendants removed CMI from their code before training and that this action violated the DMCA. Plaintiffs argue that "Defendants programmed their AI models to strip Plaintiffs' CMI," and that a "plausible inference" is that

54

"Defendants made complete, identical copies of Plaintiffs' works and removed the CMI before feeding the data into Codex and Copilot." Doe Br. 10. In support, they cite paragraphs 11, 49, 143, 144, and 205 of the second amended complaint. Yet no citation supports that proposition. Paragraphs 11 and 205 do not even mention training or inputs; instead, they allege that Defendants distributed Plaintiffs' code stripped of its CMI, 3-ER-187 ¶ 11, or vaguely assert that Defendants "intentionally removed or altered CMI" without alleging when or why, 3-ER-233 ¶ 205. Paragraph 49 is wholly conclusory and claims only that Defendants "caused Codex and Copilot to ingest and distribute Licensed Materials without including any associated" CMI. 3-ER-195 ¶ 49. And paragraphs 143 and 144 make the new input theory implausible by alleging that Copilot outputted licenses with code suggestions until July 2021, which implies that CMI was in fact attached to code during training. 3-ER-222 ¶¶ 143-44.

Plaintiffs also argue that their complaint properly alleges that "Defendants removed CMI from Plaintiffs' licensed code before using the works to train Codex and Copilot." Doe Br. 50. They cite, as before, paragraphs 11, 49, 143, 144, and 205 of the operative complaint, along with paragraphs 58, 94-95, 104-06, and 141. None of the new paragraphs mentions

removal or alteration of CMI, let alone articulates an input theory. Paragraphs 58, 94, and 95 allege that Defendants used public code to train the AI, without discussing actions taken with respect to CMI. 3-ER-197, 205 ¶¶ 58, 94-95. Paragraphs 104 through 106 relate only to the output theory by alleging that large AI models will sometimes "memorize" training data and generate output that matches that training data. 3-ER-207-08 ¶¶ 104-06. Those paragraphs say nothing about the removal of CMI at the training stage. And paragraph 141 alleges that Codex and Copilot cannot recognize whether CMI is or is not code and, again, says nothing about removal or alteration of CMI. 3-ER-221 ¶ 141. In short, the operative complaint does not allege who removed Plaintiffs' CMI from their code at the training stage, how this was done, or when this occurred—all bread-and-butter components of a DMCA claim. The absence of those basic allegations dooms an adequately pleaded input theory.[7]

Plaintiffs perform a bait-and-switch on appeal. Three versions of their complaint advanced DMCA claims premised on outputs. When the district court dismissed those claims for failure to allege that Copilot or Codex output

---

[7] OpenAI also agrees with Microsoft that Plaintiffs' complaint fails to allege the scienter required for a DMCA claim. *See* SER-138-39.

identical copies of Plaintiffs' work, Plaintiffs sought an interlocutory appeal. They successfully convinced this Court to review the district court's holding, arguing that "[w]hether §§ 1202(b)(1) and (b)(3) of the DMCA Impose an 'Identicality' Requirement is a Controlling Question of Law." 2-ER-30. That legal question only matters in the context of the output theory, since the identicality requirement addresses whether Copilot and Codex "remove" Plaintiffs' CMI when they output variations of Plaintiffs' code without including Plaintiffs' license information.

Now, however, Plaintiffs (at 50) argue for the first time that "Defendants took exact copies of the code, removed the CMI, and used those exact copies (sans CMI) to train their AI models." According to Plaintiffs (at 50), "[t]hose allegations satisfy even the district court's interpretation of the DMCA." In other words, Plaintiffs advance a new input theory and argue that it allows their DMCA claims to survive even if this Court does not resolve the identicality issue they petitioned this Court to review.

Plaintiffs had three opportunities to put this claim properly before the district court. Plaintiffs not only failed to do so, but they also repeatedly represented below that Codex and Copilot *retained* all CMI at the training stage. *Supra* p. 14. The district court, accordingly, never addressed this

57

theory. Having affirmatively eschewed the input theory below, it is far too late to attempt to resurrect a new theory of liability on appeal. *See, e.g., Gruver v. Midas Int'l Corp.*, 925 F.2d 280, 283 (9th Cir. 1991).

## CONCLUSION

For the foregoing reasons, this Court should affirm the dismissal of Plaintiffs' DMCA claim.

Respectfully submitted,

/s/ Lisa S. Blatt

| | |
|---|---|
| JOSEPH C. GRATZ | LISA S. BLATT |
| TIFFANY CHEUNG | THOMAS G. HENTOFF |
| MORRISON & FOERSTER LLP | CLAIRE R. CAHILL |
| *425 Market Street* | ERIN M. SIELAFF |
| *San Francisco, CA 94105* | CLAIRE L. LAZAR |
| | WILLIAMS & CONNOLLY LLP |
| | *680 Maine Avenue SW* |
| | *Washington, DC 20024* |
| | *(202) 434-5000* |
| | *lblatt@wc.com* |

*Attorneys for OpenAI, Inc.; OpenAI, LP; OpenAI GP, LLC; OpenAI Startup Fund GP I, LLC; OpenAI Startup Fund I, LP; OpenAI Startup Fund Management, LLC; OpenAI OPCO, LLC; OpenAI, LLC; OpenAI Global, LLC; OAI Corporation; OpenAI Holdings, LLC; OpenAI Holdco, LLC; OpenAI Investment; OpenAI Startup Fund SPV I, LP; OpenAI Startup Fund SPV GP I, LLC*

DATED: JULY 11, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** _____24-7700_____

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** _____s/ Lisa S. Blatt_____ **Date** _____7/11/2025_____
*(use "s/[typed name]" to sign electronically-filed documents)*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**     24-7700

I am the attorney or self-represented party.

**This brief contains**     12,105     **words,** including     0     words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**     s/ *Lisa S. Blatt*     **Date**   7/11/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2025, I electronically filed the foregoing brief on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

/s/ *Lisa S. Blatt*
LISA S. BLATT

DATED: JULY 11, 2025

# ADDENDUM

# TABLE OF CONTENTS

Page

17 U.S.C. § 101 ................................................................... Add.1

17 U.S.C. § 102 ................................................................. Add.11

17 U.S.C. § 504 ................................................................. Add.12

17 U.S.C. § 1201 ............................................................... Add.14

17 U.S.C. § 1202 ............................................................... Add.28

17 U.S.C. § 1203 ............................................................... Add.32

**17 U.S.C. § 101 – Definitions**

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

An "anonymous work" is a work on the copies or phonorecords of which no natural person is identified as author.

An "architectural work" is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

"Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

The "Berne Convention" is the Convention for the Protection of Literary and Artistic Works, signed at Berne, Switzerland, on September 9, 1886, and all acts, protocols, and revisions thereto.

The "best edition" of a work is the edition, published in the United States at any time before the date of deposit, that the Library of Congress determines to be most suitable for its purposes.

A person's "children" are that person's immediate offspring, whether legitimate or not, and any children legally adopted by that person.

A "collective work" is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole.

A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

A "computer program" is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.

"Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

"Copyright owner", with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right.

A "Copyright Royalty Judge" is a Copyright Royalty Judge appointed under section 802 of this title, and includes any individual serving as an interim Copyright Royalty Judge under such section.

A work is "created" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

A "device", "machine", or "process" is one now known or later developed.

A "digital transmission" is a transmission in whole or in part in a digital or other non-analog format.

To "display" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovis-ual work, to show individual images nonsequentially.

An "establishment" is a store, shop, or any similar place of business open to the general public for the primary purpose of selling goods or services in which the majority of the gross square feet of space that is nonresidential is used for that purpose, and in which nondramatic musical works are performed publicly.

The term "financial gain" includes receipt, or expectation of receipt, of anything of value, including the receipt of other copyrighted works.

A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made simultaneously with its transmission.

A "food service or drinking establishment" is a restaurant, inn, bar, tavern, or any other similar place of business in which the public or patrons assemble for the primary purpose of being served food or drink, in which the majority of the gross square feet of space that is nonresidential is used for that purpose, and in which nondramatic musical works are performed publicly.

The "Geneva Phonograms Convention" is the Convention for the Protection of Producers of Phonograms Against Unauthorized Duplication of Their Phonograms, concluded at Geneva, Switzerland, on October 29, 1971.

The "gross square feet of space" of an establishment means the entire interior space of that establishment, and any adjoining outdoor space used to serve patrons, whether on a seasonal basis or otherwise.

The terms "including" and "such as" are illustrative and not limitative.

An "international agreement" is—

    **(1)** the Universal Copyright Convention;

    **(2)** the Geneva Phonograms Convention;

    **(3)** the Berne Convention;

    **(4)** the WTO Agreement;

(5) the WIPO Copyright Treaty;

(6) the WIPO Performances and Phonograms Treaty; and

(7) any other copyright treaty to which the United States is a party.

A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

"Literary works" are works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied.

The term "motion picture exhibition facility" means a movie theater, screening room, or other venue that is being used primarily for the exhibition of a copyrighted motion picture, if such exhibition is open to the public or is made to an assembled group of viewers outside of a normal circle of a family and its social acquaintances.

"Motion pictures" are audiovisual works consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any.

To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.

A "performing rights society" is an association, corporation, or other entity that licenses the public performance of nondramatic musical works on behalf of copyright owners of such works, such as the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), and SESAC, Inc.

"Phonorecords" are material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the

aid of a machine or device. The term "phonorecords" includes the material object in which the sounds are first fixed.

"Pictorial, graphic, and sculptural works" include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

For purposes of section 513, a "proprietor" is an individual, corporation, partnership, or other entity, as the case may be, that owns an establishment or a food service or drinking establishment, except that no owner or operator of a radio or television station licensed by the Federal Communications Commission, cable system or satellite carrier, cable or satellite carrier service or programmer, provider of online services or network access or the operator of facilities therefor, telecommunications company, or any other such audio or audiovisual service or programmer now known or as may be developed in the future, commercial subscription music service, or owner or operator of any other transmission service, shall under any circumstances be deemed to be a proprietor.

A "pseudonymous work" is a work on the copies or phonorecords of which the author is identified under a fictitious name.

"Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

To perform or display a work "publicly" means—

**(1)** to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

**(2)** to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

"Registration", for purposes of sections 205(c)(2), 405, 406, 410(d), 411, 412, and 506(e), means a registration of a claim in the original or the renewed and extended term of copyright.

"Sound recordings" are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied.

"State" includes the District of Columbia and the Commonwealth of Puerto Rico, and any territories to which this title is made applicable by an Act of Congress.

A "transfer of copyright ownership" is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

A "transmission program" is a body of material that, as an aggregate, has been produced for the sole purpose of transmission to the public in sequence and as a unit.

To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

A "treaty party" is a country or intergovernmental organization other than the United States that is a party to an international agreement.

The "United States", when used in a geographical sense, comprises the several States, the District of Columbia and the Commonwealth of Puerto Rico, and the organized territories under the jurisdiction of the United States Government.

For purposes of section 411, a work is a "United States work" only if—

    **(1)** in the case of a published work, the work is first published—

        **(A)** in the United States;

        **(B)** simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;

        **(C)** simultaneously in the United States and a foreign nation that is not a treaty party; or

        **(D)** in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States;

    **(2)** in the case of an unpublished work, all the authors of the work are nationals, domiciliaries, or habitual residents of the United States, or, in the case of an unpublished audiovisual work, all the authors are legal entities with headquarters in the United States; or

    **(3)** in the case of a pictorial, graphic, or sculptural work incorporated in a building or structure, the building or structure is located in the United States.

A "useful article" is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a "useful article".

The author's "widow" or "widower" is the author's surviving spouse under the law of the author's domicile at the time of his or her death, whether or not the spouse has later remarried.

The "WIPO Copyright Treaty" is the WIPO Copyright Treaty concluded at Geneva, Switzerland, on December 20, 1996.

The "WIPO Performances and Phonograms Treaty" is the WIPO Performances and Phonograms Treaty concluded at Geneva, Switzerland, on December 20, 1996.

A "work of visual art" is—

> **(1)** a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or

> **(2)** a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author.

A work of visual art does not include—

> **(A)(i)** any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audiovisual work, book, magazine, newspaper, periodical, data base, electronic information service, electronic publication, or similar publication;

> **(ii)** any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container;

> **(iii)** any portion or part of any item described in clause (i) or (ii);

> **(B)** any work made for hire; or

> **(C)** any work not subject to copyright protection under this title.

A "work of the United States Government" is a work prepared by an officer or employee of the United States Government as part of that person's official duties.

A "work made for hire" is—

> **(1)** a work prepared by an employee within the scope of his or her employment; or

> **(2)** a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

In determining whether any work is eligible to be considered a work made for hire under paragraph (2), neither the amendment contained in section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, nor the deletion of the words added by that amendment—

> **(A)** shall be considered or otherwise given any legal significance, or

> **(B)** shall be interpreted to indicate congressional approval or disapproval of, or acquiescence in, any judicial determination,

by the courts or the Copyright Office. Paragraph (2) shall be interpreted as if both section 2(a)(1) of the Work Made For Hire and Copyright Corrections Act of 2000 and section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, were never enacted, and without regard to any inaction or awareness by the Congress at any time of any judicial determinations.

The terms "WTO Agreement" and "WTO member country" have the meanings given those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay Round Agreements Act.

**17 U.S.C. § 102 – Subject matter of copyright: In general**

(**a**) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

> (**1**) literary works;

> (**2**) musical works, including any accompanying words;

> (**3**) dramatic works, including any accompanying music;

> (**4**) pantomimes and choreographic works;

> (**5**) pictorial, graphic, and sculptural works;

> (**6**) motion pictures and other audiovisual works;

> (**7**) sound recordings; and

> (**8**) architectural works.

(**b**) In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

**17 U.S.C. § 504 – Remedies for Infringement: Damages and profits**

**(a) In General.**—Except as otherwise provided by this title, an infringer of copyright is liable for either—

> **(1)** the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or

> **(2)** statutory damages, as provided by subsection (c).

**(b) Actual Damages and Profits.**—The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

**(c) Statutory Damages.**—

> **(1)** Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.

> **(2)** In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200. The court shall remit statutory damages in any case where an infringer believed

and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107, if the infringer was: (i) an employee or agent of a nonprofit educational institution, library, or archives acting within the scope of his or her employment who, or such institution, library, or archives itself, which infringed by reproducing the work in copies or phonorecords; or (ii) a public broadcasting entity which or a person who, as a regular part of the nonprofit activities of a public broadcasting entity (as defined in section 118(f)) infringed by performing a published nondramatic literary work or by reproducing a transmission program embodying a performance of such a work.

**(3)(A)** In a case of infringement, it shall be a rebuttable presumption that the infringement was committed willfully for purposes of determining relief if the violator, or a person acting in concert with the violator, knowingly provided or knowingly caused to be provided materially false contact information to a domain name registrar, domain name registry, or other domain name registration authority in registering, maintaining, or renewing a domain name used in connection with the infringement.

**(B)** Nothing in this paragraph limits what may be considered willful infringement under this subsection.

**(C)** For purposes of this paragraph, the term "domain name" has the meaning given that term in section 45 of the Act entitled "An Act to provide for the registration and protection of trademarks used in commerce, to carry out the provisions of certain international conventions, and for other purposes" approved July 5, 1946 (commonly referred to as the "Trademark Act of 1946"; 15 U.S.C. 1127).

**(d) Additional Damages in Certain Cases.**—In any case in which the court finds that a defendant proprietor of an establishment who claims as a defense that its activities were exempt under section 110(5) did not have reasonable grounds to believe that its use of a copyrighted work was exempt under such section, the plaintiff shall be entitled to, in addition to any award of damages under this section, an additional award of two times the amount of the license fee that the proprietor of the establishment concerned should have paid the plaintiff for such use during the preceding period of up to 3 years.

**17 U.S.C. § 1201 – Circumvention of copyright protection systems**

**(a) Violations Regarding Circumvention of Technological Measures.—** **(1)(A)** No person shall circumvent a technological measure that effectively controls access to a work protected under this title. The prohibition contained in the preceding sentence shall take effect at the end of the 2-year period beginning on the date of the enactment of this chapter.

**(B)** The prohibition contained in subparagraph (A) shall not apply to persons who are users of a copyrighted work which is in a particular class of works, if such persons are, or are likely to be in the succeeding 3-year period, adversely affected by virtue of such prohibition in their ability to make noninfringing uses of that particular class of works under this title, as determined under subparagraph (C).

**(C)** During the 2-year period described in subparagraph (A), and during each succeeding 3-year period, the Librarian of Congress, upon the recommendation of the Register of Copyrights, who shall consult with the Assistant Secretary for Communications and Information of the Department of Commerce and report and comment on his or her views in making such recommendation, shall make the determination in a rulemaking proceeding for purposes of subparagraph (B) of whether persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition under subparagraph (A) in their ability to make noninfringing uses under this title of a particular class of copyrighted works. In conducting such rulemaking, the Librarian shall examine—

   **(i)** the availability for use of copyrighted works;

   **(ii)** the availability for use of works for nonprofit archival, preservation, and educational purposes;

   **(iii)** the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research;

   **(iv)** the effect of circumvention of technological measures on the market for or value of copyrighted works; and

   **(v)** such other factors as the Librarian considers appropriate.

Add.14

**(D)** The Librarian shall publish any class of copyrighted works for which the Librarian has determined, pursuant to the rulemaking conducted under subparagraph (C), that noninfringing uses by persons who are users of a copyrighted work are, or are likely to be, adversely affected, and the prohibition contained in subparagraph (A) shall not apply to such users with respect to such class of works for the ensuing 3-year period.

**(E)** Neither the exception under subparagraph (B) from the applicability of the prohibition contained in subparagraph (A), nor any determination made in a rulemaking conducted under subparagraph (C), may be used as a defense in any action to enforce any provision of this title other than this paragraph.

**(2)** No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

> **(A)** is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;

> **(B)** has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

> **(C)** is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

**(3)** As used in this subsection—

> **(A)** to "circumvent a technological measure" means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner; and

> **(B)** a technological measure "effectively controls access to a work" if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.

**(b) Additional Violations.—(1)** No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

> **(A)** is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof;

> **(B)** has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or

> **(C)** is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof.

**(2)** As used in this subsection—

> **(A)** to "circumvent protection afforded by a technological measure" means avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure; and

> **(B)** a technological measure "effectively protects a right of a copyright owner under this title" if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title.

**(c) Other Rights, Etc., Not Affected.—(1)** Nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title.

**(2)** Nothing in this section shall enlarge or diminish vicarious or contributory liability for copyright infringement in connection with any technology, product, service, device, component, or part thereof.

**(3)** Nothing in this section shall require that the design of, or design and selection of parts and components for, a consumer electronics,

telecommunications, or computing product provide for a response to any particular technological measure, so long as such part or component, or the product in which such part or component is integrated, does not otherwise fall within the prohibitions of subsection (a)(2) or (b)(1).

**(4)** Nothing in this section shall enlarge or diminish any rights of free speech or the press for activities using consumer electronics, telecommunications, or computing products.

**(d) Exemption for Nonprofit Libraries, Archives, and Educational Institutions.—(1)** A nonprofit library, archives, or educational institution which gains access to a commercially exploited copyrighted work solely in order to make a good faith determination of whether to acquire a copy of that work for the sole purpose of engaging in conduct permitted under this title shall not be in violation of subsection (a)(1)(A). A copy of a work to which access has been gained under this paragraph—

> **(A)** may not be retained longer than necessary to make such good faith determination; and

> **(B)** may not be used for any other purpose.

**(2)** The exemption made available under paragraph (1) shall only apply with respect to a work when an identical copy of that work is not reasonably available in another form.

**(3)** A nonprofit library, archives, or educational institution that willfully for the purpose of commercial advantage or financial gain violates paragraph (1)—

> **(A)** shall, for the first offense, be subject to the civil remedies under section 1203; and

> **(B)** shall, for repeated or subsequent offenses, in addition to the civil remedies under section 1203, forfeit the exemption provided under paragraph (1).

**(4)** This subsection may not be used as a defense to a claim under subsection (a)(2) or (b), nor may this subsection permit a nonprofit library, archives, or educational institution to manufacture, import, offer to the public, provide, or

Add.17

otherwise traffic in any technology, product, service, component, or part thereof, which circumvents a technological measure.

**(5)** In order for a library or archives to qualify for the exemption under this subsection, the collections of that library or archives shall be—

> **(A)** open to the public; or

> **(B)** available not only to researchers affiliated with the library or archives or with the institution of which it is a part, but also to other persons doing research in a specialized field.

**(e) Law Enforcement, Intelligence, and Other Government Activities.—** This section does not prohibit any lawfully authorized investigative, protective, information security, or intelligence activity of an officer, agent, or employee of the United States, a State, or a political subdivision of a State, or a person acting pursuant to a contract with the United States, a State, or a political subdivision of a State. For purposes of this subsection, the term "information security" means activities carried out in order to identify and address the vulnerabilities of a government computer, computer system, or computer network.

**(f) Reverse Engineering.—(1)** Notwithstanding the provisions of subsection (a)(1)(A), a person who has lawfully obtained the right to use a copy of a computer program may circumvent a technological measure that effectively controls access to a particular portion of that program for the sole purpose of identifying and analyzing those elements of the program that are necessary to achieve interoperability of an independently created computer program with other programs, and that have not previously been readily available to the person engaging in the circumvention, to the extent any such acts of identification and analysis do not constitute infringement under this title.

**(2)** Notwithstanding the provisions of subsections (a)(2) and (b), a person may develop and employ technological means to circumvent a technological measure, or to circumvent protection afforded by a technological measure, in order to enable the identification and analysis under paragraph (1), or for the purpose of enabling interoperability of an independently created computer program with other programs, if such means are necessary to achieve such interoperability, to the extent that doing so does not constitute infringement under this title.

(3) The information acquired through the acts permitted under paragraph (1), and the means permitted under paragraph (2), may be made available to others if the person referred to in paragraph (1) or (2), as the case may be, provides such information or means solely for the purpose of enabling interoperability of an independently created computer program with other programs, and to the extent that doing so does not constitute infringement under this title or violate applicable law other than this section.

(4) For purposes of this subsection, the term "interoperability" means the ability of computer programs to exchange information, and of such programs mutually to use the information which has been exchanged.

**(g) Encryption Research.—**

    **(1) Definitions.—**For purposes of this subsection—

        **(A)** the term "encryption research" means activities necessary to identify and analyze flaws and vulnerabilities of encryption technologies applied to copyrighted works, if these activities are conducted to advance the state of knowledge in the field of encryption technology or to assist in the development of encryption products; and

        **(B)** the term "encryption technology" means the scrambling and descrambling of information using mathematical formulas or algorithms.

    **(2) Permissible acts of encryption research.—**Notwithstanding the provisions of subsection (a)(1)(A), it is not a violation of that subsection for a person to circumvent a technological measure as applied to a copy, phonorecord, performance, or display of a published work in the course of an act of good faith encryption research if—

        **(A)** the person lawfully obtained the encrypted copy, phonorecord, performance, or display of the published work;

        **(B)** such act is necessary to conduct such encryption research;

**(C)** the person made a good faith effort to obtain authorization before the circumvention; and

**(D)** such act does not constitute infringement under this title or a violation of applicable law other than this section, including section 1030 of title 18 and those provisions of title 18 amended by the Computer Fraud and Abuse Act of 1986.

**(3) Factors in determining exemption.**—In determining whether a person qualifies for the exemption under paragraph (2), the factors to be considered shall include—

**(A)** whether the information derived from the encryption research was disseminated, and if so, whether it was disseminated in a manner reasonably calculated to advance the state of knowledge or development of encryption technology, versus whether it was disseminated in a manner that facilitates infringement under this title or a violation of applicable law other than this section, including a violation of privacy or breach of security;

**(B)** whether the person is engaged in a legitimate course of study, is employed, or is appropriately trained or experienced, in the field of encryption technology; and

**(C)** whether the person provides the copyright owner of the work to which the technological measure is applied with notice of the findings and documentation of the research, and the time when such notice is provided.

**(4) Use of technological means for research activities.**—Notwithstanding the provisions of subsection (a)(2), it is not a violation of that subsection for a person to—

**(A)** develop and employ technological means to circumvent a technological measure for the sole purpose of that person performing the acts of good faith encryption research described in paragraph (2); and

**(B)** provide the technological means to another person with whom he or she is working collaboratively for the purpose of conducting

the acts of good faith encryption research described in paragraph (2) or for the purpose of having that other person verify his or her acts of good faith encryption research described in paragraph (2).

**(5) Report to Congress.**—Not later than 1 year after the date of the enactment of this chapter, the Register of Copyrights and the Assistant Secretary for Communications and Information of the Department of Commerce shall jointly report to the Congress on the effect this subsection has had on—

**(A)** encryption research and the development of encryption technology;

**(B)** the adequacy and effectiveness of technological measures designed to protect copyrighted works; and

**(C)** protection of copyright owners against the unauthorized access to their encrypted copyrighted works.

The report shall include legislative recommendations, if any.

**(h) Exceptions Regarding Minors.**—In applying subsection (a) to a component or part, the court may consider the necessity for its intended and actual incorporation in a technology, product, service, or device, which—

**(1)** does not itself violate the provisions of this title; and

**(2)** has the sole purpose to prevent the access of minors to material on the Internet.

**(i) Protection of Personally Identifying Information.**—

**(1) Circumvention permitted.**—Notwithstanding the provisions of subsection (a)(1)(A), it is not a violation of that subsection for a person to circumvent a technological measure that effectively controls access to a work protected under this title, if—

**(A)** the technological measure, or the work it protects, contains the capability of collecting or disseminating personally identifying information reflecting the online activities of a natural person who seeks to gain access to the work protected;

Add.21

**(B)** in the normal course of its operation, the technological measure, or the work it protects, collects or disseminates personally identifying information about the person who seeks to gain access to the work protected, without providing conspicuous notice of such collection or dissemination to such person, and without providing such person with the capability to prevent or restrict such collection or dissemination;

**(C)** the act of circumvention has the sole effect of identifying and disabling the capability described in subparagraph (A), and has no other effect on the ability of any person to gain access to any work; and

**(D)** the act of circumvention is carried out solely for the purpose of preventing the collection or dissemination of personally identifying information about a natural person who seeks to gain access to the work protected, and is not in violation of any other law.

**(2)  Inapplicability to certain technological measures.**—This subsection does not apply to a technological measure, or a work it protects, that does not collect or disseminate personally identifying information and that is disclosed to a user as not having or using such capability.

**(j) Security Testing.—**

**(1)  Definition.**—For purposes of this subsection, the term "security testing" means accessing a computer, computer system, or computer network, solely for the purpose of good faith testing, investigating, or correcting, a security flaw or vulnerability, with the authorization of the owner or operator of such computer, computer system, or computer network.

**(2)  Permissible acts of security testing.**—Notwithstanding the provisions of subsection (a)(1)(A), it is not a violation of that subsection for a person to engage in an act of security testing, if such act does not constitute infringement under this title or a violation of applicable law other than this section, including section 1030 of title 18 and those

provisions of title 18 amended by the Computer Fraud and Abuse Act of 1986.

**(3) Factors in determining exemption.**—In determining whether a person qualifies for the exemption under paragraph (2), the factors to be considered shall include—

> **(A)** whether the information derived from the security testing was used solely to promote the security of the owner or operator of such computer, computer system or computer network, or shared directly with the developer of such computer, computer system, or computer network; and

> **(B)** whether the information derived from the security testing was used or maintained in a manner that does not facilitate infringement under this title or a violation of applicable law other than this section, including a violation of privacy or breach of security.

**(4) Use of technological means for security testing.**—Notwithstanding the provisions of subsection (a)(2), it is not a violation of that subsection for a person to develop, produce, distribute or employ technological means for the sole purpose of performing the acts of security testing described in subsection (2), provided such technological means does not otherwise violate section (a)(2).

**(k) Certain Analog Devices and Certain Technological Measures.—**

**(1) Certain analog devices.—**

> **(A)** Effective 18 months after the date of the enactment of this chapter, no person shall manufacture, import, offer to the public, provide or otherwise traffic in any—

> > **(i)** VHS format analog video cassette recorder unless such recorder conforms to the automatic gain control copy control technology;

**(ii)** 8mm format analog video cassette camcorder unless such camcorder conforms to the automatic gain control technology;

**(iii)** Beta format analog video cassette recorder, unless such recorder conforms to the automatic gain control copy control technology, except that this requirement shall not apply until there are 1,000 Beta format analog video cassette recorders sold in the United States in any one calendar year after the date of the enactment of this chapter;

**(iv)** 8mm format analog video cassette recorder that is not an analog video cassette camcorder, unless such recorder conforms to the automatic gain control copy control technology, except that this requirement shall not apply until there are 20,000 such recorders sold in the United States in any one calendar year after the date of the enactment of this chapter; or

**(v)** analog video cassette recorder that records using an NTSC format video input and that is not otherwise covered under clauses (i) through (iv), unless such device conforms to the automatic gain control copy control technology.

**(B)** Effective on the date of the enactment of this chapter, no person shall manufacture, import, offer to the public, provide or otherwise traffic in—

**(i)** any VHS format analog video cassette recorder or any 8mm format analog video cassette recorder if the design of the model of such recorder has been modified after such date of enactment so that a model of recorder that previously conformed to the automatic gain control copy control technology no longer conforms to such technology; or

**(ii)** any VHS format analog video cassette recorder, or any 8mm format analog video cassette recorder that is not an 8mm analog video cassette camcorder, if the design of the model of such recorder has been modified after such date of enactment so that a model of recorder that previously

conformed to the four-line colorstripe copy control technology no longer conforms to such technology.

Manufacturers that have not previously manufactured or sold a VHS format analog video cassette recorder, or an 8mm format analog cassette recorder, shall be required to conform to the four-line colorstripe copy control technology in the initial model of any such recorder manufactured after the date of the enactment of this chapter, and thereafter to continue conforming to the four-line colorstripe copy control technology. For purposes of this subparagraph, an analog video cassette recorder "conforms to" the four-line colorstripe copy control technology if it records a signal that, when played back by the playback function of that recorder in the normal viewing mode, exhibits, on a reference display device, a display containing distracting visible lines through portions of the viewable picture.

**(2) Certain encoding restrictions.**—No person shall apply the automatic gain control copy control technology or colorstripe copy control technology to prevent or limit consumer copying except such copying—

**(A)** of a single transmission, or specified group of transmissions, of live events or of audiovisual works for which a member of the public has exercised choice in selecting the transmissions, including the content of the transmissions or the time of receipt of such transmissions, or both, and as to which such member is charged a separate fee for each such transmission or specified group of transmissions;

**(B)** from a copy of a transmission of a live event or an audiovisual work if such transmission is provided by a channel or service where payment is made by a member of the public for such channel or service in the form of a subscription fee that entitles the member of the public to receive all of the programming contained in such channel or service;

**(C)** from a physical medium containing one or more prerecorded audiovisual works; or

**(D)** from a copy of a transmission described in subparagraph (A) or from a copy made from a physical medium described in subparagraph (C).

> In the event that a transmission meets both the conditions set forth in subparagraph (A) and those set forth in subparagraph (B), the transmission shall be treated as a transmission described in subparagraph (A).

**(3) Inapplicability.**—This subsection shall not—

**(A)** require any analog video cassette camcorder to conform to the automatic gain control copy control technology with respect to any video signal received through a camera lens;

**(B)** apply to the manufacture, importation, offer for sale, provision of, or other trafficking in, any professional analog video cassette recorder; or

**(C)** apply to the offer for sale or provision of, or other trafficking in, any previously owned analog video cassette recorder, if such recorder was legally manufactured and sold when new and not subsequently modified in violation of paragraph (1)(B).

**(4) Definitions.**—For purposes of this subsection:

**(A)** An "analog video cassette recorder" means a device that records, or a device that includes a function that records, on electromagnetic tape in an analog format the electronic impulses produced by the video and audio portions of a television program, motion picture, or other form of audiovisual work.

**(B)** An "analog video cassette camcorder" means an analog video cassette recorder that contains a recording function that operates through a camera lens and through a video input that may be connected with a television or other video playback device.

**(C)** An analog video cassette recorder "conforms" to the automatic gain control copy control technology if it—

> **(i)** detects one or more of the elements of such technology and does not record the motion picture or transmission protected by such technology; or

> **(ii)** records a signal that, when played back, exhibits a meaningfully distorted or degraded display.

**(D)** The term "professional analog video cassette recorder" means an analog video cassette recorder that is designed, manufactured, marketed, and intended for use by a person who regularly employs such a device for a lawful business or industrial use, including making, performing, displaying, distributing, or transmitting copies of motion pictures on a commercial scale.

**(E)** The terms "VHS format", "8mm format", "Beta format", "automatic gain control copy control technology", "colorstripe copy control technology", "four-line version of the colorstripe copy control technology", and "NTSC" have the meanings that are commonly understood in the consumer electronics and motion picture industries as of the date of the enactment of this chapter.

**(5) Violations.**—Any violation of paragraph (1) of this subsection shall be treated as a violation of subsection (b)(1) of this section. Any violation of paragraph (2) of this subsection shall be deemed an "act of circumvention" for the purposes of section 1203(c)(3)(A) of this chapter.

**17 U.S.C. § 1202 – Integrity of copyright management information**

**(a) False Copyright Management Information.**—No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement—

> **(1)** provide copyright management information that is false, or
>
> **(2)** distribute or import for distribution copyright management information that is false.

**(b) Removal or Alteration of Copyright Management Information.**—No person shall, without the authority of the copyright owner or the law—

> **(1)** intentionally remove or alter any copyright management information,
>
> **(2)** distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or
>
> **(3)** distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,

knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

**(c) Definition.**—As used in this section, the term "copyright management information" means any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work:

> **(1)** The title and other information identifying the work, including the information set forth on a notice of copyright.

**(2)** The name of, and other identifying information about, the author of a work.

**(3)** The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

**(4)** With the exception of public performances of works by radio and television broadcast stations, the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work.

**(5)** With the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual work.

**(6)** Terms and conditions for use of the work.

**(7)** Identifying numbers or symbols referring to such information or links to such information.

**(8)** Such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work.

**(d) Law Enforcement, Intelligence, and Other Government Activities.—** This section does not prohibit any lawfully authorized investigative, protective, information security, or intelligence activity of an officer, agent, or employee of the United States, a State, or a political subdivision of a State, or a person acting pursuant to a contract with the United States, a State, or a political subdivision of a State. For purposes of this subsection, the term "information security" means activities carried out in order to identify and address the vulnerabilities of a government computer, computer system, or computer network.

**(e) Limitations on Liability.—**

**(1) Analog transmissions.—**In the case of an analog transmission, a person who is making transmissions in its capacity as a broadcast station, or as a cable system, or someone who provides programming to such station or system, shall not be liable for a violation of subsection (b) if—

**(A)** avoiding the activity that constitutes such violation is not technically feasible or would create an undue financial hardship on such person; and

**(B)** such person did not intend, by engaging in such activity, to induce, enable, facilitate, or conceal infringement of a right under this title.

**(2) Digital transmissions.—**

**(A)** If a digital transmission standard for the placement of copyright management information for a category of works is set in a voluntary, consensus standard-setting process involving a representative cross-section of broadcast stations or cable systems and copyright owners of a category of works that are intended for public performance by such stations or systems, a person identified in paragraph (1) shall not be liable for a violation of subsection (b) with respect to the particular copyright management information addressed by such standard if—

**(i)** the placement of such information by someone other than such person is not in accordance with such standard; and

**(ii)** the activity that constitutes such violation is not intended to induce, enable, facilitate, or conceal infringement of a right under this title.

**(B)** Until a digital transmission standard has been set pursuant to subparagraph (A) with respect to the placement of copyright management information for a category of works, a person identified in paragraph (1) shall not be liable for a violation of subsection (b) with respect to such copyright management

Add.30

information, if the activity that constitutes such violation is not intended to induce, enable, facilitate, or conceal infringement of a right under this title, and if—

> **(i)** the transmission of such information by such person would result in a perceptible visual or aural degradation of the digital signal; or

> **(ii)** the transmission of such information by such person would conflict with—

>> **(I)** an applicable government regulation relating to transmission of information in a digital signal;

>> **(II)** an applicable industry-wide standard relating to the transmission of information in a digital signal that was adopted by a voluntary consensus standards body prior to the effective date of this chapter; or

>> **(III)** an applicable industry-wide standard relating to the transmission of information in a digital signal that was adopted in a voluntary, consensus standards-setting process open to participation by a representative cross-section of broadcast stations or cable systems and copyright owners of a category of works that are intended for public performance by such stations or systems.

**(3) Definitions.**—As used in this subsection—

> **(A)** the term "broadcast station" has the meaning given that term in section 3 of the Communications Act of 1934 (47 U.S.C. 153); and

> **(B)** the term "cable system" has the meaning given that term in section 602 of the Communications Act of 1934 (47 U.S.C. 522).

**17 U.S.C. § 1203 – Civil remedies**

**(a) Civil Actions.**—Any person injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation.

**(b) Powers of the Court.**—In an action brought under subsection (a), the court—

> **(1)** may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation, but in no event shall impose a prior restraint on free speech or the press protected under the 1st amendment to the Constitution;

> **(2)** at any time while an action is pending, may order the impounding, on such terms as it deems reasonable, of any device or product that is in the custody or control of the alleged violator and that the court has reasonable cause to believe was involved in a violation;

> **(3)** may award damages under subsection (c);

> **(4)** in its discretion may allow the recovery of costs by or against any party other than the United States or an officer thereof;

> **(5)** in its discretion may award reasonable attorney's fees to the prevailing party; and

> **(6)** may, as part of a final judgment or decree finding a violation, order the remedial modification or the destruction of any device or product involved in the violation that is in the custody or control of the violator or has been impounded under paragraph (2).

**(c) Award of Damages.**—

> **(1) In general.**—Except as otherwise provided in this title, a person committing a violation of section 1201 or 1202 is liable for either—

> > **(A)** the actual damages and any additional profits of the violator, as provided in paragraph (2), or

> > **(B)** statutory damages, as provided in paragraph (3).

**(2) Actual damages.**—The court shall award to the complaining party the actual damages suffered by the party as a result of the violation, and any profits of the violator that are attributable to the violation and are not taken into account in computing the actual damages, if the complaining party elects such damages at any time before final judgment is entered.

**(3) Statutory damages.**—**(A)** At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1201 in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just.

**(B)** At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1202 in the sum of not less than $2,500 or more than $25,000.

**(4) Repeated violations.**—In any case in which the injured party sustains the burden of proving, and the court finds, that a person has violated section 1201 or 1202 within 3 years after a final judgment was entered against the person for another such violation, the court may increase the award of damages up to triple the amount that would otherwise be awarded, as the court considers just.

**(5) Innocent violations.**—

**(A) In general.**—The court in its discretion may reduce or remit the total award of damages in any case in which the violator sustains the burden of proving, and the court finds, that the violator was not aware and had no reason to believe that its acts constituted a violation.

**(B) Nonprofit library, archives, educational institutions, or public broadcasting entities.**—

**(i) Definition.**—In this subparagraph, the term "public broadcasting entity" has the meaning given such term under section 118(f).

**(ii)In general.**—In the case of a nonprofit library, archives, educational institution, or public broadcasting entity, the court shall remit damages in any case in which the library, archives, educational institution, or public broadcasting entity sustains the burden of proving, and the court finds, that the library, archives, educational institution, or public broadcasting entity was not aware and had no reason to believe that its acts constituted a violation.