No. 24-7700

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

J. DOE 1, *et al.*,

*Plaintiffs-Appellants*,

v.

GITHUB, INC., *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
No. 4:22-cv-06823
Hon. Jon S. Tigar

_____

**BRIEF OF AMICI CURIAE INTELLECTUAL PROPERTY LAW
PROFESSORS IN SUPPORT OF APPELLEES AND
AFFIRMANCE**

_____

Jennifer M. Urban
Erik Stallman
Samuelson Law, Technology &
  Public Policy Clinic
UC Berkeley School of Law
353 Law Building
Berkeley, California 94720-7200
(510) 642-7338
jurban@law.berkeley.edu

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE .................................................. 1

SUMMARY OF ARGUMENT ................................................... 1

ARGUMENT ........................................................................ 4

I. The CMI Rules Are a Response to Technologies That Enabled the Easy Creation and Distribution of "Perfect" Copies of Works ........................................................ 4

    A. The Audio Home Recording Act of 1992 ........................ 5

    B. The National Information Infrastructure Green and White Papers .................................................... 8

    C. The WIPO Copyright Treaty .................................... 10

    D. Codification of Sections 1201 and 1202 ...................... 13

II. The Text of Section 1202 Supports an Identicality Requirement .................................................. 15

    A. Section 1202(b)(1) Outlaws Infringement-Facilitating Removal of CMI ................................. 16

    B. Section 1202(b)(3) Outlaws Only Distribution or Public Performance of Works or Copies From Which CMI Has Been Removed or Altered ....................... 19

III. Courts Have Properly Limited Section 1202 Liability to Identical Copies to Ensure That It Applies Only to Removal or Alteration of CMI ............................... 24

    A. Courts Have Limited the Application of Section 1202 to Identical Works .......................................... 25

    B. Identicality Supports an Inference of Removal or Alteration of CMI ....................................... 28

CONCLUSION .................................................................. 33

CERTIFICATE OF COMPLIANCE ........................................ 34

CERTIFICATE OF SERVICE .............................................. 35

APPENDIX .................................................................... A-1

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*ADR Int'l Ltd. v. Inst. for Supply Mgmt., Inc.*,
  667 F. Supp. 3d 411 (S.D. Tex. 2023) ........................................ 30, 31

*Advanta-STAR Auto. Rsch. Corp. of Am. v. Search Optics, LLC*,
  672 F. Supp. 3d 1035 (S.D. Cal. 2023) ............................................ 25

*Ashton-Tate Corp. v. Ross*,
  916 F.2d 516 (9th Cir. 1990) ............................................................ 23

*Bd. of Managers of Soho Int'l Arts Condo. v. City of New York*,
  No. 01-cv-1226-DAB, 2003 WL 21403333
  (S.D.N.Y. Jun. 17, 2003) .................................................................. 17

*Crowley v. Jones*,
  608 F. Supp. 3d 78 (S.D.N.Y. 2022) ................................................ 31

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
  539 U.S. 23 (2003) ............................................................................ 24

*Design Basics, LLC v. WK Olson Architects, Inc.*,
  No. 17-cv-7432, 2019 WL 527535
  (N.D. Ill. Feb. 11, 2019) ....................................................... 19, 26, 30

*Dolls Kill, Inc. v. Zoetop Bus. Co.*,
  No. 22-cv-1463-RGK-MAA, 2022 WL 16961477
  (C.D. Cal. Aug. 25, 2022) ..................................................... 25, 29, 30

*Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P.*,
  948 F.3d 261 (5th Cir. 2020) .......................................................... 27

*Falkner v. General Motors LLC*,
  393 F. Supp. 3d 927 (C.D. Cal. 2018) ........................................ 17, 18

*Faulkner Press, L.L.C. v. Class Notes, L.L.C.*,
   756 F. Supp. 2d 1352 (N.D. Fla. 2010)......................................26, 27

*Friedman v. Live Nation Merch., Inc.*,
   833 F.3d 1180 (9th Cir. 2016) ......................................................28

*Frost-Tsuji Architects v. Highway Inn, Inc.*,
   No. 13-cv-00496-SOM-BMK, 2014 WL 5798282
   (D. Haw. Nov. 7, 2014).............................................................19, 30

*FurnitureDealer.Net, Inc. v. Amazon.com, Inc.*,
   No. 18-cv-232-JRT-HB, 2022 WL 891473
   (D. Minn. Mar. 25, 2022) ...............................................................21

*Greg Young Publ'g, Inc. v. CafePress, Inc.*,
   No. 15-cv-6013-MWF, 2016 WL 6106752
   (C.D. Cal. Jan. 25, 2016)................................................................28

*John Wiley & Sons, Inc. v. DRK Photo*,
   882 F.3d 394 (2d Cir. 2018) ...........................................................22

*Kipp Flores Architects, LLC v. AMH Creekside Dev., LLC*,
   21-cv-1158-XR, 2022 WL 4352480
   (W.D. Tex. Sept. 16, 2022)...................................................18, 26, 30

*Kipp Flores Architects, LLC v. Pradera SFR, LLC*,
   No. 21-cv-673-XR, 2022 WL 1105751
   (W.D. Tex. April 13, 2022).......................................................26, 30

*Kirk Kara Corp. v. W. Stone & Metal Corp.*,
   No. 20-cv-1931, 2020 WL 5991503 (C.D. Cal. Aug. 14, 2020) .25, 29

*Mango v. BuzzFeed, Inc.*,
   970 F.3d 167 (2d Cir. 2020) ...........................................................28

*Michael Grecco Prods., Inc. v. Time USA, LLC*,
   No. 20-cv-4875-NRB, 2021 WL 3192543
   (S.D.N.Y. July 27, 2021) .................................................................26

iii

*New Parent World, LLC v. True to Life Prods., Inc.*,
    No. 23-cv-8089-PCT-DGC, 2024 WL 4277865
    (D. Ariz. Sept. 24, 2024)............................................................31, 32

*O'Neal v. Sideshow, Inc.*,
    583 F. Supp. 3d 1282 (C.D. Cal. 2022)............................................25

*Park v. Skidmore, Owings & Merrill LLP*,
    No. 17-cv-4473-RJS, 2019 WL 9228987
    (S.D.N.Y. Sept. 30, 2019)................................................................27

*Real World Media LLC v. Daily Caller, Inc.*,
    744 F. Supp. 3d 24 (D.D.C. 2024)....................................................32

*Ruby Mtn. Heli-Ski Guides, Inc. v. SledNV, Inc.*,
    No. 24-cv-211-MMD-CSD, 2025 WL 1587808
    (D. Nev. June 5, 2025) ....................................................................27

*Silvers v. Sony Pictures Ent., Inc.*,
    402 F.3d 881 (9th Cir. 2005) ..........................................................21

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)............................................................................6

*Stevens v. Corelogic, Inc.*,
    899 F.3d 666 (9th Cir. 2018) ....................................................16, 32

*Textile Secrets Int'l, Inc. v. Ya-Ya Brand, Inc.*,
    524 F. Supp. 2d 1184 (C.D. Cal. 2007)..............................................4

*We the Protesters, Inc. v. Sinyangwe*,
    724 F. Supp. 3d 281 (S.D.N.Y 2024) ..............................................30

*Weissmann v. Freeman*,
    868 F.2d 1313 (2d Cir. 1989) ..........................................................23

*Williams v. Hy-Vee, Inc.*,
    661 F. Supp. 3d 871 (S.D. Iowa 2023)............................................18

iv

*Wright v. Miah*,
No. 22-cv-4132, 2023 WL 6219435 (E.D.N.Y. Sept. 7, 2023).........21

**Statutes**

17 U.S.C. § 106 ................................................................................3

17 U.S.C. § 504(c) ..........................................................................19

17 U.S.C. §§ 1001, et seq. ...................................................... passim

17 U.S.C. § 1002(d)(1) .....................................................................8

17 U.S.C. § 1009(d)(1)(B)(ii) ...........................................................8

17 U.S.C. § 1201 ...................................................................2, 5, 13

17 U.S.C. § 1201(b)(1) ..............................................................16, 19

17 U.S.C. § 1202 ................................................................... passim

17 U.S.C. § 1202(a) ........................................................................27

17 U.S.C. § 1202(b) ...........................................................15, 31, 32

17 U.S.C. § 1202(b)(1) ........................................................... passim

17 U.S.C. § 1202(b)(3) ........................................................... passim

17 U.S.C. § 1202(c) .........................................................................13

17 U.S.C. § 1203 .............................................................................14

17 U.S.C. § 1203(c)(4)(A) ...............................................................15

17 U.S.C. § 1203(c)(4)(B) ...............................................................15

17 U.S.C. § 1204 .............................................................................15

17 U.S.C. § 1204(a) .........................................................................15

17 U.S.C. §§ 1201–05 (DMCA) ..............................................2, 5, 14, 29

v

## Treatises

Melville B. Nimmer and David Nimmer, 2 *Nimmer on Copyright* (2025)......................................................................................7, 32

Paul Goldstein, 3 *Goldstein on Copyright* (2025-2 Supp.) .....................25

## Legislative Materials

144 Cong. Rec. S9935, S9935 (daily ed. Sept. 3, 1998) (statement of Sen. Ashcroft).................................................................14

H.R. 2441, 104th Cong. (1995); S. 1284, 104th Cong. (1995)............10, 11

H.R. Rep., No. 102-873, pt. 2 (Sept. 21, 1992) ..........................................7

S. Rep., No. 105-190 (1998) ....................................................................14

## Other Authorities

David Nimmer, *Aus Der Neuen Welt*, 93 Nw. U. L. Rev. 195 (1998)........8

Dep't of Comm. Info. Infrastructure Task Force, *Green Paper on Intellectual Property and the National Information Infrastructure: A Preliminary Draft of the Report of the Working Group on Intellectual Property Rights* (July 1994) .....................8, 9

Dep't of Comm. Info. Infrastructure Task Force, *Intellectual Property and the National Information Infrastructure* (Sept. 1995).... passim

Julie E. Cohen, *A Right to Read Anonymously: A Closer Look at "Copyright Management" in Cyberspace*, 28 Conn. L. Rev. 981 (1996) ...........................................................................12

Off. of Tech. Assessment, *Copyright and Home Copying: Technology Challenges the Law* (Oct. 1989), https://perma.cc/U4HX-VL8T ......6

Pamela Samuelson, *Intellectual Property and the Digital Economy: Why the Anti-Circumvention Regulations Need to Be Revised*, 14 Berkeley Tech. L.J. 519 (1999).......................................................13

Pamela Samuelson, *The U.S. Digital Agenda at WIPO*, 37 Va. J. Int'l L. 369 (1997)..............................................................11, 12

Reporters Committee for Freedom of the Press, *Committee Delays Work on Controversial Electronic Copyright Bill* (June 17, 1996), https://perma.cc/F4LR-YPWS ...............................................10

*Text of the Substantive and Administrative Provisions of the Treaty as Presented to the Diplomatic Conference*, Art. 13, Records of the Diplomatic Conference on Certain Copyright and Neighboring Rights Questions, Vol. 1 (1996) ...................................11

*Webster's II, New Riverside University Dictionary* (1994) ...............17, 18

WIPO Copyright Treaty (Dec. 20, 1996) 13WIPO, Diplomatic Conference on Certain Copyright and Neighboring Rights Questions, Geneva, December 2-20, 1996, CRNR/DC/102..............................13

Xiyin Tang, *The Class Action as Licensing and Reform Device*, 122 Colum. L. Rev. 1627 (2022) ..............................................................7

## INTEREST OF AMICI CURIAE

Amici, listed in an appendix to this brief, are law professors who teach and write about intellectual property law. Amici's sole concern in submitting this brief is the proper development of intellectual property law. Amici submit this brief to assist the Court in its analysis of the purpose and scope of 17 U.S.C. § 1202.[1]

## SUMMARY OF ARGUMENT

This Court should construe 17 U.S.C. §§ 1202(b)(1) and 1202(b)(3) as limited to tampering with copyright management information ("CMI") as to identical copies, as the District Court held. This is a sound interpretation of the statute in light of its purpose as revealed by legislative history, its textual features, and courts' application of the statute over time. This interpretation also avoids outsized and unjustified claims for statutory damages, such as the $9 billion claim

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part, and no party or party's counsel made a monetary contribution to fund the preparation or submission of this brief. No person or entity made a monetary contribution to the preparation or submission of this brief. Amici thank Berkeley Law students Ayesha Asad, Ashley Fan, Spencer Feinstein, and Eleanor Stalick for their assistance in preparing this brief.

1

that Appellants sought and may seek to revive depending on the outcome of their interlocutory appeal.

In passing section 1202, Congress was overwhelmingly concerned with digital piracy of perfect copies of works, distributed easily, cheaply, and widely via the Internet. To provide additional protections for copyrighted works, the Digital Millennium Copyright Act ("DMCA") included sections 1201 and 1202 as a pair of prohibitions to deter bad actors from using digital tools to circumvent technical protection measures ("TPMs") and from stripping out or falsifying CMI from those pirated copies. And the remedial scheme Congress provided for violations of these provisions is likewise crafted to deter and address piracy rather than garden-variety copyright infringement. It includes statutory damages starting at $2,500 to $25,000 *per violation* of section 1202, ten times higher than the range of statutory damages for violating section 1201's anti-circumvention provision.

The text of section 1202 supports an identicality requirement. CMI is not "removed" or "altered" in the creation of derivative works which involve reproductions but are not identical copies of the original work. Similarly, section 1202(b)(3) does not apply to all rights available

2

to copyright holders under section 106. It reaches only those tied to the problem of dissemination of perfect copies: the right of distribution and the right of public performance of works.

For the most part, courts have faithfully applied this understanding of section 1202 and distinguished between two types of claims. Claims against defendants that have reproduced or distributed entire or partial exact—that is, identical—copies of the plaintiff's work with the plaintiff's CMI removed or altered are likely to stand. Claims against defendants that have produced new, distinct works are not. This distinction is important because identicality supports an inference that CMI was removed or altered—and removal or alteration is necessary for liability to arise under section 1202.

This distinction is also important given the magnitude of liability available to plaintiffs with section 1202 claims. Here, Appellants claim that Appellees violated section 1202 more than three and a half million times in the course of training a generative AI model, initially seeking $9 billion in statutory damages. And that would be the statutory minimum, with the high end being ninety billion dollars. Appellants made—and may seek to revive—this award request despite the fact

3

that there is no copyright infringement claim in the case. Their section 1202 claim is an exceptional stretch of a law that was intended to do much different and narrower work. The identicality requirement keeps liability under section 1202 in the bounds of Congressional intent and statutory text.

## ARGUMENT

### I.    The CMI Rules Are a Response to Technologies That Enabled the Easy Creation and Distribution of "Perfect" Copies of Works

Section 1202 is an outgrowth of laws, policies, and international agreements addressing concerns that emerging digital reprography technologies and digital networks made it easy and cheap to create and distribute perfect (that is, identical) reproductions of in-copyright works in digital form. *See Textile Secrets Int'l, Inc. v. Ya-Ya Brand*, *Inc.*, 524 F. Supp. 2d 1184, 1202 n. 17 (C.D. Cal. 2007) (observing that Congress enacted section 1202 to "give an added layer of protection to certain works that were vulnerable to infringement due to advances in modern technology, namely the Internet"). With the goal of providing new protections to copyright owners against digital piracy, Congress enacted two significant laws to respond to these threats. The first was a *sui*

4

*generis* law, the Audio Home Recording Act of 1992, 17 U.S.C. §§ 1001, et seq. ("AHRA"), which requires the manufacturer of certain digital audio recording and player technologies to design them to thwart consumers' ability to make multiple copies of digital sound recordings. The second, the DMCA, included a pair of rules, codified in a new Chapter 12 of Title 17 of the U.S. Code, 17 U.S.C. §§ 1201 and 1202, adapted from AHRA. Both the prohibitions and the penalties for violating DMCA provisions were extraordinary and aimed at the unique threat posed by the ease with which identical reproductions could be made and distributed. The following sections explain the evolution of what became section 1202 in order to provide the necessary background for interpreting it.

### A. The Audio Home Recording Act of 1992

Like section 1202, section 1002 of AHRA grew out of concerns with digital technologies that enabled the production of perfect copies of copyrighted works. In 1987, Sony introduced a new consumer electronics product, digital audio tape ("DAT") recording and playback machines. Three years earlier, Sony had prevailed in a lawsuit brought by Universal City Studios and Disney challenging its manufacture and

5

sale of video tape recording machines ("VTRs"), such as its Betamax machines, to the public, even though Sony knew that some consumers would use their VTRs to make infringing copies of programs shown on broadcast television. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 421–422 (1984). The Supreme Court ruled that Sony was not contributorily liable for its customers' infringements because VTRs were capable of substantial non-infringing uses, *id.* at 441–42, such as the fair uses that consumers made when preparing time-shift copies of television programs to watch at later times. *Id.* at 456.

Home taping of sound recordings had long been an irritant to the Recording Industry Association of America ("RIAA") and to music publisher groups. In 1989, 40% of Americans over the age of 10 had made private copies of sound recordings in the previous year (resulting in more than a billion unauthorized copies) and the public overwhelmingly thought that private copying was allowed. *See* Off. of Tech. Assessment, *Copyright and Home Copying: Technology Challenges the Law* at 3, 11 (Oct. 1989). The recording industry perceived DAT machines to pose considerably greater risks to their businesses than conventional tape recorders because of the higher

quality of the identical digital copies from digital copies ripped from CDs and the capacity for each digital copy, in effect, to become a factory to create more perfect digital copies. The recording industry challenged Sony's sales of DAT machines, but the litigation settled as copyright holders and device manufacturers worked toward a legislative compromise. *See* Xiyin Tang, *The Class Action as Licensing and Reform Device*, 122 Colum. L. Rev. 1627, 1647–1648 (2022). That compromise was the AHRA.

AHRA's legislative history makes clear Congress's preoccupation with mass piracy of "perfect" digital copies: "From a single prerecorded work, hundreds of copies and copies of copies might be made that would be virtually indistinguishable from the original." H.R. Rep., No. 102-873, pt. 2, at 4 (Sept. 21, 1992). Congress's answer to this threat was a "serial copyright management system" ("SCMS") that allowed limited— but simultaneously to forestall untrammeled—home copying." 2 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 8B.01 (2025).

The SCMS relied on "flags," *i.e.*, information encoded on digital media signifying the copyright status of the work at issue, to prevent

serial copying. These "flags ushered us into the world of copyright management information." David Nimmer, *Aus Der Neuen Welt*, 93 Nw. U. L. Rev. 195, 198 (1998). To prevent tampering with the flags that limited home copying, AHRA included an express prohibition on encoding a digital music sound recording "with inaccurate information relating to the category code, copyright status, or generation status of the source material for the recording." 17 U.S.C. § 1002(d)(1). Further, statutory damages are modest: $25 per digital music recording. 17 U.S.C. § 1009(d)(1)(B)(ii).

## B. The National Information Infrastructure Green and White Papers

Although digital media and audio devices enabled perfect reproductions of in-copyright works, the Internet enabled mass distribution of those digital reproductions. In 1994, the Clinton Administration's Working Group on Intellectual Property Rights published a policy document proposing legislative changes to respond to the challenges that digital technologies and the Internet posed for copyright owners. *See* Dep't of Comm. Info. Infrastructure Task Force, *Green Paper on Intellectual Property and the National Information Infrastructure: A Preliminary Draft of the Report of the Working Group*

8

*on Intellectual Property Rights* (July 1994) ("Green Paper"). The Green Paper's proposed anti-circumvention rule was word-for-word identical to its counterpart in AHRA except that it would not be limited to circumvention of the SCMS. *Id.* at 128. Indeed, the Green Paper cited AHRA as a model for its CMI provision, although it envisioned a broader role for copyright management information than preventing serial copies. *Id.* at 112.

Signifying that the Green Paper contemplated tampering with CMI as something beyond bare omission of the original CMI in garden-variety infringement/substantial similarity cases, it proposed making intentional tampering with CMI by removal or falsification a criminal offense. *Id.* at 131. The follow-on White Paper moved the proposed CMI provision to its own section of Title 17, section 1202, but maintained significant penalties: a statutory damage award of between $2,500 and $25,000 per violation as well as criminal penalties of up to $500,000 or 5 years imprisonment for tampering with CMI with the intent to defraud. Dep't of Comm. Info. Infrastructure Task Force, *Intellectual Property and the National Information Infrastructure*, Appx. 2, at 5

9

(Sept. 1995) ("White Paper"). Only acts that posed a significant risk of large-scale piracy would warrant such penalties.

The White Paper contended that these provisions were necessary because the Internet made it possible "for one individual, with a few key strokes, to deliver perfect copies of digitized works to scores of other individuals." *Id*. at 12. Taking up these concerns, the chairs and ranking members of the House and Senate Committee introduced the White Paper's recommended legislative package as the National Information Infrastructure Copyright Protection Act of 1995 ("NIICPA"). H.R. 2441, 104th Cong. (1995); S. 1284, 104th Cong. (1995). However, that legislation foundered due to opposition from a coalition of software developers, academics, librarians, journalists, and others who argued that the bill "ignor[ed] long-standing copyright provisions—such as fair use and educational use exceptions." *See, e.g.*, Reporters Committee for Freedom of the Press, *Committee Delays Work on Controversial Electronic Copyright Bill* (June 17, 1996).

## C.   The WIPO Copyright Treaty

Following the legislative setback, the Clinton administration sought to achieve international adoption of its recommendations via the

World Intellectual Property Organization ("WIPO"), which convened a diplomatic conference in 1996 to update copyright law for the digital age. *See* Pamela Samuelson, *The U.S. Digital Agenda at WIPO*, 37 Va. J. Int'l L. 369, 372–74, 411, 415–16 (1997). The draft WIPO Copyright Treaty proposed a rule that closely resembled the White Paper's proposed anti-circumvention rule. *See Text of the Substantive and Administrative Provisions of the Treaty as Presented to the Diplomatic Conference*, Art. 13, Records of the Diplomatic Conference on Certain Copyright and Neighboring Rights Questions, Vol. 1 (1996), at 13. It also proposed a rights management information (hereinafter CMI)[2] anti-tampering rule that was substantively the same as the White Paper's, although the draft treaty limited its scope to electronic rights management information. *Id.* at 14.

The draft treaty's anti-circumvention and CMI articles were almost always discussed together. Echoing debates over AHRA and NIICPA, some delegates expressed concerns that the CMI provision

---

[2] The WIPO Copyright Treaty used the term "rights management information" in place of "copyright management information" but the terms are interchangeable. We use CMI throughout.

11

would go beyond digital piracy and reach lawful activities, "restrict[ing] the individuals' ability to use portions of copyrighted works for private purposes." WIPO, Diplomatic Conference on Certain Copyright and Neighboring Rights Questions, Geneva, December 2-20, 1996, CRNR/DC/102 at 78, ¶ 528. These delegates argued that "unless copies were distributed in some manner, there would be no prejudice from the mere removal or alteration of any rights management information." *Id.* Delegates advocated a narrower scope, with "an explicit link with the infringement of rights." *Id.* at 80. Separately, academics and civil society representatives raised concerns that anti-tampering rules could "prevent readers from taking measures to protect themselves against intrusive monitoring of their activities." Julie E. Cohen, *A Right to Read Anonymously: A Closer Look at "Copyright Management" in Cyberspace*, 28 Conn. L. Rev. 981, 990 (1996); *see also* Samuelson, *U.S. Digital Agenda at WIPO*, *supra*, at 413, 415–17 (summarizing criticism). As a compromise, the diplomats agreed to support Articles 11 and 12 of the final WIPO Copyright Treaty, which required member states only to have "adequate protection and effective remedies" against the circumvention of technological protection measures ("TPMs") and

removal or falsification of CMI. WIPO Copyright Treaty, (Dec. 20, 1996), Arts. 11, 12(1). Further, the CMI provision was narrowed to cases where a person had "reasonable grounds to know" that tampering with CMI would "induce, enable, facilitate or conceal an infringement" of rights. *Id.*, Art. 12(1).

### D. Codification of Sections 1201 and 1202

To implement the WIPO Copyright Treaty's anti-circumvention and CMI articles, Congress enacted what became sections 1201 and 1202 in 1998 in a new chapter 12 of Title 17. As enacted, section 1202 is substantively similar to the approved WIPO treaty's CMI provision, although it does not limit its scope to electronic forms of CMI. The anti-circumvention rules were much more controversial and much more elaborate than the CMI tampering rules. *See* Pamela Samuelson, *Intellectual Property and the Digital Economy: Why the Anti-Circumvention Regulations Need to Be Revised*, 14 Berkeley Tech. L.J. 519, 535–536 (1999). Nonetheless, Congress addressed privacy concerns by expressly carving out users' personally identifiable information from the definition of CMI. *See* 17 U.S.C. § 1202(c).

13

Like the Commerce Department White Paper, the legislative
history of Title I of the Digital Millennium Copyright Act refers to
Congress's concern that "the digital environment poses a unique threat
to the rights of copyright owners . . . [i]n contrast to the analog
experience, digital technology enables pirates to reproduce and
distribute perfect copies of works–at virtually no cost at all to the
pirate." 144 Cong. Rec. S9935, S9935 (daily ed. Sept. 3, 1998)
(statement of Sen. Ashcroft). For Congress, the goals of facilitating
online licensing of works and deterring piracy were linked: "Due to the
ease with which digital works can be copied and distributed worldwide
virtually instantaneously, copyright owners will hesitate to make their
works readily available on the Internet without reasonable assurance
that they will be protected against massive piracy." S. Rep., No. 105-
190, at 8 (1998). The CMI provision thus was dual-purposed to
"facilitate licensing of copyright for use on the Internet and to
discourage piracy." *Id.* at 12 n.18.

Congress also elected to maintain the penalties recommended in
the White Paper. Section 1203 authorizes awards of actual damages or
statutory damages, injunctive relief, impoundment of devices, costs and

14

reasonable attorney fees. The statutory damage range starts with a $2,500 minimum and goes up to $25,000 per violation. 17 U.S.C. § 1203(c)(4)(B). The measure of statutory damages suggests that Congress considered tampering with CMI a graver offense than circumvention of TPMs, with a statutory range of only $200 to $2,500 per violation. 17 U.S.C. § 1203(c)(4)(A). Further, section 1204 authorizes criminal penalties for willful violations of section 1202 if done for "purposes of commercial advantage or private financial gain." 17 U.S.C. § 1204(a). A first offense can result in a fine of up to $500,000 and five years in prison or both, while subsequent violations can result in a fine of up to $1,000,000 and ten years in prison. Such grave consequences are evidence of the serious harm—large-scale digital piracy—that Congress anticipated would result from violations of section 1202.

## II. The Text of Section 1202 Supports an Identicality Requirement

A careful reading of the texts of section 1202(b)(1) and section 1202(b)(3) further supports an interpretation that limits their scope to identical copies. Removal of CMI can facilitate digital piracy, and liability under section 1202(b) may attach when the defendant knows

15

that removal will do so. But section 1202(b)(1) does not apply when secondary works fail to include a first work's CMI. Section 1202(b)(3) complements section 1202(b)(1) in protecting copyright owners from digital piracy. That section applies only when works or copies of works whose CMI has been removed have been disseminated, not when those works have been reproduced, constitute derivative works, or are being publicly displayed. Limiting the scope of section 1202 to identical copies will ensure that this provision is not misused when secondary uses constitute ordinary infringement or are noninfringing.

## A. Section 1202(b)(1) Outlaws Infringement-Facilitating Removal of CMI

Section 1202(b)(1) outlaws removal or alteration of CMI from works or copies of works only if the defendant did so intentionally and with knowledge that these acts would "induce, enable, facilitate or conceal" copyright infringement. Removal or alteration of CMI by itself cannot "induce, enable, facilitate or conceal" copyright infringement. *See Stevens v. Corelogic, Inc.*, 899 F.3d 666, 674–75 (9th Cir. 2018). A section 1201(b)(1) violation may, however, be found if someone intentionally removes CMI from, for example, digital photographs with the intent of facilitating infringement by a confederate who plans to

16

disseminate infringing copies of those photographs without CMI in violation of section 1202(b)(3).

CMI can be "removed" from a work or copies of a work under section 1202(b)(1) only if that work or those copies already exist and the wrongdoer takes active steps to excise that CMI. As one court observed about the meaning of "remove" in interpreting another provision of the Copyright Act, "words are presumed to carry their quotidian, common-sense meaning. . . . 'Remove' means '[t]o move *from a position occupied* . . . [t]o convey from one place to another.'" *Bd. of Managers of Soho Int'l Arts Condo. v. City of New York*, No. 01-cv-1226-DAB, 2003 WL 21403333, at *10 (S.D.N.Y. Jun. 17, 2003) (citing *Webster's II, New Riverside University Dictionary* (1994)) (emphasis added).

Creating a secondary work that omits a first work's CMI may infringe the earlier work's copyright, but it does not violate section 1202(b)(1), as the court found in *Falkner v. General Motors LLC*, 393 F. Supp. 3d 927 (C.D. Cal. 2018). Falkner was an artist who sued General Motors ("GM") because its advertising agency posted online a photograph of one of GM's cars in front of part of Falkner's mural which had been painted on two sides of a building. The photograph did not

17

include the part of Falkner's mural that identified him as the artist. However, the court ruled that merely *omitting* this information in the photograph did not violate section 1202(b)(1) because neither the photographer nor GM had "removed" CMI from the mural. It granted GM's motion for summary judgment on the section 1202(b)(1) claim, but denied its motion for summary judgment on Falkner's copyright infringement claim. *Id.* at 939–40. *See also Williams v. Hy-Vee, Inc.*, 661 F. Supp. 3d 871, 884–85 (S.D. Iowa 2023) (adopting *Falkner*'s reasoning; failure to include is not removal).

Generating a new work, even if it infringes an existing work, does not involve removal of CMI. *Kipp Flores Architects, LLC v. AMH Creekside Dev., LLC*, 21-cv-1158-XR, 2022 WL 4352480 (W.D. Tex. Sept. 16, 2022), resolved this question correctly, beginning with the basic dictionary definition of "remove." *Id.* at *4 (citing Merriam-Webster's Dictionary definition of "remove" as "taking away or off," or "to get rid of" something). As the court readily concluded, "CMI cannot be 'removed' from a separate work that never included CMI to begin with." *Id.* Instead, the court properly required cropping or other means of deletion from a copy. *Id.*; *see also Design Basics, LLC v. WK Olson*

18

*Architects, Inc.*, No. 17-cv-7432, 2019 WL 527535, at *5 (N.D. Ill. Feb. 11, 2019) ("Basing a drawing on another's work is not the same as removing copyright management information.") (quoting *Frost-Tsuji Architects v. Highway Inn, Inc.*, No. 13-cv-00496-SOM-BMK, 2014 WL 5798282, at *5, 7 (D. Haw. Nov. 7, 2014)).

To construe section 1202(b)(1) as broadly as Appellants do would risk making every copyright infringement case into a section 1202(b)(1) removal case if the second work's author did not identify the first work's author or the title of that work when using parts of it in their secondary work. Moreover, this would allow plaintiffs to evade copyright law's registration requirement and to claim statutory damages far beyond what copyright law provides (a minimum of $2,500 per violation as compared to a minimum of $750 per infringed work under section 504(c)). This would undermine the copyright law's limits on enforcement and remedies which depend on registration requirements.

## B. Section 1202(b)(3) Outlaws Only Distribution or Public Performance of Works or Copies From Which CMI Has Been Removed or Altered

Section 1202(b)(3) complements section 1201(b)(1) by making it illegal to distribute (including importing for distribution) or publicly

19

perform works or copies of works from which CMI has been removed or
altered with knowledge of the removal or alteration of the CMI and also
with knowledge that the dissemination will "induce, enable, facilitate,
or conceal" copyright infringement.

Unlike section 106 of Title 17, which sets out copyright's five
exclusive rights, section 1202(b)(3) covers only two of them—
distribution and public performance. This has important implications
for the proper interpretation of section 1202(b)(3) in the larger statutory
scheme. Section 1202(b)(3) has both an infringement-facilitation
requirement and an exclusive right nexus. Accordingly, the provision
Congress ultimately adopted, by its terms, did not apply to all CMI
removal; nor did it apply to all the copyright rights granted by
section 106, given the focus on preventing unauthorized digital
distribution or public performance of identical copies.[3] Making copies of
works from which CMI has been removed or altered, creating derivative

———————————————

[3] Notably, a section 106(3) "distribution" also requires the preexistence
of a copy because it requires a "sale *or other transfer* of ownership, or by
rental, lease, or lending"—that is, there must be a preexisting copy that
can be transferred, rented, leased, or lent (as opposed to a new
reproduction, derivative work, or public performance) (emphasis added).

20

works, and public displays of works whose CMI was removed or altered are not covered by section 1202(b)(3) at all.

In rejecting a plaintiff's attempt to claim a violation of section 1202(b)(3) based on the public display right, one court stated:

> If distribution included public display, then it would be superfluous for Congress to include public display [in section 106] as a separate exclusive right for a copyright owner when that right would be encompassed by the right to distribute. . . . [I]f Congress wanted to include public display as a violation of § 1202(b)(3) it certainly could have done so by specifically including public display in the statutory language. Congress chose not to do so, and the Court will not read public display into § 1202(b)(3)'s use of the term distribution.

*FurnitureDealer.Net, Inc. v. Amazon.com, Inc.*, No. 18-cv-232-JRT-HB, 2022 WL 891473 (D. Minn. Mar. 25, 2022) at *23; *see also Wright v. Miah*, No. 22-cv-4132, 2023 WL 6219435, at *7 (E.D.N.Y. Sept. 7, 2023) ("distribution" requires a "sale or transfer of ownership extending beyond that of a mere public display"). The same reasoning holds true for all exclusive rights omitted from that subsection.

This Court should take account of Congress's intentional exclusion of three highly significant exclusive rights that guard copyright owners' legitimate interests. *See Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) ("The doctrine of *expressio unius est exclusio*

21

*alterius* 'as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions.' . . . Copyright is a creature of statute, so we will not lightly insert common law principles that Congress has left out.") (citation omitted); *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 405 (2d Cir. 2018) ("The special features of copyright make the application of the *expressio unius* canon especially appropriate. . . . The copyright regime that Congress had adopted and over time amended reflects a legislative balancing of rights and duties with unique features.") (citation omitted). Non-identical copies may infringe copyrights because they constitute a substantially similar reproduction of the expression in plaintiffs' works (also often known as derivative works), but section 1202 liability does not arise simply because an infringing work did not identify the source works' authors, even if the source works contained CMI which the

infringers ignored. These are not the kinds of copies to which section 1202, with its goal of lessening the risk of piracy, was directed.[4]

It is therefore vital to distinguish exact reproductions from inexact copies, which might be derivative works. Derivative works regularly have different authors and owners than their source works. With a movie version of a novel, for example, the novel's author has the copyright in the novel, while the movie studio is generally the author (through the work for hire doctrine), and copyright owner, of the movie. This Court has long recognized this rule. *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 522 (9th Cir. 1990) (agreeing with *Weissmann v. Freeman*, 868 F.2d 1313, 1317–18 (2d Cir. 1989)), that ownership and authorship of a derivative work is distinct from ownership and authorship of the original). A derivative work authored by another that did not include the original's CMI would neither have removed nor altered the CMI of the original work.

---------------

[4] There can be substantial overlap between the derivative works right and reproduction right, but section 1202 does not require the Court to distinguish them because it also excludes reproduction from the covered rights.

Honoring the literal meanings of "remove" and "alter," and the significance of the omitted exclusive rights, yields an interpretation of section 1202 consistent with Congressional intent. Further, it avoids a morass in which the author of a derivative work could face potential 1202 liability for failing to name the source work's author in her work, and also face potential liability for providing false CMI if she did so. *Cf. Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 36 (2003) (disfavoring interpretation of trademark statute that would risk liability both for crediting and for not crediting original).

## III. Courts Have Properly Limited Section 1202 Liability to Identical Copies to Ensure That It Applies Only to Removal or Alteration of CMI

Courts have followed section 1202's text by limiting its application to claims against defendants that have removed or altered CMI from a plaintiff's original work. To do this, most courts have distinguished between claims against defendants that have reproduced or distributed entire or partial exact copies of the plaintiff's original work—having removed or altered the CMI —and defendants that have produced new, distinct works. Some courts call this identicality; some use different terms; some simply apply section 1202 when the works are the same

24

and do not when they are not. However it is termed, an identicality requirement helps courts infer whether or not the CMI on an original work was tampered with—and thus whether section 1202 was violated. Accordingly, "[a]s a rule, the works must be identical for there to be a violation." 3 Paul Goldstein, *Goldstein on Copyright* § 7.18 at 6 (2025-2 Supp.).

### A. Courts Have Limited the Application of Section 1202 to Identical Works

Some courts have expressly required the plaintiff's and defendant's works to be "identical" in order to find a section 1202 violation. *Kirk Kara Corp. v. W. Stone & Metal Corp.*, No. 20-cv-1931, 2020 WL 5991503, at *6 (C.D. Cal. Aug. 14, 2020) ("no DMCA violation exists where the works are not identical"); *O'Neal v. Sideshow, Inc.*, 583 F. Supp. 3d 1282, 1287 (C.D. Cal. 2022) (quoting *Kirk Kara*); *Dolls Kill, Inc. v. Zoetop Bus. Co.*, No. 22-cv-1463-RGK-MAA, 2022 WL 16961477, at *4 (C.D. Cal. Aug. 25, 2022) (same); *Advanta-STAR Auto. Rsch. Corp. of Am. v. Search Optics, LLC*, 672 F. Supp. 3d 1035, 1057 (S.D. Cal. 2023) (same).

Most courts use the same approach, though the term "identical" has a few stand-ins. Courts have said that a section 1202 claim doesn't

lie when the defendant incorporates a plaintiff's "product or original work" into a "different product." *Faulkner Press, L.L.C. v. Class Notes, L.L.C.*, 756 F. Supp. 2d 1352, 1359 (N.D. Fla. 2010). A claim doesn't lie where a defendant only "copied aspects of" an original work rather than "directly reproduc[ing]" it. *Design Basics*, 2019 WL 527535, at *5. A section 1202 claim has failed where the defendant produced a "nonidentical rendition" or a "separate work" and thus had not "remov[ed] [CMI] from a copyrighted work." *Kipp Flores v. AMH*, 2022 WL 4352480, at *4; *Kipp Flores Architects, LLC v. Pradera SFR, LLC*, No. 21-cv-673-XR, 2022 WL 1105751, at *3 (W.D. Tex. April 13, 2022) (using the same reasoning in a case involving the same plaintiff). A claim has similarly failed where it "conflate[d]" the plaintiff's with the defendant's works. *Michael Grecco Prods., Inc. v. Time USA, LLC*, No. 20-cv-4875-NRB, 2021 WL 3192543, at *5 (S.D.N.Y. July 27, 2021) (refusing to apply section 1202(a) where the plaintiff "conflate[d] the Photographs with the Covers" and defendant *Time* magazine "created unique Covers using plaintiff's Photographs").

Whatever the terminology, courts follow the text of section 1202 by asking whether a defendant "remove[d] [CMI] from the plaintiff's

original work" or instead "incorporated the plaintiff's copyrighted materials into its own work," creating "distinct products." *Park v. Skidmore, Owings & Merrill LLP*, No. 17-cv-4473-RJS, 2019 WL 9228987, at *11 (S.D.N.Y. Sept. 30, 2019) (deciding a section 1202(a) claim and citing *Faulkner*, 756 F. Supp. 2d at 1359–60).

Similarly, some courts find support for section 1202 violations when the works in question are substantially identical as a factual matter. *See, e.g., Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P.*, 948 F.3d 261, 275–76 (5th Cir. 2020) (changing the PDF file names of a subscription-only newsletter and distributing these PDF files to others without subscriptions could support a section 1202 violation); *Ruby Mtn. Heli-Ski Guides, Inc. v. SledNV, Inc.*, No. 24-cv-211-MMD-CSD, 2025 WL 1587808, at *6–7 (June 5, D. Nev. 2025) (granting summary judgment to the plaintiff on a section 1202(a) claim where a specific photo of the plaintiff's—the "Seitz Canyon photo"—was included on the defendant's website but with the defendant's CMI). While these courts did not discuss an identicality requirement *per se*, the cases are straightforward applications of section 1202 precisely because they involved substantially identical works.

27

### B.   Identicality Supports an Inference of Removal or Alteration of CMI

Identicality is important because it supports an inference of CMI removal or alteration from the plaintiff's work, rather than mere omission of CMI from a new work. This Court, in *Friedman v. Live Nation Merch., Inc.*, for example, found that where the accused photographs were "exact copies of the images precisely as they appeared" in the original sources, this created a "compelling inference that [defendant] directly copied from those sources." 833 F.3d 1180, 1188 (9th Cir. 2016). Indeed, "the *only* material difference in the [defendant] versions was that the CMI was missing," rendering it "necessarily the case that the CMI had been removed on the copied version." *Id.* Similarly, where the photos at issue were identical but for a gutter credit change, the Second Circuit considered this an indication that the defendant knew that CMI had been removed or altered. *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 169–73 (2d Cir. 2020). *See also Greg Young Publ'g, Inc. v. CafePress, Inc.*, No. 15-cv-6013-MWF, 2016 WL 6106752, at *5 (C.D. Cal. Jan. 25, 2016) (an allegation that Defendant resized and cropped images, causing CMI to be removed, was "sufficient

to create a plausible inference that Defendant intentionally removed CMI" from the images).

A *lack* of identicality between a plaintiff's and defendant's works— that is, where the works are distinct and separate from one another— supports the opposite inference. In *Kirk Kara*, for example, the court's "review of the side-by-side images included in the Complaint" allowed it to determine that the works were not the same and thus that CMI had not been removed from the original work. *Kirk Kara*, 2020 WL 5991503, at *6 ("Defendant did not make *identical* copies of Plaintiff's works and then remove the engraved CMI"). Similarly, in *Dolls Kill, Inc. v. Zoetop*, a court considering "knock-off" fashion explained that "[r]e-creating another party's work may be unlawful, but it does not necessarily implicate the DMCA because copying a work does not require the removal or alteration of CMI." *Dolls Kill, Inc.*, 2022 WL 16961477 at *3. In that case, despite "similarities," the products were "not exactly the same." *Id.* at *4. That there were differences "undercut any inference that Defendants removed or altered Plaintiff's CMI. To find otherwise would be to speculate that by merely omitting CMI, Defendants must have necessarily removed it. The Court declines to speculate." *Id*.

29

Courts across the country have taken this approach. For example, in a pair of Texas cases involving architectural drawings, there could be no CMI removal where a defendant "generate[d] nonidentical renditions" of the plaintiff's work, because "CMI cannot be 'removed' from a new work that never included the CMI to begin with." *Kipp Flores v. Pradera*, 2022 WL 1105751, at *3; *Kipp Flores v. AMH*, 2022 WL 4352480, at *4. The District of Hawaii found that, even where works appeared "virtually identical" in the end, "basing a drawing on another's work is not the same as removing copyright management information." *Id. Frost-Tsuji Architects*, 2014 WL 5798282, at *5. Courts in New York, Florida, and Illinois have reasoned similarly. *We the Protesters, Inc. v. Sinyangwe*, 724 F. Supp. 3d 281, 296–297 (S.D.N.Y 2024), *Faulkner*, 756 F. Supp. 2d at 1359–60 (Florida); *Design Basics*, 2019 WL 527535, at *5 (Illinois).

This approach holds even in cases where courts explicitly declined to apply an "identicality" requirement. In *ADR Int'l Ltd. v. Inst. for Supply Mgmt.,* for example, a Texas court rejected an identicality requirement in applying section 1202—but on facts that likely met such a requirement. 667 F. Supp. 3d 411, 430 (S.D. Tex. 2023). In that case,

30

the defendant alleged "verbatim, or nearly verbatim" copying of portions of the plaintiff's copyrighted professional training materials, with slight changes in color and font, "stripped" of the plaintiff's CMI and "replaced with . . . [defendant's] name and logo, falsely claiming to be the author and copyright owner[.]" *Id.* at 418–19, 431. *See also New Parent World, LLC v. True to Life Prods., Inc.*, No. 23-cv-8089-PCT-DGC, 2024 WL 4277865, at *2–3 (D. Ariz. Sept. 24, 2024) (denying the defendant's motion to dismiss a section 1202(b) claim for alleged copying and transcribing of copyrighted audio and DVD content in a "substantially similar or word-for-word" manner).

These cases, then, are not in tension with an identicality requirement because, in each case, plaintiffs properly alleged removal or alteration of CMI from their original works, with sufficient support for the courts to infer this. Indeed, in *New Parent World*, the court noted that "[s]ome cases hold that a work falls outside the DMCA if it is 'unquestionably a distinct work,'" but found that the defendants before it had failed to provide a basis to support such a finding. *Id.* at *3, quoting Crowley v. Jones*, 608 F. Supp. 3d 78, 90 (S.D.N.Y. 2022).

These courts also appear to have followed a red herring by assuming that an "identicality" test requires letter-perfect congruence between works. *See, e.g.*, *New Parent World*, 2024 WL 4277865 at *3 (quoting *Nimmer on Copyright* at § 12A.10). But as the case examples above show, it is not the case that "changing one sentence" in a "300-page book" necessarily would defeat a section 1202 claim. *Contra*, *Nimmer on Copyright*, *supra*. Rather, an identical reproduction can be whole or partial, so long as the reproduction on its face supports the inference of CMI removal or alteration. *See, e.g.*, *Real World Media LLC v. Daily Caller, Inc.*, 744 F. Supp. 3d 24, 40 (D.D.C. 2024) (finding that an "*exact copy* of *portions* of an original work" can support a section 1202 claim); *see also Stevens*, 899 F.3d at 672 (downsized copies of copyrighted photographs, which have fewer pixels than the original photographs but depict the same image, can support a section 1202(b) claim). In each of these cases, the works in question were substantially identical, supporting an inference that CMI was actually removed or altered from the plaintiff's work.

In sum, courts, regardless of whether they've used the term "identicality," have consistently applied section 1202 when there is

exact copying of the plaintiff's original work, and not when there is incorporation into a defendant's separate, distinct work—because this is when removal or alteration of CMI from the plaintiff's original work can be inferred. By doing so, courts have applied section 1202 within its textual parameters and according to Congress's purpose in creating it. A defendant's new, distinct work may copy a little or a lot of the plaintiff's work. It may or may not infringe the plaintiff's section 106 rights. It may or may not be a fair use. But it should not violate section 1202.

## CONCLUSION

For the foregoing reasons, Amici respectfully request that this Court *affirm* the decision below.

Dated: July 18, 2025

Respectfully submitted,

/s/ *Jennifer M. Urban*
Jennifer M. Urban
Erik Stallman
Samuelson Law, Technology &
   Public Policy Clinic
UC Berkeley School of Law
353 Law Building
Berkeley, California 94720-7200
(510) 642-7338
jurban@law.berkeley.edu

*Counsel for Amici Curiae*

33

## CERTIFICATE OF COMPLIANCE

I, Jennifer M. Urban, certify that the foregoing brief amici curiae complies with the word limit of Fed. R. App. P. 29(a)(5) because it contains **6,370 words**, excluding the items exempted by Fed. R. App. P. 32(f). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2024 in Century Schoolbook 14-point font.

Dated: July 18, 2025         */s/ Jennifer M. Urban*
                                                    Jennifer M. Urban

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system. I further certify that to my knowledge all participants in the case are registered ACMS users so service on them will be accomplished through the appellate ACMS system.

Dated: July 18, 2025

/s/ *Jennifer M. Urban*
Jennifer M. Urban

# APPENDIX

# APPENDIX – LIST OF AMICI

Amici are listed in alphabetical order by last name, below.

**Michael W. Carroll**
Professor of Law
American University Washington College of Law

**Zachary L. Catanzaro**
Assistant Professor of Law
Widener University Delaware Law School

**Jim Gibson**
Sesquicentennial Professor of Law
University of Richmond School of Law

**Paul Heald**
Albert J. Harno & Edward W. Cleary Chair in Law (Emeritus)
University of Illinois College of Law

**Laura A. Heymann**
James G. Cutler Professor of Law
William & Mary Law School

**Timothy T. Hsieh**
Associate Professor of Law
Oklahoma City University School of Law

**Peter Jaszi**
Emeritus Professor of Law
American University Washington College of Law

**Mark A. Lemley**
William H. Neukom Professor of Law
Stanford Law School

**Yvette Joy Liebesman**
Professor of Law
Saint Louis University School of Law

**Joseph Liu**
Professor of Law and Dean's Distinguished Scholar
Boston College Law School

**Mark P. McKenna**
Professor of Law
UCLA School of Law

**Matthew Sag**
Jonas Robitscher Professor of Law in Artificial Intelligence,
Machine Learning, and Data Science
Emory University

**Pamela Samuelson**
Richard M. Sherman Distinguished Professor of Law
UC Berkeley School of Law

**Jason Schultz**
Professor of Law
New York University School of Law

**Jessica Silbey**
Professor of Law and Honorable Frank R. Kenison
Distinguished Scholar in Law
Boston University School of Law

**Rebecca Tushnet**
Frank Stanton Professor of the First Amendment
Harvard Law School